# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:08-cv-01236-CBS-BNB

**ACE AMERICAN INSURANCE CORPORATION, a Pennsylvania corporation,
INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation,
NATIONAL SURETY CORPORATION, an Illinois corporation, and
THE AMERICAN INSURANCE COMPANY, an Ohio corporation,**

**Plaintiffs,**

**v.**

**AURORA DAIRY CORPORATION d/b/a AURORA ORGANIC DAIRY, a Delaware corporation,**

**Defendant.**

---

**AURORA DAIRY CORPORATION d/b/a AURORA ORGANIC DAIRY, a Delaware corporation,**

**Counterplaintiff,**

**v.**

**ACE AMERICAN INSURANCE CORPORATION, a Pennsylvania corporation,
INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation,
NATIONAL SURETY CORPORATION, an Illinois corporation,
THE AMERICAN INSURANCE COMPANY, an Ohio corporation,
GENERAL FIRE & CASUALTY COMPANY, an Idaho corporation, and
AMERICAN FARMERS & RANCHERS MUTUAL INSURANCE COMPANY, an Oklahoma corporation,**

**Counterdefendants.**

---

### ANSWER, AFFIRMATIVE DEFENSES AND FIRST AMENDED COUNTERCLAIM OF DEFENDANT AURORA DAIRY CORPORATION TO PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

---

Defendant Aurora Dairy Corporation d/b/a Aurora Organic Dairy ("Aurora" or

"Defendant"), by its counsel, as and for its Answer, Affirmative Defenses and First Amended

Counterclaim to the Complaint for Declaratory Relief of Plaintiffs ACE American Insurance

Corporation ("ACE"), Indemnity Insurance Company of North America ("IICNA"), National

Surety Corporation ("NSC"), and The American Insurance Company ("AIC") (collectively, the

"Plaintiffs") states as follows:

1.      Plaintiff ACE American Insurance Company ("ACE") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

**ANSWER:**

Aurora is without knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 1 and on that basis, denies them.  Except as

expressly admitted, Aurora denies any remaining allegations in Paragraph 1.

2.      Plaintiff Indemnity Insurance Company of North America ("IICNA") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

**ANSWER:**

Aurora is without knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 2 and on that basis, denies them.  Except as

expressly admitted, Aurora denies any remaining allegations in Paragraph 2.

3.      Plaintiff National Surety Corporation ("NSC") is an Illinois corporation with its principal place of business in Chicago, Illinois.

**ANSWER:**

Aurora is without knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 3 and on that basis, denies them.  Except as

expressly admitted, Aurora denies any remaining allegations in Paragraph 3.

4.      Plaintiff The American Insurance Company ("AIC") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

**ANSWER**:

Aurora is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 4 and on that basis, denies them.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 4.

5.      Collectively ACE, IICNA, NSC, and AIC are referred to in this Complaint as the Insurers.

**ANSWER**:

Aurora admits that through this Complaint, Plaintiffs purport to refer to ACE, IICNA, NSC and AIC collectively as the "Insurers."  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 5.

6.      Aurora Dairy Corporation ("Aurora") is a Delaware corporation with its principal place of business in Colorado.

**ANSWER**:

Aurora admits the allegations in Paragraph 6.

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  The Insurers and Aurora do not share a common state residence and the amount in controversy exceeds $75,000.  The Insurers seek a declaration of their rights pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*.

**ANSWER**:

Aurora admits that Plaintiffs purport to assert jurisdiction pursuant to 28 U.S.C. § 1332. Aurora further admits that jurisdiction appears to exist under 28 U.S.C. § 1332, as Plaintiffs have alleged that none of them share a common state of residence with Aurora and that the amount in controversy exceeds $75,000.  Aurora further admits that Plaintiffs purport to seek a declaration of their rights pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq. Aurora denies that Plaintiffs are entitled to any relief whatsoever, including, but not limited to, the relief sought in Plaintiffs' Complaint.  Aurora specifically denies that Plaintiffs are entitled to

a declaratory judgment regarding their obligation to indemnify Aurora, as such a declaration would be premature.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 7.

8.      Aurora is in the business of processing milk that has been certified as "organic." Through its dairy processing business, Aurora supplies milk that has been certified as organic to retailers.  On information and belief, Aurora sells the milk it processes and certifies as organic to retailers.  The retailers then sell the milk under their own store brand or label.

**ANSWER:**

Aurora admits that it produces organic milk which is sold by various retailers under the respective retailers' store brands and labels, as well as through Aurora's own label, "High Meadow."  Aurora further admits that it markets and sells milk with the "USDA Organic" seal in accordance with the organic certifications issued to Aurora by two certifying agents -- the Colorado Department of Agriculture ("CDA") and Quality Assurance International ("QAI") -- acting pursuant to the authority vested in them by the United States Department of Agriculture ("USDA") under the Organic Food Production Act of 1990 ("OFPA") (7 U.S.C. 6501 et seq.) and the National Organic Program ("NOP") regulations (7 C.F.R. Part 205 et seq.).  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 8.

9.      Aurora has been named as a defendant in numerous consumer class actions in which the named plaintiffs seek certification of statewide and nationwide classes of individuals claiming to have sustained an economic loss because they paid a higher price for the milk processed by Aurora based on the allegedly false certification that it was "organic." It is alleged that because of the allegedly false certification that the milk was organic Aurora obtained more revenue for the milk than it would have obtained for non-organic milk.  The plaintiffs in the pending class actions claim that Aurora has been "unjustly enriched" and should be required to disgorge to the class members the amount paid to purchase the milk that was falsely represented to be "organic." Aurora has requested that the Insurers provide it with a defense in the pending consumer class actions.

**ANSWER:**

Aurora admits that it has been named in thirteen (13) consumer class actions (the "underlying actions"), which were filed in the courts of six (6) different states and have been

4

consolidated pursuant to 28 U.S.C. § 1407 before the United States District Court for the Eastern District of Missouri in the action In re Aurora Dairy Corporation Organic Milk Marketing and Sales Practice Litigation ("In re Aurora Dairy Corp.").  Aurora further admits that it tendered a request that Plaintiffs provide it with a defense in the underlying actions.  By way of further response, Aurora affirmatively states that allegations of bodily injury, property damage, personal injury and/or advertising injury are included in the foregoing actions and that Plaintiffs have wrongfully refused to defend Aurora in twelve of the thirteen underlying actions.  Aurora further states that the allegations and claims in the underlying actions speak for themselves and, to the extent that the allegations in Paragraph 9 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 9.

10.     ACE, IICNA, and NSC have agreed to provide a defense to Aurora in the action captioned:  Katherine Mothershead and Leonie Lloyd v. Aurora Dairy Corporation d/b/a Aurora Organic Dairy, Case No. 4:07-cv-01701, U.S.D.C. for the Eastern District of Missouri, filed October 7, 2007 (the "Mothershead action").  A true and correct copy of the Complaint in the Mothershead action is attached as Exhibit A to this Complaint.

**ANSWER:**

Aurora admits that a true and correct copy of the complaint filed in Mothershead v. Aurora Dairy Corporation d/b/a Aurora Organic Dairy, Case No. 4:07-cv-01701 (E.D. Mo. filed October 7, 2007) ("Mothershead") is attached to Plaintiffs' Complaint as Exhibit A.  Aurora further admits that ACE, IICNA and NSC agreed to pay defense costs incurred by Aurora in the Mothershead action but, to date, they have refused to actually reimburse Aurora for any of the costs it has incurred, in spite of repeated requests.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 10.

11.     In the Mothershead action ACE, IICNA and NSC reserved the right to deny coverage and withdraw from the defense based on certain terms and conditions of their respective insurance contracts.  The Insurers also reserved the right to recover back defense costs incurred if it is determined they had no duty to defend.

**ANSWER**:

Aurora admits that Plaintiffs purported to reserve certain "rights" in correspondence dated January 14, 2008 (sent by NSC and AIC) and January 28, 2008 (sent by IICNA and ACE), but Aurora expressly denies that such "rights" exist or that any such "reservation" was proper or appropriate.  Aurora affirmatively states that the January 14, 2008 letter was not received by Aurora until on or about April 15, 2008 -- when NSC and AIC resent the letter to Aurora by e-mail -- due to the fact that the January 14, 2008 letter was sent to the wrong address by NSC and AIC.  By way of further response, Aurora expressly denies that Plaintiffs have paid any defense costs whatsoever.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 11.

12.    To date, Aurora has not responded to the offers made by ACE, IICNA, and NSC to defend it in the Mothershead action.

**ANSWER**:

Aurora denies the allegations in Paragraph 12.

13.    In this action the Insurers are seeking a declaration that they have no obligation to defend or indemnify Aurora in the Mothershead action.

**ANSWER**:

Aurora admits that through this lawsuit, Plaintiffs purport to seek a declaration that they have no obligation to defend or indemnify Aurora in the Mothershead action.  Aurora denies that Plaintiffs are entitled to any relief whatsoever, including, but not limited to, the relief sought in their Complaint.  By way of further response, Aurora affirmatively states that Plaintiffs' request for a declaration regarding their duty to indemnify Aurora is premature.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 13.

14.    For the policy period August 1, 2002 – August 1, 2003, ACE provided general liability coverage to Aurora through policy number FO-139293, a copy of which is attached as Exhibit B.  The general liability coverage issued to Aurora was renewed by ACE for the policy

period August 1, 2003 – August 1, 2004 through the same policy number, FO-139293.  During both policy periods, the coverage was subject to a $1,000,000 "each occurrence" limit of liability and a $2,000,000 aggregate.

**ANSWER:**

Aurora admits that ACE provided general liability coverage to Aurora during the policy periods and through the policy numbers listed in Paragraph 14.  Aurora further admits that a copy of Policy No. FO-139293 appears to be attached to the Complaint as Exhibit B.  Policy No. FO-139293 speaks for itself and, to the extent that the allegations in Paragraph 14 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 14.

15.     For the policy period August 1, 2002 – August 1, 2003, IICNA provided general liability coverage to Aurora through policy number FO-139292, a copy of which policy is attached as Exhibit C.  For the policy period August 1, 2003 – August 1, 2004, IICNA provided general liability coverage to Aurora through policy numbers FO-146246 and FO-146297, copies of which are attached as Exhibits D and E, respectively.  During both policy periods, the coverage was subject to a $1,000,000 "each occurrence" limit of liability and a $2,000,000 aggregate.

**ANSWER:**

Aurora admits that IICNA provided general liability coverage to Aurora during the policy periods and through the policies listed in Paragraph 15.  Aurora further admits that copies of Policy Nos. FO-139292, FO-146246 and FO-146297 appear to be attached to the Complaint as Exhibits C, D and E, respectively.  Policy Nos. FO-139292, FO-146246 and FO-146297 speak for themselves and, to the extent that the allegations in Paragraph 15 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 15.

16.     For the policy period May 1, 2005 – May 1, 2006, NSC provided general liability coverage to Aurora through policy number S 86 MXX 80843533.  The general liability coverage issued to Aurora was renewed by NSC for the policy period May 1, 2006 – May 1, 2007 through policy number S 86 MXX 80859105.  During both policy periods, the coverage was subject to a $1,000,000 "each occurrence" limit of liability and a $2,000,000 aggregate.  Attached as Exhibit

F is a true and correct copy of policy number S 86 MXX 80843533.  Attached as Exhibit G is a true and correct copy of policy number S 86 MXX 80859105.

**ANSWER:**

Aurora admits that NSC provided general liability coverage to Aurora during the policy periods and through the policies listed in Paragraph 16.  Aurora further admits that at least portions of copies of Policy Nos. S 86 MXX 80843533 and S 86 MXX 80859105 appear to be attached to the Complaint as Exhibits F and G, respectively.  Policy Nos. S 86 MXX 80843533 and S 86 MXX 80859105 speak for themselves and, to the extent that the allegations in Paragraph 16 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 16.

17.     The policies discussed in Paragraphs 14, 15 and 16 are referenced collectively in this Complaint as "the CGL Policies."

**ANSWER:**

Aurora admits that in their Complaint, Plaintiffs purport to refer to the policies discussed in Paragraphs 14, 15 and 16 of the Complaint collectively as "the CGL Policies."  Aurora affirmatively states that the policies identified in Paragraph 17 vary.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 17.

18.     The relevant policy language included in each of the CGL Policies is identical and is being discussed collectively herein.

**ANSWER:**

The CGL Policies speak for themselves and, to the extent that the allegations in Paragraph 18 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 18.

19.     The insuring agreement that applies to "bodily injury" and "property damage" under the CGL Policies provided:

**Section I — Coverages**

**Coverage A Bodily injury and Property Damage Liability**

1.      **Insuring Agreement**

a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies.  We will have the right and duty to defend the insured against any **suit** seeking those damages. However, we will have no duty to defend the insured against any suit seeking damages for **bodily injury** or **property damage** to which this insurance does not apply.  We may at our discretion investigate any **occurrence** and settle any claim or **suit** that may result.  But:

(1)     The amount we will pay for damages is limited as described in Section III - Limits of Insurance; and

(2)     Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

b.      This insurance applies to **bodily injury** and **property damage** only if:

(1)     The **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**;

(2)     The **bodily injury** or **property damage** occurs during the policy period; and

(3)     Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is an Insured and no **employee** authorized by you to give or receive notice of an **occurrence** or claim, knew that the **bodily injury** or **property damage** had occurred, in whole or in part.  If such a listed insured or authorized **employee** knew, prior to the policy period, that the **bodily injury** or **property damage** occurred, then any continuation, change or resumption of such **bodily injury** or **property damage** during or after the policy period will be deemed to have been known prior to the policy period.

**ANSWER:**

The CGL Policies speak for themselves and, to the extent that the allegations in

Paragraph 19 vary therewith, Aurora denies those allegations.  Except as expressly admitted,

Aurora denies any remaining allegations in Paragraph 19.

20.    To fall within this insuring agreement to the CGL Policies the following requirements must be met:

☐    The insured must be legally required to pay damages as a result of "bodily injury" or "property damage" caused by an "occurrence";

☐    The "bodily injury" or "property damage" must occur during the policy period; and

☐    Prior to the policy period no insured can have had knowledge of the "bodily injury"; "property damage"; "occurrence"; "claim"; or "suit".

**ANSWER:**

Paragraph 20 is a legal conclusion for which no answer is required.  To the extent an

answer is required, Aurora states that the CGL Policies speak for themselves and, to the extent

that the allegations in Paragraph 20 vary therewith, Aurora denies those allegations.  Except as

expressly admitted, Aurora denies any remaining allegations in Paragraph 20.

21.    Coverage under the CGL Policies is provided only for "damages."  The amounts sought by the plaintiffs in the underlying <u>Mothershead</u> action representing disgorgement or restitution do not constitute "damages" covered by the CGL Policies.

**ANSWER:**

Aurora denies the allegations in Paragraph 21.

22.    The term "property damage" in the CGL Policies is defined as follows:

17.    **Property damage** means:

a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.      Loss of use of tangible property that is not physically injured.   All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.

**ANSWER:**

The CGL Policies speak for themselves and, to the extent that the allegations in Paragraph 22 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 22.

23.      The economic losses complained of by the plaintiffs in the Mothershead action were not the result of physical damage to or loss of use of tangible property.

**ANSWER:**

Aurora denies the allegations in Paragraph 23.

24.      The term "bodily injury" is defined in the CGL Policies as follows:

3.      **Bodily injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**ANSWER:**

The CGL Policies speak for themselves and, to the extent that the allegations in Paragraph 24 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 24.

25.      No plaintiff in the Mothershead action alleges that he or she sustained "bodily injury," "sickness" or "disease" as a result of Aurora's false certification that the milk it processed was "organic."

**ANSWER:**

Aurora denies the allegations in Paragraph 25.

26.      The term "occurrence" is defined in the CGL Policies as follows:

13.      **Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**ANSWER**:

The CGL Policies speak for themselves and, to the extent that the allegations in Paragraph 26 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 26.

27.     The Plaintiffs in the <u>Mothershead</u> action do not allege that they sustained "bodily injury" or "property damage" as a result of an "accident."

**ANSWER**:

Aurora denies the allegations in Paragraph 27.

28.     The CGL Policies incorporate the following exclusion:

This insurance does not apply to:

a.      Expected or Intended Injury

**Bodily injury** or **property damage** expected or intended from the standpoint of the insured.  This exclusion does not apply to **bodily injury** resulting from the use of reasonable force to protect persons or property.

**ANSWER**:

The CGL Policies speak for themselves and, to the extent that the allegations in Paragraph 28 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 28.

29.     To the extent damages were sought in the <u>Mothershead</u> action for "bodily injury" or "property damage" the exclusion for "bodily injury" or "property damage" that is expected or intended would preclude coverage.

**ANSWER**:

Aurora denies the allegations in Paragraph 29.

30.     The insuring agreements in the CGL Policies that apply to the "personal injury and advertising injury" provide:

**Coverage B Personal and Advertising Injury Liability**

1.      **Insuring Agreement**

a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of **personal and advertising injury** to which this insurance applies.  We will have the right and duty to defend the insured against any **suit** seeking those damages. However, we will have no duty to defend the insured against any **suit** seeking damages for **personal and advertising injury** to which this insurance does not apply.  We may, at our discretion, investigate any offense and settle any claim or suit that may result. But:

(1)   The amount we will pay for damages is limited as described in Section III — Limits of Insurance; and

(2)   Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

b.   This insurance applies to **personal and advertising injury** caused by an offense arising out of your business but only if the offense was committed in the **coverage territory** during the policy period.

**ANSWER:**

The CGL Policies speak for themselves and, to the extent that the allegations in Paragraph 30 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 30.

31.   The term "personal and advertising injury," is defined in the CGL Policies as follows:

14.   **Personal and advertising injury** means injury, including consequential **bodily injury**, arising out of one or more of the following offenses:

a.   False arrest, detention or imprisonment;

b.   Malicious prosecution;

c.   The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or

13

premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your **advertisement**; or

g. Infringing upon another's copyright, trade dress or slogan in your **advertisement**.

**<u>ANSWER</u>:**

The CGL Policies speak for themselves and, to the extent that the allegations in Paragraph 31 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 31.

32. No damages are sought in the <u>Mothershead</u> action for "personal and advertising injury" as those terms are defined in the CGL Policies.

**<u>ANSWER</u>:**

Aurora denies the allegations in Paragraph 32.

33. The CGL Policies incorporate the following exclusion:

This insurance does not apply to:

g. Quality or Performance of Goods - Failure to Conform to Statements

 **Personal and advertising injury** arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your **advertisement**.

**ANSWER:**

The CGL Policies speak for themselves and, to the extent that the allegations in Paragraph 33 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 33.

34.     To the extent damages were sought in the <u>Mothershead</u> action for "personal and advertising injury" the exclusion for Quality or Performance of Goods would preclude coverage.

**ANSWER:**

Aurora denies the allegations in Paragraph 34.

35.     AIC provided liability coverage to Aurora and certain related entities under policy number 643 FRM8025025, issued to Aurora Dairy Corp. for the period June 1, 2005 – June 1, 2006.  This policy was subject to a $1,000,000 limit of liability that applied to each occurrence and a $2,000,000 aggregate.  Policy number 643 FRM0664651 was issued to Aurora Organic Dairy of Texas, Inc., Aurora Dairy Corp., and TXAGR Real Estate Holdings, LLC for the period June 1, 2005 – June 1, 2006.  Policy number 643 FRM0664651 was subject to a $1,000,000 limit of liability that applied to each occurrence and a $2,000,000 aggregate.  Policy number 643 FRM80253328 was issued to Aurora Dairy Corp. for the period June 1, 2006 – June 1, 2007 and was subject to a $1,000,000 limit of liability that applied to each occurrence and a $2,000,000 aggregate.  Policy number 643 FRM06646251 was issued to Aurora Organic Dairy of Tx., Inc., Aurora Dairy Corp. and TXAGR Real Estate Holdings, LLC for the period June 1, 2006 – June 1, 2007 and was subject to a $1,000,000 limit of liability that applied to each occurrence and a $2,000,000 aggregate.  The policies described in this Paragraph will be referenced in this Complaint as the AIC Policies.

**ANSWER:**

Aurora admits that AIC provided general liability coverage:

- to Aurora Dairy Corporation under Policy No. 6 43 FRM80250251 from June 1, 2005 through June 1, 2006;

- to Aurora Organic Dairy Texas, Inc. under Policy No. 6 43 FRM06646251 from June 1, 2006 through June 1, 2007; and

- to Aurora Dairy Corporation under Policy No. 6 43 FRM80255328 from June 1, 2006 through June 1, 2007.

Aurora further states that in their Complaint, Plaintiffs incorrectly identify the policies at issue as 643 FRM8025025, 643 FRM06646251, and 643 FRM80253328 and refer to them collectively as the "AIC Policies."  By way of further response, Aurora states that the correct policy numbers are apparently 6 43 FRM80250251, 6 43 FRM06646251 and 6 43 FRM80255328.  Policy Nos. 6 43 FRM80250251, 6 43 FRM06646251 and 6 43 FRM80255328 speak for themselves and, to the extent that the allegations in Paragraph 35 vary therewith, Aurora denies those allegations. Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 35.

36.     The insuring agreement and definitions found in the AIC Policies do not differ materially from the insuring agreement and definitions in the ACE, IICNA, and NSC policies.  In addition, the AIC Policies incorporate the following exclusion:

This insurance does not apply to:

i.     Business Pursuits

**Bodily injury** or **property damage** arising out of or in connection with a business engaged in by an **insured**.  This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the business.

This exclusion does not apply to an insured minor involved in self-employed business pursuits that are occasional or part-time and customarily undertaken on that basis by minors.

**ANSWER:**

Policy Nos. 6 43 FRM80250251, 6 43 FRM06646251 and 6 43 FRM80255328 speak for themselves and, to the extent that the allegations in Paragraph 36 vary therewith, Aurora denies those allegations.  Aurora expressly denies that the insuring agreement and definition in the AIC Policies do not differ materially from the insuring agreement and the definitions found in the ACE, IICNA and NSC Policies.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 36.

37.    The term "business" is defined in the AIC Polices as follows:

> 3.    **Business** means a trade, profession, occupation, enterprise or activity, other than **farming** or **custom farming**, which is engaged in for the purpose of monetary or other compensation.

**ANSWER:**

Policy Nos. 6 43 FRM80250251, 6 43 FRM06646251 and 6 43 FRM80255328 speak for themselves and, to the extent that the allegations in Paragraph 37 vary therewith, Aurora denies those allegations.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 37.

38.    Aurora's potential liability in the <u>Mothershead</u> action arises out of the certifications it made as a processor and wholesaler of organic milk.  The "Business Pursuits" exclusion in the AIC Policies precludes coverage for the relief sought in the <u>Mothershead</u> action.

**ANSWER:**

Aurora denies the allegations in Paragraph 38.

39.    There is a real and justiciable controversy between Aurora and the Insurers as to whether or not the relief sought in the <u>Mothershead</u> action is potentially covered.  On information and belief Aurora contends that ACE, IICNA and NSC are obligated to provide it with a defense in the <u>Mothershead</u> action.  The Insurers contend that the relief requested in the <u>Mothershead</u> action is not covered and they have no obligation to defend Aurora.

**ANSWER:**

Aurora admits that there is a real and justiciable controversy as to whether Plaintiffs have a duty to reimburse Aurora for the cost of defense in the <u>Mothershead</u> action.  By way of further response, Aurora expressly denies that there is a justiciable controversy as to whether or not indemnification is owed to Aurora in the <u>Mothershead</u> action, because a determination as to Plaintiffs' indemnity obligations would be premature at this juncture.  By way of further response, Aurora admits that Plaintiffs claim they have no obligation to defend Aurora.  Aurora affirmatively states that Plaintiffs do have an obligation to defend Aurora, and Plaintiffs' claim

to the contrary is made in bad faith.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 39.

40.     ACE, IICNA, NSC, and AIC incorporate by reference the allegations set out in paragraphs 1 - 39 of this Complaint.

**ANSWER:**

Aurora incorporates its answers to Paragraphs 1-39 as if set forth fully herein.

41.     ACE, IICNA NSC, and AIC seek a declaration that they have no duty to defend or indemnify Aurora in the Mothershead action under the commercial liability policies described in this Complaint.

**ANSWER:**

Aurora admits that through this lawsuit, Plaintiffs purport to seek a declaration that they have no obligation to defend or indemnify Aurora in the Mothershead action.  Aurora denies that Plaintiffs are entitled to any relief whatsoever, including, but not limited to, the relief sought in their Complaint.  Aurora further denies that Plaintiffs are entitled to a declaratory judgment regarding their obligation to indemnify Aurora, as such a declaration would be premature.  Except as expressly admitted, Aurora denies any remaining allegations in Paragraph 41.

**WHEREFORE**, ACE, IICNA, NSC, and AIC request:

1.     A declaration that they have no duty to defend or indemnify Aurora in the Mothershead action;

2.     A declaration that they are entitled to recover back any amounts paid to defend Aurora in the Mothershead action; and

3.     Such other and further relief as this Court may deem just and appropriate.

**ANSWER:**

Aurora denies that Plaintiffs are entitled to any relief whatsoever, including, but not limited to, the relief requested in Plaintiffs' Complaint.  Aurora specifically denies that Plaintiffs have paid any amounts for the defense of the Mothershead litigation, in spite of Aurora's repeated requests.  Aurora further denies that Plaintiffs are entitled to a declaration regarding

their duty to indemnify Aurora, as such a declaration would be premature at this juncture. Except as expressly admitted, Aurora denies any remaining allegations in the preceding Paragraph.

## FIRST AFFIRMATIVE DEFENSE

1.      The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

2.      The claims of Plaintiffs are barred, in whole or in part, by the doctrines of waiver, estoppel and/or laches.

## THIRD AFFIRMATIVE DEFENSE

3.      Plaintiffs may be barred, in whole or in part, from recovery because they have made statements and/or taken actions that estop them from asserting their claims.

## FOURTH AFFIRMATIVE DEFENSE

4.      The claims of Plaintiffs are barred, in whole or in part, to the extent that they engaged in unlawful, inequitable or improper conduct.

## FIFTH AFFIRMATIVE DEFENSE

5.      The claims of Plaintiffs are barred, in whole or in part, because Plaintiffs have breached their duties to Aurora and their contractual obligations, including their duty of good faith and fair dealing.

## SIXTH AFFIRMATIVE DEFENSE

6.      Plaintiffs' request for a declaration regarding their duty to indemnify Aurora is barred as premature.

## SEVENTH AFFIRMATIVE DEFENSE

7.      Aurora has insufficient knowledge or information upon which to form a belief as to whether it may have additional affirmative defenses that govern the claims asserted by

Plaintiffs.  Aurora, therefore, reserves the right to raise additional defenses as appropriate in the future.

### AURORA DAIRY CORPORATION'S FIRST AMENDED COUNTERCLAIM

Counterplaintiff Aurora Dairy Corporation d/b/a Aurora Organic Dairy ("Aurora" or "Counterplaintiff"), by its counsel, as its First Amended Counterclaim against Counterdefendants, ACE American Insurance Corporation ("ACE"), Indemnity Insurance Company of North America ("IICNA"), National Surety Corporation ("NSC"), The American Insurance Company ("AIC") and General Fire & Casualty Company and its successor in interest American Farmers & Ranchers Mutual Insurance Company (collectively "GFC," and together with ACE, IICNA, NSC and AIC, "Counterdefendants") states as follows:

### The Parties

1.      Aurora is a Delaware corporation with its principal place of business in Colorado.

2.      Upon information and belief, ACE is a Pennsylvania corporation with its principal place of business in Pennsylvania.

3.      Upon information and belief, IICNA is a Pennsylvania corporation with its principal place of business in Pennsylvania.

4.      Upon information and belief, NSC is an Illinois corporation with its principal place of business in Illinois.

5.      Upon information and belief, AIC is an Ohio corporation with its principal place of business in Ohio.

6.      Upon information and belief, General Fire & Casualty Company was an Idaho corporation with its principal place of business in Idaho.  Also upon information and belief, American Farmers & Ranchers Mutual Insurance Co. acquired and became a successor in interest to General Fire & Casualty Company in approximately 2008, and American Farmers &

Ranchers Mutual Insurance Co. is an Oklahoma corporation with its principal place of business in Oklahoma.

## Jurisdiction and Venue

7.     This Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332 and Fed. R. Civ. P. 13, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     By filing a declaratory action against Aurora in this Court, ACE, IICNA, AIC and NSC have consented to personal jurisdiction before this Court.

9.     Personal jurisdiction before this Court is appropriate with regard to GFC pursuant to, inter alia, C.R.S. § 13-1-124(d) because GFC contracted to insure a "person, property or risk" residing or located within this state at the time of contracting.

10.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to this First Amended Counterclaim occurred in this District.

## The Insurance Policies

11.     ACE, IICNA and NSC provided general commercial liability insurance to Aurora pursuant to the insurance policies identified in Paragraphs 14-16 of the Complaint, partial or full copies of which appear to be attached to the Complaint as Exhibits B-G.  AIC provided general commercial liability coverage to Aurora pursuant to insurance policies identified in Paragraph 35 of Aurora's Answer.

12.     GFC provided liability insurance to Aurora as described in Paragraph 45 of this First Amended Counterclaim.

**The ACE Policy**

13.     ACE issued to Aurora general liability coverage Policy No. FO-139293 covering the period from August 1, 2002 through August 1, 2003, which policy was renewed for the policy period August 1, 2003 through August 1, 2004.

14.     The ACE policy requires, among other things, that ACE defend Aurora against any suits seeking damage for "bodily injury" or "property damage," caused by an "occurrence" within the "coverage territory" during the policy period and/or any suits seeking damages out of a "personal and advertising injury" within the "coverage territory."

15.     The ACE policy defines "bodily injury" as, inter alia, "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

16.     The term "property damage" is defined in the ACE policy as "a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured.   All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

17.     The ACE policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

18.     The ACE policy defines the "coverage territory" as, among other areas, "the United States of America."

19.     The term "personal and advertising injury" is defined in the ACE policy as "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses: . . . [o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; . . .

[t]he use of another's advertising idea in your 'advertisement;' <u>or</u> . . . [i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" (emphasis supplied).

20.     Aurora has complied with all applicable conditions of the ACE policy, including having paid all premiums due in connection with the ACE policy, as well as providing proper notice to ACE.

**<u>The IICNA Policies</u>**

21.     IICNA issued to Aurora general liability coverage Policy Nos. FO-139292, FO-146246 and FO-146297 covering the period from August 1, 2002 through August 1, 2004.

22.     The IICNA policies require, among other things, that IICNA defend Aurora against any suits seeking damage for "bodily injury" or "property damage," caused by an "occurrence" within the "coverage territory" during the policy period and/or any suits seeking damages out of a "personal and advertising injury" within the "coverage territory."

23.     The IICNA policies define "bodily injury" as, <u>inter alia</u>, "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

24.     The term "property damage" is defined in the IICNA policies as "a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured.   All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

25.     The IICNA policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

26.     The IICNA policies define the "coverage territory" as, among other areas, "the United States of America."

27.    The term "personal and advertising injury" is defined in the IICNA policies as "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses . . .[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; . . . [t]he use of another's advertising idea in your 'advertisement;' <u>or</u> . . . [i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" (emphasis supplied).

28.    Aurora has complied with all applicable conditions of the IICNA policies, including having paid all premiums due in connection with the IICNA policies, as well as providing proper notice to IICNA.

**The NSC Policies**

29.    NSC issued to Aurora the general liability coverage Policy Nos. S86 MXX 80843533 and S86 MXX 80859105 covering the period from May 1, 2005 through May 1, 2007.

30.    The NSC policies require, among other things, that NSC defend Aurora against any suits seeking damage for "bodily injury" or "property damage," caused by an "occurrence" within the "coverage territory" during the policy period and/or any suits seeking damages out of a "personal and advertising injury" within the "coverage territory."

31.    The NSC policies define "bodily injury" as, <u>inter alia</u>, "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

32.    The term "property damage" is defined in the NSC policies as "a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured.   All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

33.     The NSC policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

34.     The NSC policies define the "coverage territory" as, among other areas, "the United States of America."

35.     The term "personal and advertising injury" is defined in the NSC policies as "injury, including consequential bodily injury, arising out of one or more of the following offenses: . . .  [o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; . . . [t]he use of another's advertising idea in your advertisement; or . . .[i]nfringing upon another's copyright, trade dress or slogan in your advertisement."  (emphasis supplied; additional emphasis omitted).

36.     Aurora has complied with all applicable conditions of the NSC policies, including having paid all premiums due in connection with the NSC policies, as well as providing proper notice to NSC.

## The AIC Policies

37.     AIC issued to Aurora and some of its related entities general liability coverage Policy Nos. 6 43 FRM80250251, 6 43 FRM06646251 and 6 43 FRM80255328 covering the period from June 1, 2005 through June 1, 2007.

38.     The AIC policies require, among other things, that AIC defend Aurora against any suits seeking damage for "bodily injury" or "property damage" caused by an "occurrence" during the policy period and/or any suits seeking damages out of a "personal injury" during the policy period or "advertising injury" in the coverage territory during the policy period.

39.     The AIC policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

40.     The term "property damage" is defined in the AIC policies as "a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured.   All such loss of use shall be deemed to occur at the time of the occurrence that caused it." (emphasis omitted).

41.     The AIC policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

42.     The term "personal injury" is defined in the AIC policies as "injury, other than bodily injury, arising out of one or more of the following offenses: . . .[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or . . . [o]ral or written publication of material that violates a person's right of privacy." (emphasis supplied; additional emphasis omitted).

43.     The term "advertising injury" is defined in the AIC policies as "an injury arising out of one or more of the following offenses:  a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; b. Oral or written publication of material that violates a person's right of privacy; c. Misappropriation of advertising ideas or style of doing business; or d. Infringement of copyright, title or slogan."

44.     Aurora has complied with all applicable conditions of the AIC policies, including having paid all premiums due in connection with the AIC policies, as well as providing proper notice to AIC.

**The GFC Policy**

45.     GFC issued to Aurora legal liability and defense coverage through RiskManager Policy No. RM00734-00, a copy of which is attached as Exhibit 1 hereto, covering the period from July 1, 2004 to July 1, 2005.

46.     The GFC policy requires, among other things, that GFC defend Aurora for any "covered legal liability and defense causes of loss" (emphasis omitted).

47.     The GFC policy defines "covered legal liability and defense causes of loss" as including, inter alia, "advertising and publication liability," "bodily injury," "product liability" and "property damage."

48.     The term "advertising and publication liability" is defined in the GFC policy as "loss or damage" that arises from "oral or written publication of material that slanders or libels a person or organization; disparages a person's or organization's goods, products or services; violates a person's right of privacy; or misappropriates other's advertising ideas or style of doing business."

49.     The term "bodily injury" is defined in the GFC policy as "all liability and defense claims that first occur during the policy period and arise from human physical damage, sickness or disease . . . and the resulting emotional or mental distress or death from any of these conditions."

50.     The term "product liability" is defined in the GFC policy as "bodily injury or property damages . . . caused by . . . any goods or products . . . grown, manufactured, sold, handled, distributed or disposed of by [Aurora], and those instructions, warranties and representations" Aurora made "relating to those goods or products."

51.     The term "property damage" is defined in the GFC policy as "loss or damage . . . aris[ing] from physical injury to or destruction of tangible property including all resulting loss of use to that property."

52.     Aurora has complied with all applicable conditions of the GFC policy, including having paid all premiums due in connection with the GFC policy, as well as providing proper notice to GFC.

**The Underlying Actions**

53.     Aurora produces organic milk that is sold by various private label customers as well as through its own label, "High Meadow."  Aurora's organic milk is sold by retail grocery stores throughout the country.  Aurora markets and sells its milk with the "USDA Organic" seal in accordance with the organic certifications issued to Aurora by two certifying agents -- the Colorado Department of Agriculture ("CDA") and Quality Assurance International ("QAI") -- acting pursuant to the authority vested in them by the United States Department of Agriculture ("USDA") under the Organic Food Production Act of 1990 ("OFPA") (7 U.S.C. §§ 6501, et seq.) and the National Organic Program ("NOP") regulations (7 C.F.R. Part 205).  These certifications are and at all times have been valid and have never been suspended or revoked.

54.     Aurora has been named in thirteen consumer class actions filed in the courts of six different states.  In addition, consumers have also filed six class actions against some of Aurora's retailer customers, basing their complaints against the retailers on Aurora's alleged wrongdoing. These nineteen class actions were consolidated before the United States District Court for the Eastern District of Missouri by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407 in the action In re Aurora Dairy Corp., Case No. 4:08-md-01907-ERW.

55.     The claimants in the underlying actions have alleged that Aurora sold milk labeled "organic" that contained contaminants and other non-organic compounds and that was not in fact produced in accordance with federal organic standards as detailed in OFPA and the NOP.  See, e.g., Compl. ¶¶ 8, 16-18, Freyre v. Aurora Dairy Corp., Case No. 07-cv-02183 (D. Colo., filed Oct. 17, 2007); Compl. ¶¶ 40, 53-54, Still v. Aurora Dairy Corp., d/b/a Aurora Organic Dairy, 07-cv-02188 (D. Colo., filed Oct. 17, 2007).  Based on these allegations, the claimants in the underlying actions have asserted a variety of causes of action, including causes of action for negligence and negligence per se.  See, e.g., Compl. ¶¶ 102-118, Mothershead v. Aurora Dairy Corporation d/b/a Aurora Organic Dairy, Case No. 4:07-cv-01701 (E.D. Mo., filed Oct. 7, 2007) ("Mothershead"); Compl. ¶¶ 97-104, Still v. Aurora Dairy Corp., d/b/a Aurora Organic Dairy, 07-cv-02188 (D. Colo., filed Oct. 17, 2007).

56.     The claimants in the underlying actions allege that they purchased organic milk because it is healthier and free of bovine growth hormone, antibiotics and pesticides.  See, e.g., Compl. ¶ 10, White v. Aurora Dairy Corp., d/b/a Aurora Organic Dairy, 07-cv-9418 (S.D.N.Y., filed Oct. 19, 2007); Compl. ¶ 9, Kaye v. Aurora Dairy Corp., d/b/a Aurora Organic Dairy, cv-07-4425 (E.D.N.Y., filed Oct. 23, 2007).  The claimants in the underlying actions further allege that the milk provided by Aurora that they purchased allegedly exposed them, their families and their friends to pesticides, hormones, antibodies and other chemicals and/or has generally caused them injury or damage.  See, e.g., Mothershead, Compl. ¶ 107.

57.     The pleadings in the underlying actions do not implicate, on their faces, any policy exclusions for "bodily injury."  See, e.g., Mothershead.

58.     Pursuant to the terms of the policies and as provided by law, Counterdefendants are obligated to assume the defense of Aurora in full and/or pay all defense-related costs,

including attorneys' fees and supplemental expenses, with respect to the <u>Mothershead</u> action because allegations exist in the <u>Mothershead</u> action that state one or more claims falling within or potentially within the policy coverage.   This duty to defend further applies even if the allegations in the <u>Mothershead</u> action are groundless, false or fraudulent.

59.     Aurora provided Counterdefendants with timely notice of each of the underlying actions, along with copies of the complaints, and requested that Counterdefendants defend and indemnify Aurora.

60.     On or about November 20, 2007, GFC informed Aurora that the allegations in the <u>Mothershead</u> complaint purportedly "do not implicate the 'Covered Legal Liability and Defense Causes of Loss'" and refused to pay Aurora's defense costs in that action.  GFC did conclude, however, that the allegations in the various complaints against Aurora triggered the "'Sub-Limited Legal Liability and Defense Cause . . . of Loss' for 'Internet Activity Liability'" and paid Aurora the sum of $1,000.

61.     On or about January 14, 2008, NSC and AIC agreed to defend Aurora in the <u>Mothershead</u> action, but subsequently denied coverage for all other underlying actions that comprise <u>In re Aurora Dairy Corp.</u>  NSC and AIC's letter, however, was sent to the wrong address by NSC and AIC and was not actually received by Aurora until April, 2008.

62.     On or about January 28, 2008, IICNA and ACE similarly agreed to defend Aurora in the <u>Mothershead</u> action, but subsequently denied coverage for all other underlying actions that comprise <u>In re Aurora Dairy Corp.</u>

63.     On or about April 15, 2008, NSC and AIC learned that they had sent their prior correspondence to the wrong address and re-sent their January correspondence to Aurora via e-mail, affirming that they would defend Aurora in the <u>Mothershead</u> action.

64.     NSC, AIC, IICNA and ACE, however, have not paid the full cost of defense of the <u>Mothershead</u> action, in direct violation of both the terms of the relevant policies and of Counterdefendants' representations to Aurora.

### Count I – Declaratory Judgment

65.     Aurora realleges and incorporates herein by reference the foregoing Paragraphs 1 through 64 of its Counterclaim as if set forth fully herein.

66.     An actual controversy has arisen and now exists between Aurora and Counterdefendants concerning their respective rights, obligations and other interests under the policies.  Counterdefendants have at all relevant times been obligated under the policies to provide a complete and full defense to Aurora in the <u>Mothershead</u> action, which they have failed to do to date.

67.     Aurora seeks a judicial determination of the obligations of Counterdefendants to reimburse Aurora's costs of defense to date and to pay such further defined costs as Aurora may hereafter incur in connection with the <u>Mothershead</u> action.

68.     A prompt judicial determination is necessary and appropriate at this time in order that Aurora may ascertain its rights to a full and complete defense in the <u>Mothershead</u> action and its right to reimbursement for defense costs already incurred under the policies.

WHEREFORE, Aurora prays for judgment as follows:

A.     For a declaration that Counterdefendants have at all relevant times heretofore been obligated based on the allegations in the <u>Mothershead</u> action to provide a defense to Aurora for that lawsuit in accordance with the terms of the policies and shall continue to be so obligated; and

B.     For such other and further legal, equitable or other relief as this Court deems just and proper.

## **Count II – Claim for Breach of Contract**

69.     Aurora realleges and incorporates herein by reference the foregoing Paragraphs 1 through 68 of its Counterclaim as if set forth fully herein.

70.     The policies require Counterdefendants to defend Aurora against claims for liability potentially covered by those policies, including, inter alia, claims for damages because of "bodily injury" or "property damage**."**

71.     The claimants in the Mothershead action are seeking damages against Aurora for claims which are, at an absolute minimum, potentially or possibly within the coverage afforded by the policies issued by Counterdefendants.

72.     On the face of the complaint in the Mothershead action, none of the exclusions contained in the policies bars potential coverage for the claims made against Aurora in that lawsuit.

73.     By failing to defend Aurora in the Mothershead action, Counterdefendants have breached their duties under the policies.

74.     As a direct and proximate result of each such breach of the policies, Aurora has incurred and continues to incur substantial costs, including but not limited to attorneys' fees, expenses and costs in connection with the Mothershead action, as will be proven at or before the trial of this matter.

75.     Aurora has performed all conditions required of it under the policies issued to it by Counterdefendants.

WHEREFORE, Aurora prays for judgment as follows:

A.     For all of Aurora's costs of defense, including but not limited to attorneys' fees, expenses and costs, together with interest thereon running from the date such costs were incurred, in connection with the Mothershead action; and

B.      For such other and further legal, equitable or other relief as this Court deems just and proper.

## Count III Against All Counterdefendants
## Bad Faith Breach of an Insurance Contract

76.      Aurora realleges and incorporates herein by reference the foregoing Paragraphs 1 through 75 of its Counterclaim as if set forth fully herein.

77.      By unreasonably failing to defend Aurora in the Mothershead action, Counterdefendants (1) breached their contractual obligations to Aurora; (2) breached the implied duty of good faith and fair dealing; and (3) acted in bad faith.

78.      Counterdefendants' breach of their contractual obligations was in bad faith because, inter alia, Counterdefendants knew or should have known that there was no reasonable basis for Counterdefendants' failure to fulfill their duty to defend Aurora in the Mothershead action.

79.      By way of example, ACE, IICNA, NSC and AIC conceded they had a duty to defend Aurora in the Mothershead action on or about January 14, 2008 and reaffirmed that duty on or about March 6, 2008 and on or about April 15, 2008.  On or about June 11, 2008, however, ACE, IICNA, NSC and AIC withdrew their commitment to defend Aurora, despite the fact that there had been no material changes to, developments in or new information regarding the Mothershead action since their prior correspondence with and commitment to Aurora.

80.      Moreover, Counterdefendants have failed and continue to fail to reimburse Aurora for all costs incurred by Aurora in the Mothershead action.

81.      As a direct and proximate result of Counterdefendants' bad faith, Aurora has been damaged and has incurred and continues to incur substantial costs, including, but not limited to, attorneys' fees, expenses and costs in connection with the Mothershead action.

82.     As a further result of Counterdefendants' bad faith refusal to satisfy their coverage obligation, Aurora was forced to file this Counterclaim and thereby incurred unnecessary legal fees and costs in order to obtain the coverage due to it under the policies issued by Counterdefendants.

WHEREFORE, Aurora prays for judgment as follows:

A.      For all of Aurora's costs of defense, including but not limited to attorneys' fees, expenses and costs in connection with the Mothershead action, together with interest thereon running from the date such costs were incurred;

B.      For Aurora's attorneys' fees and other reasonable and necessary expenses incurred in connection with this action;

C.      For accrued interest on the amount of the judgment as provided by law;

D.      For punitive damages; and

E.      For such other and further legal, equitable or other relief as this Court deems just and proper.

## **JURY DEMAND**

Aurora hereby demands trial by jury on all claims asserted in the Complaint and Aurora's First Amended Counterclaim that are triable by a jury.

Dated:  February 11, 2009                              Respectfully submitted,

                                                      /s/Mark S. Mester
                                                      One of the Attorneys for Defendant Aurora
                                                      Dairy Corporation d/b/a Aurora Organic Dairy

**SANDER, INGEBRETSEN & WAKE, P.C.**
Daniel F. Wake
1660 17th Street, Suite 450
Denver, Colorado  80202
Telephone: (303) 285-5344
Facsimile: (303) 285-5301
Email: dwake@siwlegal.com

**LATHAM & WATKINS LLP**
Mark S. Mester
Livia M. Kiser
233 South Wacker Drive
Suite 5800 Sears Tower
Chicago, Illinois  60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: mark.mester@lw.com
        livia.kiser@lw.com

# EXHIBIT 1

# RiskManager ™



General Fire & Casualty
COMPANY

™

HOME OFFICE - BOISE, IDAHO

Please read this Policy and the Declarations and Schedules carefully.  Contact your insurance agent with any questions or concerns you may have.  You will find your agent's name, address and phone number on your Policy Declaration page.

The Policy Declarations and Schedules, including all endorsements required to conform to applicable state laws, are attached to and are made a part of this policy.  In the event of any change to state laws effective during the term of this policy, this policy is automatically changed to the extent needed to conform.

We have issued this policy in reliance upon your representations.  By accepting this policy, you affirm that you have inspected the information in the Policy Declarations and Schedules and confirm that it is accurate and complete.

The Riskmanager form is composed of five sections:  the Covered Property Section, the Business Income or Extra Expense Section, the Legal Liability and Defense Section, the Uninsured Risks Section, and the Common Section.  Words or phrases in ***bold face italic script*** are key terms defined in that section.  The meaning of these key terms remains consistent throughout each section.

---

### IN THE EVENT OF A LOSS

✓   NOTIFY YOUR AGENT AT THE NUMBER SHOWN ON YOUR POLICY DECLARATION PAGE AS SOON AS PRACTICABLE;

✓   GATHER TOGETHER ALL KNOWN FACTS INCLUDING THE NAMES, ADDRESSES AND PHONE NUMBERS OF ANY POTENTIAL CLAIMANTS OR WITNESSES;

✓   TAKE PHOTOGRAPHS IF THESE WOULD BE HELPFUL IN UNDERSTANDING EVENTS.  IT IS USEFUL TO KEEP DISPOSABLE CAMERAS IN YOUR VEHICLES;

✓   MAKE EVERY REASONABLE EFFORT TO PREVENT ANY FURTHER LOSS;

✓   FILE A REPORT WITH THE POLICE OR OTHER PROPER AUTHORITIES IF REQUIRED BY LAW OR THE TERMS OF THIS POLICY.

---

<u>This is a defense within the limits policy</u>.  In a defense within the limits policy, the attorney fees and other defense costs reduce the applicable Legal Liability and Defense limit. If you have any questions regarding defense within the limits, please ask your agent.

---

RiskManager ™
RM (01 2003)

© 2003 General Fire & Casualty Company
Patent Pending

# TABLE OF CONTENTS

**THE INSURER** — **1**

**THE INSURED** — **1**

**ADDITIONAL INSUREDS** — **1**

**COVERED PROPERTY** — **3**

A. INSURING AGREEMENT — 3
B. COVERED PROPERTY — 3
C. SELF-INSURED PROPERTY — 3
D. YOUR DUTIES IN THE EVENT OF A PROPERTY LOSS — 3
E. OUR DUTY TO RESPOND — 4
F. BLANKET PROPERTY — 4
G. SCHEDULED PROPERTY — 4
H. REINSTATEMENT OF PROPERTY INSURANCE LIMITS — 4
I. VALUATION OPTION — 4
J. LOSS PAYMENT PROVISIONS — 4
K. INSURANCE TO VALUE REQUIRED — 5
L. SALVAGE RIGHTS — 6
M. YOUR COVERED PROPERTY — 6
N. ADDITIONAL SCHEDULED COVERED PROPERTY — 8
O. INSURED CAUSES OF PROPERTY LOSS — 12

**LOSS OF BUSINESS INCOME OR EXTRA EXPENSE** — **19**

A. INSURING AGREEMENT — 19
B. YOUR DUTIES IN THE EVENT OF A LOSS OF BUSINESS INCOME OR EXTRA EXPENSE LOSS — 19
C. COVERED PROPERTY — 20
D. LOSS PAYMENT PROVISIONS — 20
E. ADDITIONAL SCHEDULED LOSS OF BUSINESS INCOME OR EXTRA EXPENSE — 21
F. INSURED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS — 24

**LEGAL LIABILITY AND DEFENSE** — **32**

A. INSURING AGREEMENT — 32
B. OUR DUTY TO INVESTIGATE, DEFEND AND SETTLE — 32
C. LEGAL COUNSEL — 32
D. PRIOR WRITTEN CONSENT REQUIRED — 32
E. LEGAL LIABILITY AND DEFENSE WITHIN POLICY LIMITS — 32
F. YOUR DUTIES IN THE EVENT OF A LEGAL LIABILITY AND DEFENSE LOSS — 32
G. COVERED LEGAL LIABILITY AND DEFENSE COSTS — 33
H. COVERED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS — 33
I. SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS - CONSEQUENTIAL LOSS OR DAMAGE — 35

# TABLE OF CONTENTS

**UNINSURED RISKS**     **46**

A.  DUTY TO DEFEND - INSURED ELSEWHERE     46
B.  ILLEGAL ACTS     46
C.  SPECIFIED ACTS OR DECISIONS     46
D.  EMPLOYER'S LIABILITY RISK - STATUTORY     47
E.  GOVERNMENTAL AUTHORITIES RISK     47
F.  NUCLEAR AND RADIATION RISK     47
G.  PRIOR LOSSES OR OFFENSES     48
H.  PUBLIC OFFICIALS ERRORS AND OMISSIONS     48
I.  PUNITIVE DAMAGES AND MISCELLANEOUS EXPENSES     48
J.  UNINSURED PREMISES MEDICAL PAYMENTS     48
K.  SPECIFIC UNINSURED LIABILITY LOSSES     48
L.  SPECIFIC UNINSURED PROPERTY LOSSES     49
M.  SPECIFIC UNINSURED PROPERTY     49
N.  ROAD HAZARD TO TIRES     49
O.  UNREASONABLE NEGLECT BY YOU     49
P.  BIOLOGICAL AND CHEMICAL AGENTS     50
Q.  WAR     50

**COMMON POLICY TERMS AND CONDITIONS**     **51**

A.  BANKRUPTCY     51
B.  BREACH OF POLICY PROVISIONS     51
C.  BAILEE     51
D.  CANCELLATION     51
E.  CHANGES TO POLICY     51
F.  CONFORMITY WITH STATE LAW     51
G.  DEDUCTIBLE     52
H.  EXAMINATION UNDER OATH     52
I.  EXAMINATION OF YOUR BOOKS AND RECORDS     52
J.  INSPECTIONS AND SURVEYS     52
K.  INTEGRATION     52
L.  LEGAL ACTION AGAINST US     52
M.  LIBERALIZATION     52
N.  MORTGAGE HOLDERS - LOSS PAYEES     52
O.  NON-RENEWAL     53
P.  OTHER INSURANCE     53
Q.  PREMIUMS     53
R.  RENEWAL PREMIUM OR COVERAGE CHANGES     53
S.  SEPARATION OF COVERED ENTITIES     54
T.  SETTLEMENT RIGHTS     54
U.  TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY     54
V.  TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US     54

# THE PARTIES TO THIS INSURANCE

## THE INSURER

"We", "us" or "our" as used in this policy means:

**General Fire & Casualty Company**
**2710 Sunrise Rim Road, Boise, ID 83705**
**Phone: 208-345-6658 – Fax: 208-345-2871 – Email: info@genfireins.com**

## THE INSURED

Throughout this policy the words "you" and "your" refer to the Named Insured as shown on the Policy Declarations and Schedules.  The following are insureds under this policy:

A.   You, the named persons or entities listed on the Policy Declarations and Schedules or by endorsement.

B.   Your family unit meaning your spouse, children, parents or relatives who primarily reside with you (and those same persons while temporarily residing elsewhere), and guests who are temporarily residing with you.

C.   Your temporary representative meaning those persons or entities having proper temporary custody of your property if you die or become disabled, but only with respect to liability arising out of the maintenance or use of that property and only until your legal representative has been appointed.

D.   Your legal representative meaning those persons or organizations having proper permanent custody of your property if you die or become disabled, but only with respect to duties as your legal representative.  That legal representative will have all your rights and duties under this policy.

E.   Your employees including your leased or temporary workers, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business and only if no other insurance of any kind is available to that person or organization for this liability.  Temporary workers are defined as persons who are furnished to you to substitute for a permanent employee on leave or to meet seasonal or short-term workload conditions.

F.   Your sole proprietorship if listed on the Policy Declarations and Schedules or by endorsement.

G.   Your trade name or legally assumed business name also known as a DBA (doing business as) if listed on the Policy Declarations and Schedules or by endorsement.

H.   Your partnership, limited liability company or joint venture (if listed on the Policy Declarations and Schedules or by endorsement) including the named partners, members, joint venture investors, and their spouses who reside in the same household, but only with respect to the conduct of your partnership, limited liability company or joint venture business.

I.   Your corporation (if listed on the Policy Declarations and Schedules or by endorsement) including the directors and officers, but only with respect to their duties as directors or officers.  Your stockholders are also insured, but only with respect to their liability as stockholders.  Officers are those persons holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

J.   Your real estate manager, meaning persons (other than your employees) or entities, which you authorize to manage your affairs and interests in real property.

K.   Your business entities that are newly acquired or formed after the inception date of this policy, in which you maintain majority ownership interest and a management interest, will be covered only if there is no other coverage in force for that business entity and you report this to us within 90 days of acquisition or formation.

## ADDITIONAL INSUREDS

The following are ADDITIONAL INSUREDS:

A.   Any person operating your ***vehicles*** or watercraft with your permission, but only with respect to their operation of covered ***vehicles*** or watercraft.  Any other person or entity responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the covered ***vehicles*** or watercraft and only if no other insurance of any kind is available to that person or entity for this liability.

B.   Your vendors if listed on the Policy Declarations and Schedules or by endorsement, but only for those activities arising from sale of ***your product***, and as specifically limited.

## THE PARTIES TO THIS INSURANCE

C.  Those individuals or entities listed on the Policy Declarations and Schedules or by endorsement as additional insureds, but only with respect to their specifically stated insurable interest in your business or property that is covered by this policy. For Legal Liability and Defense claims, coverage applies only to the extent the additional insureds are held liable for our insured's acts or omissions arising out of and in the course of ongoing operations performed for the additional insureds by our insured.

# COVERED PROPERTY SECTION

## COVERED PROPERTY

### A.   INSURING AGREEMENT

Subject to the terms and conditions of this policy, we will pay up to the applicable *blanket covered property limit*, *scheduled covered property limit* or *property sub-limit* for *Insured Causes of Property Loss* to covered property.

*Insured Causes of Property Loss* means accidental loss or damage to covered property that first occurs during the policy period and arises from *Direct Causes of Property Loss* or *Sub-limited Causes of Property Loss – Consequential Loss or Damage*.

Exposure to substantially the same cause or causes of loss or damage or a series of related acts or omissions shall be considered a single claim. In the event a claim relates to two or more of our policy periods, such claim shall be deemed to have originated in the earliest policy period in which the claim first occurred. If that claim is covered, all damages related to that claim shall be included in the applicable *blanket covered property limit*, *scheduled covered property limit* or *property sub-limit* of the earliest policy period during which the claim first began to occur.

### B.   COVERED PROPERTY

This coverage only applies to property that you have declared to us and is listed on your policy declarations and schedules. This coverage also applies to property that you have reported to us and subsequently requested us to add following the policy inception. This coverage does not apply to any property that is not declared or property that is newly acquired or constructed property, other than as provided under *undeclared property; building – newly acquired or constructed; dwelling – newly acquired or constructed; vehicles – newly acquired; vehicles – rented and non-owned;* and *watercraft – newly acquired; watercraft – rented and non –owned*

### C.   SELF-INSURED PROPERTY

This coverage does not apply to any property scheduled as SELF-INSURED PROPERTY in the Policy Declarations and Schedules.

### D.   YOUR DUTIES IN THE EVENT OF A PROPERTY LOSS

This insurance contract requires you to perform certain duties. In the event of loss you must:

1.  Report all losses to us or to your agent as soon as practicable;

2.  Take all necessary and reasonable steps to protect property from further loss following an insured loss;

3.  Set aside or make available damaged property for our inspection and examination before any repair or disposal;

4.  Keep records of expenses incurred;

5.  Provide us with complete inventories of property within 30 days of our request following an insured loss;

6.  Permit us to inspect the property shown in your records and to take samples of damaged property for inspection, testing and analysis;

7.  Not abandon any property for any reason;

8.  Provide a signed and sworn Statement in Proof of Loss containing the information we request and on the form that we provide within 60 days after our request;

9.  Promptly make claim in writing against the common carrier involved and keep copies of claim papers for any necessary use by us. This only applies in the event of a loss to your property in transit by others;

10. Promptly notify the appropriate law enforcement officials if property is lost, stolen or misplaced;

11. Cooperate with us in any investigation, negotiation or lawsuit including pursuing any right against any person or entity that may be liable to indemnify us for any amounts paid for your covered loss. At our request, you will assist us in the conduct of lawsuits, attend all hearings and trials, secure and give evidence or testimony, and disclose the identity of, or assist in locating, witnesses;

© 2003 General Fire & Casualty Company
Patent Pending

# COVERED PROPERTY SECTION

12. Obtain a formal kill sheet from an USDA-approved packing facility after slaughter if the loss involves **livestock** (if applicable);

13. Acquire and produce a rendering slip for each **livestock** carcass, and upon our request obtain a veterinary necropsy report at your expense on each animal.  When more than 20 animals are lost or damaged, you will only have to necropsy one in four animals.

Your failure to fulfill any of these duties may result in a loss or reduction of coverage.

E.  OUR DUTY TO RESPOND

We will give notice of our intentions within 30 days after we receive the sworn Statement in Proof of Loss.  Once we have reached agreement with you on the amount of loss or if an award has been rendered in accordance with the terms and conditions of the **valuation dispute resolution** or **arbitration** provisions of this policy, we will then pay the agreed or award amount due within 30 days.

F.  BLANKET PROPERTY

Subject to our approval, covered property (other than scheduled property) may be insured under a **blanket covered property limit**.  This coverage limit is the separately stated amount identified in the Policy Declarations and Schedules.

G.  SCHEDULED PROPERTY

Covered property may be separately scheduled and listed in the **scheduled covered property limit.** This coverage is specifically limited as to amount of coverage and **deductible** that will apply.

H.  REINSTATEMENT OF PROPERTY INSURANCE LIMITS

When we pay for your losses to property, the applicable limit or **property sub-limit** for that property will be reduced by the amount of the claims paid.  As repairs are made to your property, the amount of that reduction will be reinstated in accordance with the value of the repairs.  This reinstatement will not increase the applicable limit and will not increase any aggregate limit.

I.  VALUATION OPTION

1.  **REPLACEMENT COST** means we will pay the full cost to repair or replace the covered property at the time of the loss without deduction for depreciation.  If the covered property is no longer manufactured or is not available, **replacement cost** shall revert to **functional replacement cost**

2.  **FUNCTIONAL REPLACEMENT COST** means we will pay up to the cost to repair or replace lost or damaged covered property with the most reasonably available replacement property, or repair materials and parts that will provide or restore the same or similar utility functions without deduction for depreciation.

3.  **ACTUAL CASH VALUE** means we will pay up to the cost to repair or replace the covered property with materials of like kind and quality with deduction for depreciation.

4.  **AGREED VALUE** means we will pay the cost to repair or replace the covered property up to an agreed or appraised value without application of any **undervaluation** provision or depreciation.

J.  LOSS PAYMENT PROVISIONS

1.  **BLANKET COVERED PROPERTY LIMIT** Unless another **valuation option** is specifically stated herein or in the Policy Declarations and Schedules, we will pay based on the **functional replacement cost**  We may take all or any part of the damaged covered property at an agreed or appraised value.  In any event, we will not pay more than the applicable **blanket covered property limit** stated in your Policy Declarations and Schedules, or the applicable **property sub-limit** for lost or damaged covered property.

2.  **SCHEDULED COVERED PROPERTY LIMIT** Unless another **valuation option** is specifically stated herein or in the Policy Declarations and Schedules, we will pay the **functional replacement cost** up to the scheduled amount on file with us.  We may take all or any part of the damaged covered property at an agreed or appraised value.  In any event, we will not pay more than the applicable limit stated in your Policy Declarations and Schedules or the applicable **property sub-limit** for lost or damaged covered property.

## COVERED PROPERTY SECTION

3.   **PROPERTY SUB-LIMIT** Certain causes of loss, consequential losses or damages are sub-limited and have a lower limit than the **blanket covered property limit** or the **scheduled covered property limit**. These lower limits are stated in your Policy Declarations and Schedules and are defined in **Sub-limited Causes of Property Loss - Consequential Loss or Damage**. For these losses or damages, the most we will pay is the applicable **property sub-limit**.

4.   COVERAGE UNDER TWO OR MORE LIMITS:  If the **blanket covered property limit** or **scheduled covered property limit** or one or more **property sub-limits** apply to the same covered property, we will only pay up to the largest single applicable **property sub-limit**.  In any event, no stacking of any coverage is allowed regardless of the number of covered claims or other cause of loss or event that contributes concurrently or in sequence to the cause of loss, consequential loss or damage to that covered property.

5.   CASH SETTLEMENT OPTION: In the event damaged property (that is covered on a **replacement cost** or **functional replacement cost** basis) is not repaired or replaced, you may elect to receive payment (subject to **undervaluation**) based on the **actual cash value** of the damaged covered property. We may take all or any part of the damaged covered property at an agreed or appraised value.

You have up to 180 days following our **actual cash value** settlement to notify us in writing if you decide to replace the lost or damaged covered property.  If you subsequently replace the covered property within 12 months of the date of loss, we will pay you the difference between the **actual cash value** settlement and the stated valuation up to the limit shown. In no event will we pay more than the **blanket covered property limit**, **scheduled covered property limit** or **property sub-limit** applicable to the loss.

6.   INSURABLE INTEREST is established by ownership or contract. We will not pay more than your insurable interest in the lost or damaged covered property.

7.   LOSS ADJUSTMENT WITH OWNERS: If you are not the owner of lost or damaged property, we may adjust losses with the owners. If we resolve the claim with the owners, such resolution will satisfy your claims against us for the owners' covered property. We will not pay the owners more than their financial interest in the covered property.

8.   PAIR OR SET: In the event of loss or damage to any part of a pair or set of covered property, we will pay to repair or replace the damaged or lost part to restore the pair or set to its value prior to loss, or the difference between the value of the pair or set before and after the damage or loss.

9.   PARTIAL LOSS: In the event of partial damage to covered property (other than **vehicles, irrigation systems, wind generating machinery** or watercraft) which is less than $10,000, we will pay the **replacement cost** for new components, parts or materials or the applicable **property sub-limit**, whichever is less.

10.  PARTS: In the event of loss or damage to any part of covered **vehicles, irrigation systems**, or **wind generating machinery** that consists of several parts, we will only pay for the value of the lost or damaged part up to the **actual cash value** of the **vehicles, irrigation systems**, or **wind generating machinery**.

K.   INSURANCE TO VALUE REQUIRED

1.   RELIANCE UPON YOUR VALUATIONS: We have calculated the premium and issued this policy in reliance upon your property valuations as contained in the application, statement of values or any subsequent change requests.  By accepting this policy, you have confirmed that the property information and property limits stated in the Policy Declarations and Schedules are adequate, accurate and complete to the best of your knowledge.

2.   **UNDERVALUATION**   Your property is undervalued whenever your declared value, as stated in the Policy Declarations and Schedules, is less than 80% of the actual value (based on the applicable **valuation option**) at the time of loss.  Provided that your property is not undervalued, we will pay up to 120% of the declared value on an individual item or the actual loss or damage, whichever is less.  In no event will we pay more than the **blanket covered property limit** if applicable.  We will not pay more than $100,000 during the policy period for losses in excess of your declared value.

You may request that we make changes to update your property value estimates at any time during the policy period.  In the event your property is undervalued, your claims payment will be determined as follows:

[Declared Value / (Actual value based on the applicable **valuation option** X .80)] X (Loss - **Deductible**) = Claim Payment

3.   **VALUATION DISPUTE RESOLUTION** In the event of any dispute over valuation of your property following a loss, either party may request the services of a mutually agreeable professional appraiser to establish an independent valuation.  You will equally share the cost of the appraisal with us.  In the event the appraisal determines your declared value as being within 80% of the actual value, we will reimburse you for your portion of the appraisal cost.

# COVERED PROPERTY SECTION

If the appraisal determines your declared value to be less than 80% of the actual value, we may withhold our portion of the appraisal cost out of any payment due.

4. **ARBITRATION** In the event either party fails to accept the **valuation dispute resolution** outcome described above, both parties will submit to arbitration. Each party will hire an appraiser at their own expense and those appraisers will appoint an arbiter whose cost will initially be shared equally by both parties. Each party will accept a simple majority ruling of the three to set the valuation. This ruling will be binding on both parties. The prevailing party will be entitled to reimbursement for the expense of the arbiter. In the event of a compromise settlement, both parties will bear their own expenses. However, in all events each party will bear their own attorney fees and other costs.

5. JOINT LOSS ADJUSTMENT: In the event of loss or damage to property that is covered by this policy and a Boiler and Machinery policy, and there is a dispute between the insurance carriers providing your Boiler and Machinery coverage and us as to the amount of loss to be paid by each company, the following requirements must be met before we will make payment to you:

   a. The Boiler and Machinery policies must contain a provision or endorsement with essentially the same conditions, procedures and requirements as this Joint Loss Adjustment provision;

   b. The loss or damage to the covered property must arise from a cause for which both the Boiler and Machinery policies and this policy provide at least partial coverage;

   c. The total amount of loss or damage to the covered property must be agreed upon by you, your Boiler and Machinery carriers and us;

   d. Acceptance by you of the sums paid under this policy section shall not waive or alter any other right against us;

   e. We and the Boiler and Machinery carriers agree to submit our differences according to section K. part 4. **Arbitration** listed above within 90 days of any loss payments made under this section.

If all requirements listed above are met, we and your Boiler and Machinery carriers will make payments to the extent and in the manner described as follows:

   a. After we receive your written request, we will pay you the full amount of the loss that we agree was covered by this policy, and one-half of any amounts that are in dispute;

   b. After they receive your written request, your Boiler and Machinery carriers will pay you the full amount of the loss that they have agreed is covered by your Boiler and Machinery policies, and one-half of any amounts that are in dispute;

   c. Any amounts in dispute that are to be paid by us shall not exceed the amount payable under any equivalent Joint Loss Adjustment (or similar provision or endorsements) wording of your Boiler and Machinery policies;

   d. Any amounts to be paid under this policy section shall not exceed the amount that would have been paid had no Boiler and Machinery policies been in effect at the time of the covered loss.

L. SALVAGE RIGHTS

If either party recovers any covered property after loss settlement, that party must give the other prompt notice. At your option, the recovered property will be returned to you in exchange for the amount we paid you for the loss.

M. YOUR COVERED PROPERTY

The following types of property may be covered under a **blanket covered property limit** or a **scheduled covered property limit**

1. **BUILDING** means a structure that has at least two walls and a roof (and does not meet the definition of a **dwelling**), including permanently installed equipment, fixtures, and tenant improvements and betterments. **Building** does not include **land and land improvements**

   a. BUILDING VALUATION: A **building** will be valued at **functional replacement cost** unless another **valuation option** is shown in the Policy Declarations and Schedules.

   b. Glass windows or doors that are designed for and are part of a **building** are valued at **replacement cost** including the cost of safety glazing material and lettering.

# COVERED PROPERTY SECTION

2. **BUSINESS PERSONAL PROPERTY** means declared business personal property that you own and use in your business. Examples include office furniture, fixtures, appliances, supplies or parts. **Business personal property** does not include **household personal property, vehicles, stock** and those items listed under Section N. ADDITIONAL SCHEDULED COVERED PROPERTY in this Covered Property Section.

   **Business personal property** will be valued at **functional replacement cost** unless another **valuation option** is shown in the Policy Declarations and Schedules.

3. **DWELLING** means a structure that houses one or two family units and meets the community standards for human habitation. **Dwelling** does not include **land and land improvements**.

   a. DWELLING VALUATION: A **dwelling** other than a tenant or employee occupied **dwelling**, will be valued at **replacement cost** unless another **valuation option** is shown in the Policy Declarations and Schedules. A tenant or employee occupied **dwelling** will be valued at **actual cash value** unless another **valuation option** is shown in the Policy Declarations and Schedules.

   b. Glass windows or doors that are designed for and are part of a **dwelling** are valued at **replacement cost** including the cost of safety glazing material and lettering.

4. **DWELLING - APPURTENANT STRUCTURES** mean structures that are not attached to a **dwelling** but that are in service to the **dwelling** and which are located on the same location or lot as the **dwelling**. Examples include detached garages, storage sheds or pool equipment sheds. **Dwelling Appurtenant Structures** does not include commercial or farm buildings.

   The most we will pay for any single covered loss for a **dwelling - appurtenant structure** is 10% of the **dwelling** limit for the **dwelling** at the loss location.

5. **HOUSEHOLD PERSONAL PROPERTY** means personal property that is owned by you or family members who reside with you, and that is not permanently installed in a **building** or **dwelling**. Examples include home furnishings, clothing, sporting goods and personal belongings. If no other coverage is applicable, we will also cover the personal property located within your covered owner occupied **dwelling** that belongs to your guests, but only while they temporarily reside with you.

   **Household personal property** will be valued at **replacement cost**.

   The most that we will pay for any single covered loss for **household personal property** is 70% of the owner occupied **dwelling** limit for the **dwelling** at the loss location.

6. **STOCK** means declared merchandise or commodities held in storage or for sale, raw materials and in-process or finished goods, including parts or supplies used to manufacture, package or ship your merchandise or commodities. We will also cover **stock** owned by others while in your care, custody and control. **Stock** does not include **livestock, business personal property, household personal property, vehicles**.

   a. STOCK VALUATION: **Stock** will be valued at market value for similar grades and kinds at the time of loss at the place of loss at the local market used by you. If the insured loss occurs while the local market is closed, the market value will be the value established at the closing of the local market on the day preceding the loss.

   b. SELLING PRICE: In the event the covered **stock** has been sold but not yet delivered, we will pay the selling price less discounts and expenses you would have incurred.

   c. IMPORTS: In the event such **stock** is imported property held for sale and held under bond, we will pay the cost of like grade and quality at the point of origin, plus freight to the place of loss, and import duty if such import duty has been paid.

   d. STOCK - CONSEQUENTIAL LOSS: If you cannot use undamaged portions or parts of your **stock** (that are used to form a part of a finished **stock** product) due to a direct physical damage loss to other parts of the **stock**, we will pay the net reduction in value of the undamaged **stock**. In determining the reduction in value to the finished **stock**, we will consider the following:

      1) Whether or not the undamaged **stock** can be used with other **stock** to form the finished **stock** or can be put to use in another way;

      2) The value of the **stock** had there been no loss or damage;

      3) The remaining value of the **stock**, including any salvage value or resale value after the loss or damage.

# COVERED PROPERTY SECTION

    e.   STOCK - SPECIAL VALUATION: Any other special **stock** valuation will be shown in the Policy Declarations and Schedules.

7.   **VEHICLES** mean your automobiles, motorcycles, trucks, trailers, forklifts, snowmobiles, all terrain vehicles (ATVs) and golf carts.  **Vehicles** also include other mobile equipment such as construction or farm machinery that is not permanently installed, attached or in service to a **building** or **dwelling**.

    a.   VEHICLE VALUATION: Unless another **valuation option** is specifically stated in the Policy Declarations and Schedules, we will pay based on the **actual cash value** on the date of loss or damage.

    b.   VEHICLE GLASS COVERAGE: Windshields or windows that are installed in **vehicles** are covered for windshield or window replacement less the applicable **deductible** stated in the Policy Declarations and Schedules.  We may also pay the cost of a windshield "chip" repair without a **deductible** in lieu of replacement.

N.   ADDITIONAL SCHEDULED COVERED PROPERTY

Unless another **valuation option** is specifically stated herein or in the Policy Declarations and Schedules, we will pay the **functional replacement cost** up to the scheduled limit per covered accident, less the applicable **deductible** as stated on the policy declarations and schedules for any and all losses resulting from **insured causes of property loss** to the additional scheduled covered property as defined below:

1.   **ACCOUNTS RECEIVABLE** means your inability to collect outstanding amounts due you caused by lost, damaged or destroyed customer records including:

    a.   Charge or credit card evidences of debt;

    b.   Collection expenses that are in excess of normal, which you incur as a result of the covered loss;

    c.   Any interest charges on any loan that you have pledged your accounts receivable as collateral;

    d.   Any other reasonable expense that you incur to recreate your accounts receivable records.

An **accounts receivable** loss will be adjusted as follows:

After a covered cause of loss occurs where you are unable to accurately determine the amount of **accounts receivable** that you had at the time of the loss, we will determine the total amount of **accounts receivable** that you had in the most recent 12 months preceding the loss.  We will divide this total by 12 in order to calculate the average monthly amount of **accounts receivable**.  We will then adjust this average amount by the fluctuations that normally occur in the month of loss.  This amount will become the **gross accounts receivable** eligible for coverage under the scheduled limit.

We will then calculate your **net accounts receivable**.  **Net accounts receivable** are the **gross accounts receivable** less:

    a.   The amount of any **accounts receivable** that has not been damaged;

    b.   An amount equal to your normal bad debt expense;

    c.   All unearned interest or service charges.

We will pay the least of the **net accounts receivable** or this **accounts receivable** sub-limit.

2.   **AIRCRAFT DAMAGE** means physical damage to aircraft or aircraft parts that you own, hire, borrow, or aircraft in your care, custody and control at the time of the loss.

3.   **ANTIQUE PROPERTY** means covered property that is universally recognized by the general public as antique or that has been established as such by a professional appraisal within the last three years.

We will pay the current appraised value or the declared amount shown on the schedule or on file with us, whichever is less.

4.   **BUILDING OR BUSINESS PERSONAL PROPERTY - NEWLY ACQUIRED OR CONSTRUCTED** means your newly acquired or constructed **building** or **business personal property**.

This temporary coverage protects a newly acquired or constructed **building**, including a **building** in the course of construction, any permanently installed equipment and **business personal property** of which you have gained legal ownership, or begin construction on after the policy inception date, but have not yet reported to us.

© 2003 General Fire & Casualty Company
Patent Pending

# COVERED PROPERTY SECTION

This temporary coverage automatically expires at 12:01 a.m. on the 90th day following the date of acquisition, the date you begin construction or on the policy expiration date, whichever is sooner.

To continue coverage, you must ask your agent to request that we add the newly constructed or acquired **building** or **business personal property** to your policy prior to the expiration of the temporary coverage period. We will charge you the additional premiums based on the values reported from the date you acquire the property or the date construction begins.

5. **BULK STOCK- STORED IN THE OPEN** means bulk, bags, bales, stacks or piles of **stock** that are not stored in a **building**.

    a. Hay or haylage in the open:

        This coverage is limited to loss or damage arising out of **fire**, lightning, windstorm, **vandalism, riot or civil commotion, vehicles**, or theft. Hay or haylage bulk, bags, bales, stacks or piles not separated by at least 100 feet of clear space between other bulk, bags, bales, stacks, piles, **buildings** or other combustible materials will be considered one stack, and limited to $100,000 per stack.

        **Fire** means a chemical change that releases heat and light and is accompanied by flame.

        **Vandalism** means willful or malicious loss or damage to covered property, including actions during a **riot or civil commotion**.

        **Riot or civil commotion** means a public disturbance involving an act or acts of violence committed by two or more persons.

    b. **Stock** stored in the open (other than hay or haylage):

        This coverage is limited to loss or damage arising out of **fire**, lightning, windstorm, **vandalism, riot or civil commotion, vehicles**, or theft.

6. **CARGO - TRANSPORTATION OF PROPERTY** means covered **business personal property** or **stock** (other than **livestock** or **worldwide covered property**) that is lost or damaged while in the due course of transportation, but only when the instrument of transportation is owned, hired, borrowed, or operated by you. This coverage includes:

    a. Freight charges earned by you from the point of shipment to the point of insured loss, if such charges are unpaid and rendered uncollectible from the shipper, or are prepaid but required to be refunded to the shipper;

    b. The expenses you incur in removing debris of covered property damaged while in the course of transportation.

In the event the instrument of transportation is not owned, hired, borrowed, or operated by you, this coverage applies only as excess coverage and is in addition to and not a pro rata share of any other collectible insurance. The **deductible** is waived when payment is made as excess coverage.

This coverage includes personal property of others that you are transporting in owned and operated **vehicles**.

7. **CONDITIONAL SALE OF COVERED PROPERTY** means covered property that you have sold and delivered to the purchasing party under conditional sale or trust agreement or under any deferred-payment plan.

This coverage applies only when you are unable to obtain reimbursement or return of the property within 90 days following the date of any **insured causes of property loss**, and after all reasonable efforts to collect the balance due have failed.

8. **CREDIT CARD FORGERY OR COUNTERFEIT CURRENCY** means the fraudulent or unauthorized use of credit or fund-transfer cards issued to you or registered in your name; forgery or alteration of checks or negotiable instruments; or your acceptance in good faith of counterfeit United States or Canadian paper currency. This includes fraudulent or unauthorized use of credit or fund-transfer cards over the Internet.

This coverage will only apply if you have complied with all terms and conditions under which the credit or fund-transfer cards were issued.

9. **DWELLING - NEWLY ACQUIRED OR CONSTRUCTED** means your newly acquired or constructed **dwelling**.

This temporary coverage protects your newly acquired or constructed **dwelling** including a **dwelling** in the course of construction and **household personal property** of which you have gained legal ownership, or begin construction on after the policy inception date, but have not yet reported to us.

# COVERED PROPERTY SECTION

This temporary coverage automatically expires at 12:01 a.m. on the 90th day following the date of acquisition, the date construction begins or the policy expiration date, whichever is sooner.

To continue coverage, you must ask your agent to request that we add the newly acquired or constructed **dwelling** or **household personal property** to your policy prior to the expiration of the temporary coverage period. We will charge you the additional premiums based on the values reported from the date you acquire the property or the date construction begins.

10. **ELECTRONIC DATA PROCESSING EQUIPMENT, MEDIA AND SOFTWARE** means computer or telephone hardware equipment including operational peripherals and parts, and operating software used in the operation of your business.

11. **FENCES** mean a structure or partition designed and constructed for providing a barrier, boundary, railing, enclosure or screen for ornamental, containment or security purposes on your property.

12. **FOUNDATIONS, PAVEMENT, BRIDGES AND RAILROAD SIDETRACK** means the foundation of a **building** or **dwelling,** bridges, railroad sidetracks, roadways, sidewalks, patios or other paved surfaces, or retaining walls.

13. **GROWING CROPS OR PLANTS** mean products of the soil that are capable of being grown, raised and harvested; cultivated and non-cultivated orchards; timber; pasture grass; fodder; fiber or food plants other than declared containerized nursery **stock**.

14. **INTELLECTUAL PROPERTY** means any intangible asset, goodwill, reputation, franchise, copyright, patent, business know-how, customer list and information, financial information, credit card information, competitive and other confidential or private information, including electronically stored, or any similar non-intrinsic property or right, owned by you, or in your care, custody or control.

15. **IRRIGATION SYSTEMS** mean windmills, wheel-lines, center pivots, sprinkler lines, irrigation tubes or other such systems along with the miscellaneous pumps, panels, motors or parts that service them. **Irrigation systems** will be valued at **actual cash value**.

16. **LAND AND LAND IMPROVEMENTS** mean ground, rock, soil or earth, fields, meadows, mountains, moors, marsh and any improvements constructed of land. **Land and land improvements** include all dams; reservoirs; ditches; tunnels; pilings; piers; wharves and docks that you own, or are owned by others while in your care, custody and control.

17. **LANDSCAPING OR PLANTS - OUTDOORS** mean outdoor landscaping plants, trees, shrubs, and lawns (other than **growing crops or plants**) used for ornamental purposes and not held for sale.

18. **MONEY AND SECURITIES** mean the following types of property but only while at your premises, in a bank or savings institution, while en route to or from a bank or savings institution, or within the living quarters of the custodian of such **money and securities**. **Money and securities** include:

   a. Currency, coins and bank notes;

   b. Stocks and bonds;

   c. Traveler's checks, register checks and money orders, negotiable, and nonnegotiable instruments or contracts representing either money or other property;

   d. Tokens, travel tickets, revenue and other stamps in current use (whether represented by actual stamps or unused value in a meter);

   e. Evidences of debt issued in connection with credit cards, but only if the cards are not issued by you.

   We will pay up to the limit stated in the Policy Declarations and Schedules or the market value at the time of loss at the place of loss whichever is less.

19. **PRECIOUS METALS** mean gold, silver, platinum or other similar metals that have an established market price. **Precious metals** does not include coins, silverware, gold ware, pewter ware, flatware, hollowware, **jewelry**, tea sets, trays or trophies made of silver, gold, platinum or other similar metals.

   We will pay up to the limit stated in the Policy Declarations and Schedules or the market value at the time of loss at the place of loss, whichever is less.

---

# COVERED PROPERTY SECTION

20. **TENANT OCCUPIED BUILDING OR DWELLING - PERSONAL PROPERTY** means any property (other than **vehicles** or watercraft) that is owned by your tenant while located in your owned rental **building** or **dwelling**. This coverage only applies if the tenant has no other applicable insurance.

21. **TOOLS AND TACK OWNED BY YOUR EMPLOYEE** means employee's tools and tack being used in your business at your request.

22. **UNDECLARED PROPERTY** means property that was not reported or declared to us at the policy inception or renewal or following the expiration of any newly acquired property coverage afforded herein.

23. **UNDERGROUND TANKS** means underground storage tanks including the contents contained therein.

24. **UTILITY SYSTEMS** mean:

    a. Communication systems, radio, microwave or television systems, overhead or coaxial cables and microwave radio relays, satellites, satellite dishes and other antennae (other than **electronic data processing equipment, media and software**);

    b. Waste disposal and sewage treatment systems;

    c. Power supply services, electricity, natural gas, fossil fuels or propane (other than **irrigation systems**);

    d. Utility-generating plants, switching stations, substations, transformers and supply lines;

    e. Water supply services (other than **irrigation systems**) including pumping stations, wells, deep well pumps, water mains and pipes, flues or drains supplying water;

    a. Similar systems owned by a utility, landlord or other supplier with whom you have contracted, whereby you have agreed to maintain those services for your covered property.

25. **VALUABLE PAPERS** mean catalogs, registrations, letters of credit, books, manuscripts, written documents, drawings, blueprints, films, bills or deeds and the cost of blank materials when valuable papers exist on electronic or magnetic media or media other than prepackaged software programs.

26. **VEHICLES - NEWLY ACQUIRED** means **vehicles** that you newly acquire through purchase or **lease**.

    **Lease** means those **vehicles** you acquire for your use via a written lease agreement where the agreed time period is written into the agreement and your use of the **vehicles** will exceed 60 days.

    This temporary coverage protects **vehicles** that you have gained or assumed legal responsibility for after the policy inception date but have not yet reported to us. This temporary coverage automatically expires at 12:01 a.m. on the 60th day following the date of acquisition or possession whichever is sooner, but no later than the policy expiration date.

    To continue coverage, you must ask your agent to request that we add the newly acquired **vehicles** to your policy prior to the expiration of the temporary coverage period.

27. **VEHICLES - RENTED AND NON-OWNED** means **vehicles** that you use as a temporary replacement, or that you borrow for a period of time that does not exceed 60 days. This coverage includes **vehicles** that you **rent**.

    **Rent** means those **vehicles** you acquire for your use via an agreement where the agreed time period is not specified or your use of the **vehicles** will not exceed 60 days.

28. **WATER RESOURCE** means any river, lake, stream, spring, well or other surface or underground water resource.

29. **WATERCRAFT - OTHER** means any motorboat, sailboat, jet ski, rowboat, canoe, kayak or rubber raft, or other craft that exceed 26 feet in length or 250 horsepower including accessory equipment, furnishings, outboard motors and trailers.

30. **WATERCRAFT - PERSONAL** means any motorboat, sailboat, jet-ski, rowboat, canoe, kayak or rubber raft, that does not exceed 26 feet in length or 250 horsepower including accessory equipment, furnishings, outboard motors and trailers. Coverage only applies to **watercraft - personal** crafts that are designed for and limited to seasonal recreational use within the United States territorial waters.

31. **WATERCRAFT - NEWLY ACQUIRED** means **watercraft - personal** that you have newly acquired through purchase or **lease**.

# COVERED PROPERTY SECTION

This temporary coverage protects *watercraft - personal* that you have gained or assumed legal responsibility for after the policy inception date but have not yet reported to us. This temporary coverage automatically expires at 12:01 a.m. on the 60th day following the date of acquisition or possession or the expiration of the policy period, whichever is sooner.

To continue coverage, you must contact your agent to request that we add the newly acquired *watercraft - personal* to your policy prior to the expiration of the temporary coverage period.

32. *WATERCRAFT - RENTED AND NON-OWNED* means *watercraft - personal* that you use as a temporary replacement, or that you borrow for period of time that does not exceed 60 days. This coverage includes *watercraft - personal* that you *rent*.

33. *WIND GENERATING MACHINERY* means any machinery that is designed and used to move air to protect *growing crops or plants* from extremes of temperature. *Wind generating machinery* will be valued at *actual cash value*.

34. *WORLDWIDE COVERED PROPERTY* means your property (other than *vehicles* or watercraft) that is lost or damaged while outside the territory of the United States of America or Canada.

O.  INSURED CAUSES OF PROPERTY LOSS

Please note that certain causes of loss are not covered by this policy.

1. *DIRECT CAUSES OF PROPERTY LOSS* means direct physical loss to covered property arising from insured risks (other than *Sub-limited Causes of Property Loss - Consequential Loss or Damage* including, but not limited to *fire* and smoke, explosion, lightning, windstorm, snowstorm, hail, *vandalism*, *riot or civil commotion*, collision, falling objects, damage from *vehicles*, theft, or:

   a.  *COLLAPSE* means a sudden and unexpected downfall or cave-in of a *building* or *dwelling*, or any part of a *building* or *dwelling* which results in the inability to utilize the *building* or *dwelling* for its intended purpose. A *building* or *dwelling* or any part of a *building* or *dwelling* that is in imminent danger of sudden and unexpected downfall or cave-in is also considered *collapse*.

   *Collapse* coverage only applies if caused by one or more of the following:

   1) Use of defective materials in construction, repair, renovation, or remodeling if *collapse* occurs during the construction, repair, renovation or remodeling;

   2) Decay that is hidden from view, unless the presence of decay is known or should have been known to you prior to *collapse*;

   3) Damage from insects, birds or rodents that is hidden from view, unless the presence of damage is known or should have been known to you prior to *collapse*;

   4) Breakage of *building* or *dwelling* glass;

   5) Weight of ice, snow or water;

   6) Weight of people, *stock* or *livestock*.

   A *building* or *dwelling* that is standing is not in a state of *collapse* despite evidence of cracking, bulging, sagging, leaning, settling, shrinking, rupturing, bursting, contracting, wrinkling, swelling or expanding unless it is in imminent danger of *collapse*.

   *Collapse* coverage does not apply to loss or damage to the following covered property unless the loss or damage is caused by the *collapse* of a *building* or *dwelling*:

   1) Outdoor radio, satellite, or television antennas;

   2) Yard fixtures;

   3) Outdoor swimming pools, diving platforms and beach platforms;

   4) *Fences*;

   5) Retaining walls or bulkheads;

## COVERED PROPERTY SECTION

6) Piers, wharves or docks;

7) Underground pipes, flues, drains, drain fields, cesspools or septic tanks;

8) Walkways, roadways or other paved or concrete surfaces.

b. **EARTH MOVEMENT OR VOLCANIC ERUPTION - VEHICLES** means damage to your **vehicles** from **earth movement or volcanic eruption**, but only if your **vehicles** are insured for physical damage.

**Earth movement or volcanic eruption** means:

1) Earthquake, sinkhole collapse, or landslide;

2) Mine subsidence or earth sinking, rising, or shifting;

3) Volcanic eruption, blast, airborne shockwaves, ash, dust, particulate matter or lava flow.

c. **VEHICLES - GROUND WATER** means damage to your **vehicles** from water, but only if your **vehicles** are insured for physical damage.

d. Sewer backup (other than as a consequence of **ground water**);
   **Ground water** means:

1) Flood;

2) Surface water;

3) Mudslide or mudflow;

4) Waves, tides or tidal waves;

5) Any overflow or continuous or repeated seepage of any body of water or spray, whether driven by wind or not;

6) Any water under the ground surface pressing on, flowing on, or seeping through foundations, walls, floors, basements or paved surfaces;

7) Any water seepage through open doors, windows or other openings into your **building** or **dwelling**;

8) Any back up of water, mud, sewage or other material through any sewer system or drain that is a direct result of any of the above.

e. Water, snow, sand or dust damage to your covered **business personal property** or **household personal property** that is located inside your covered **building** or **dwelling** but only if damage is first sustained from windstorm or hail to the roof or walls of the **building** or **dwelling** which causes an opening and allows the water, snow, sand or dust to enter the **building** or **dwelling**;

f. Loss that results from any act of destruction to property ordered by governmental authority and taken at the time of a **fire** to prevent its spread to adjacent property;

g. Loss to property caused by the sudden and accidental leakage of water from the fire suppression water sprinkler system of your **building** or **dwelling**;

h. Loss to property caused by the sudden and accidental leakage of water from the fixtures or plumbing systems within your **building** or **dwelling** (other than **fungus, spores, mold and mildew - all other fungus, spores, mold and mildew – construction defect**);

i. Loss to property caused by an ensuing **fire** or explosion that is a consequence of **ground water**, nuclear reaction, or **earth movement or volcanic eruption**;

2. **SUB-LIMITED CAUSES OF PROPERTY LOSS - CONSEQUENTIAL LOSS OR DAMAGE** means those causes of loss, and consequential causes of loss or damage that are listed below. A Specific **property sub-limit** applies to each insured cause of loss, consequential cause of loss or damage and is stated in the Policy Declarations and Schedules.

Each **property sub-limit** applies regardless of any other insured causes of loss or events other than ensuing **fire** that contributes concurrently or in sequence to these specific causes of loss:

# COVERED PROPERTY SECTION

a. **ANIMAL OR INSECT DAMAGE** (other than causing **collapse**) means any damage caused by insects, birds, vermin, rodents or other animals, including domesticated animals or pets. This coverage also includes damage from infestation and any resulting wastes from any animal or insect.

b. **ATMOSPHERIC CONDITION - OUTDOORS** mean the outdoor atmospheric extremes of temperature or humidity that causes any and all settling, sagging, leaning, cracking, shrinking, expanding, rupturing, bursting, contracting, bulging, wrinkling or swelling of any part of property.

c. **BREAKAGE - FRAGILE PROPERTY** means the accidental shattering or sudden breaking of covered property that is substantially constructed or composed of glass, porcelain or similar brittle materials. **Breakage - fragile property** does not include glass windows or doors used as building materials, or windshields or windows in **vehicles**, or **antique property**.

d. **COMPUTER ERROR OR VIRUS** means any programming error, oversight, defect, or any unauthorized, corrupting, or harmful piece of code known as a computer virus.

e. **CONSTRUCTION DEFECT** (other than **fungus, spores, mold, and mildew - construction defect**) means the damage to or loss of use of a **building** or **dwelling** due to:

   1) Faulty or substandard: planning, zoning, development, surveying, location, design, specifications, engineering, structural stress loading, workmanship, repair, construction, renovation, remodeling, grading or compaction;

   2) Defective materials used in repair, construction, renovation, remodeling and or maintenance;

   3) Failure to comply with applicable building codes or laws, rules or regulations governing such construction.

   The **construction defect** sub limit does not apply to the ensuing loss to your covered property that arises from water, **fire** or **collapse** damage caused by **construction defect**.

f. **CONTAMINATION** (other than **misapplication of chemicals stock – miscellaneous causes of loss, fungus, spores, mold and mildew – all other, fungus, spores, mold and mildew – construction defect**) means any actual or suspected damage to, or resulting impurity in, your covered property caused by exposure, mixture or contact with an irritant or contaminant. **Contamination** includes all costs or expenses to remove, abate, mitigate, or dispose of the irritant or contaminant.

g. **CONTRACT, LEASE, LICENSE, OR ORDER** means the cancellation, lapse, revocation, suspension or voidance of any contract, lease, license, or order.

h. **DELAY** means any holdup, postponement, suspension, setback, or reschedule.

i. **DISEASE** means illness, sickness, ailment, virus, malady, and disorder including any accidental transmission of any disease by you or your property.

j. **EARTH MOVEMENT OR VOLCANIC ERUPTION - ALL OTHER** means damage to your covered property (other than **vehicles**) caused by **earth movement or volcanic eruption**.

   All **earth movement or volcanic eruption** that occurs within any 168-hour period will constitute a single loss.

k. **EMPLOYEE DISHONESTY** (other than **livestock rustling**) means theft by your employee of your property, including **money and securities** for his or her own personal use or benefit, the benefit of a third person or to deny you the benefit of your property. This coverage is canceled for any employee immediately upon discovery of any fraudulent or dishonest act by such employee.

l. **FALSE PRETENSE** means the fraudulent taking, obtaining or withholding of your property or your purchase in good faith of lost, stolen or fraudulently obtained property. This coverage only applies if the property has been returned to its rightful owners or legal authorities.

m. **FUNGUS, SPORES, MOLD and MILDEW - ALL OTHER** means damage to a **building, dwelling, business personal property** or **household personal property** arising out of fungi, spores, mildew, mold, or other organic irritants including the resulting release of mycotoxins or odors.

n. **FUNGUS, SPORES, MOLD and MILDEW - CONSTRUCTION DEFECT** means damage from fungi, spores, mildew, mold, or other organic irritants including the resulting release of mycotoxins or odors to a **building, dwelling, business personal property** or **household personal property** arising out of:

---

# COVERED PROPERTY SECTION

1) Faulty or substandard: planning, zoning, development, surveying, location, design, specifications, engineering, structural stress loading, workmanship, repair, construction, renovation, remodeling, grading or compaction;

2) Defective materials used in repair, construction, renovation, remodeling and or maintenance;

3) Failure to comply with applicable building codes or laws, rules or regulations governing such construction.

o. **GOVERNMENTAL ACTION** means any loss or damages resulting from seizure, quarantine, condemnation, forfeiture, confiscation, nationalization, access restriction or destruction of any property by order of governmental authority. This includes any governmental authority exercising its sovereign or quasi-sovereign interest or other theory on protecting or preserving any governmental property or property right or other interest in your property or property rights.

p. **GROUND WATER - ALL OTHER** means physical damage to your property (other than **vehicles - ground water**) from:

1) Flood;

2) Surface water;

3) Mudslide or mudflow;

4) Waves, tides, or tidal waves;

5) Overflow or continuous or repeated seepage of any body of water or spray whether driven by wind or not;

6) Water under the ground surface pressing on, flowing on, or seeping through foundations, walls, floors or paved surfaces or basements;

7) Water seepage through open doors, windows or other openings into your covered **building** or **dwelling**;

8) Back up of water, mud, sewage or other material through any sewer system or drain that is a direct result of any of the above.

q. **LIVESTOCK - BASIC CAUSES OF LOSS** means we will pay the market value, the per head limit, or the **property sub-limit** (whichever is less), caused by **livestock rustling** (other than **livestock - cargo and transportation**) or the death of, or death made necessary for humane purposes of **livestock** from any of the following:

1) Aircraft or falling objects;

2) **Domestic dog** means loss from an attack by a domesticated dog or pack of dogs (other than domestic dogs owned by you or your employee). All domestic dog attacks that occur within a 48-hour period shall be considered a single loss;

3) Drowning;

4) **Earth movement or volcanic eruption**;

5) **Electrocution** means electric shock or burning from lightning or artificially generated electrical current;

6) **Fire** or smoke;

7) Hail, wind, cyclone or tornado;

8) **Loading and unloading** means direct loss to **livestock** that occurs while a truck or conveyance is docked at the loading chute, and loading and unloading of **livestock** is occurring. The direct loss must occur on the loading chute, or within the trailer, conveyance or corral;

9) **Pen collapse** means the sudden and unexpected collapse, downfall or cave in of bridges, **building(s)**, conveyance decks, pens, tanks, corrals, chutes, or culverts;

10) **Shooting** means loss or damage arising out of the use of **firearms** by any person, other than you or your employee(s). All **shooting** incidents that occur within a 48-hour period shall be considered a single loss;

# COVERED PROPERTY SECTION

**Firearms** means a pistol, revolver, rifle, shotgun or other device designed for the firing of a shot, projectile or other object by force of combustion, explosion, gas or mechanical means.

11) **Vandalism;**

12) **Wild animals** mean loss to **livestock** by any non-domesticated animal (other than an animal owned by you or your employee). All loss from **wild animals** that occurs within a 48-hour period will be considered a single loss.

**Livestock rustling** means the unlawful taking and carrying away of insured **livestock** from an insured location. This coverage only applies when there is direct physical evidence that a robbery, burglary or larceny has occurred. This coverage includes **livestock rustling** by your employees. All **livestock rustling** events that occur within a 48-hour period by the same perpetrators shall be considered a single loss.

**Livestock** means all swine, equine, poultry, sheep, or other declared animal that you produce or maintain for slaughter, breeding, production, or saddle use.

This coverage applies only to **livestock** located within the United States of America or Canada that are 90 days old or older, and **livestock** that you acquire after the inception of this policy but only while in your care, custody and control. This coverage also includes **livestock** that are owned by others, but only while in your care, custody and control.

The per-head limits are shown in the Policy Declarations and Schedules.

r. **LIVESTOCK – CARGO AND TRANSPORTATION** means we will pay the market value, the per head limit, or the **property sub-limit** whichever is less for loss to **livestock** in your owned **vehicles**, or **vehicles** you hire, borrow or operate while in the due course of transportation arising out of the following:

   1) Any **LIVESTOCK – BASIC CAUSES OF LOSS** listed above, other than **livestock rustling**

   2) Theft of entire load of **livestock;**

   3) The death of, or death made necessary for humane purposes of **livestock** caused by collision or upset of a conveyance transporting **livestock;**

   4) The death of, or death made necessary for humane purposes of **livestock** caused by collapse of the deck, gates or floors of a conveyance transporting **livestock;**

   5) **Livestock** transportation freight charges earned by you from the point of shipment to the point of loss, if such charges are unpaid and not collectible from the shipper or are prepaid, but are required to be refunded to the shipper.

The per-head limits are shown in the Policy Declarations and Schedules.

s. **LIVESTOCK – MISCELLANEOUS CAUSES OF LOSS** means we will pay the market value, the per head limit, or the **property sub-limit** whichever is less for death of, or death made necessary for humane purposes of **livestock**, caused by the following:

   1) The wrongful delivery or formulation of your **livestock** feed;

   2) Your failure to follow the directions or instructions supplied on the label of any pharmaceutical, chemical, or biological product regarding the use or application of that product. This only applies to pharmaceutical, chemical, or biological product designed for the treatment of **livestock;**

   3) Your failure to follow the written prescription supplied by your veterinarian regarding the use of any pharmaceutical, chemical, or biological product designed for treating **livestock;**

   4) Any actual damage to, or resulting impurity in, your **livestock** caused by exposure, mixture or contact with poisons or toxins in your feed or water.

The per-head limits are shown in the Policy Declarations and Schedules.

t. **LIVESTOCK – ROAD KILL** means we will pay the market value, the per head limit, or the **property sub-limit** whichever is less for the death of, or death made necessary for humane purposes of **livestock** (or non-owned **livestock** in your care, custody and control) that are struck by **vehicles** or trains while crossing, moving along, or standing on a highway, road or railroad bed.

# COVERED PROPERTY SECTION

The per-head limits are shown in the Policy Declarations and Schedules.

u. **LOSS OF MARKET** means the reduction or loss of any value or price of covered property set by a fair public marketplace based upon demand for such covered property.

v. **LOSS OF USE** means the inability to benefit from the employment, utilization, enjoyment, service, or other purposeful action of covered property.

w. **MECHANICAL OR ELECTRICAL BREAKDOWN - DIRECT DAMAGE** means the sudden and accidental malfunction or operational failure of equipment (other than **vehicles**) arising from internal mechanical breakdown, internal electrical breakdown, rupture or bursting caused by: centrifugal force; artificially generated electrical current that distributes through electrical devices, appliances or wires; or electrical arcing.   This coverage only applies to the following types of covered property whether owned, leased or operated by you:

1) **Computer equipment** means your covered computer or other electronic data processing equipment, computer systems, and related software;

2) **Irrigation systems;**

3) **Refrigeration and air handling equipment** means refrigerators, compressors, cooling towers, heat exchangers, coolers, air handlers, fans, CFC, anhydrous ammonia or similar refrigerant storage tanks, refrigerated milk storage tanks and miscellaneous related equipment that comprise the covered refrigeration system or air handling system;

4) **Steam boiler** means your covered steam boilers including, steam piping, steam engines or steam turbines, boiler-feed water piping, or condensate-return piping;

5) **Production machinery and equipment** means all mechanical or electrical machinery, other than **computer equipment, refrigeration and air handling equipment, steam boiler** or **utility systems;**

6) **Wind generating machinery**

7) **Utility systems**

x. **MECHANICAL OR ELECTRICAL BREAKDOWN - PERISHABLE STOCK** means any ensuing adulteration, debasement, spoilage or corruption of perishable **stock**, including any resulting change of grade caused by the sudden and accidental mechanical or electrical breakdown of **refrigeration and air handling equipment** including the computer hardware or software used to control or monitor such equipment, that causes or is caused by:

1) A change in pressure, temperature, humidity, or gas concentrations in your storage facility;

2) Any subsequent accidental leakage or discharge of refrigerant;

3) Any loss of power or outage beyond your control;

4) Closure or suspension of your operations caused by order of governmental authority due to your perishable **stock**.

y. **MECHANICAL OR ELECTRICAL BREAKDOWN - ALL OTHER** means the sudden and accidental malfunction or operational failure of equipment (other than **vehicles** or **household personal property**) arising from the internal mechanical breakdown, internal electrical breakdown, rupture or bursting caused by:  centrifugal force; artificially generated electrical current that distributes through electrical devices, appliances or wires; or electrical arcing; but only to property that is owned, leased, or operated by you (other than **mechanical or electrical breakdown - direct damage**).

z. **MISAPPLICATION OF CHEMICALS** mean any alteration, debasement, spoilage or corruption of **growing crops or plants, landscaping or plants - outdoors** or **stock** due to the improper formulation or application of chemicals, fumigants, pesticides, herbicides, detergents or additives.

aa. **MYSTERIOUS DISAPPEARANCE** means covered property that is missing where the shortage is only discovered on taking inventory or where the disappearance of property is unexplained.

**Mysterious disappearance** does not apply to the loss of precious stones from the settings of **jewelry**.

bb. **PRESSURE TESTING** means any hydrostatic, pneumatic or gas pressure test of any pressure vessel or any insulation breakdown test of any type of electrical equipment or **steam boiler**.

# COVERED PROPERTY SECTION

cc. **RACING OR STUNTING ACTIVITIES** mean the use of any property for contests of racing, speed, endurance, tractor pulls, or any demolition or stunting activity, including practicing for such contests or activities.

dd. **STEAM BOILER EXPLOSION** means the explosion of a **steam boiler** owned, leased, or operated by you.

ee. **STOCK – MISCELLANEOUS CAUSES OF LOSS** means we will pay the market value or the **property sub-limit** whichever is less for all loss or damage to **stock** caused by any of the following:

1) **Stock** that has decayed, decomposed or is contaminated due to bin burn, internal heating, spontaneous combustion (other than ensuing **fire**), fungi, spores, mildew, mold, or other organic irritants including the resulting release of mycotoxins or odors;

2) The deterioration of **stock** caused by the storage of **stock** for a period of time that exceeds the normal storage life of the **stock**;

3) Your failure or inability to promptly place and maintain **stock** in storage under conditions usual to the standards of the industry such as proper temperature, gas concentration, or humidity;

4) The placement in storage of covered **stock** of quality less than the usual standards of the industry;

5) Your failure to protect against the deterioration or reduction in quality of **stock** in excess of the usual standards of the industry;

6) Your failure to connect or maintain the connection to any refrigeration, heating, cooking or atmospheric control system; or

7) Your failure to activate or deactivate electrical power needed for the proper storage, refrigeration, heating, cooking or atmospheric control system

ff. **TANK LEAKAGE** (other than **underground tanks**) means the sudden and accidental discharge of liquid from above ground tanks.

gg. **THEFT – SPECIFIC HOUSEHOLD PERSONAL PROPERTY** means loss of the following specified property by theft:

1) **Firearms**;

2) **Jewelry** means your bracelets, earrings, necklaces, pendants, rings, watches or other similar personal ornaments;

    This coverage includes the accidental loss of precious stones from the setting of your **jewelry**;

3) **Silverware, gold ware, pewter ware, and collectibles** ean your silverware, gold ware, pewter ware, collectibles or similar items on file with us.

Covered **firearms, jewelry, silverware, gold ware, pewter ware and collectibles** ill be valued at the current appraised amount on file with us or the scheduled limit stated on the policy declaration, whichever is less.

hh. **VACANT BUILDING OR DWELLING** means a **building** or **dwelling** that has been unoccupied or has not been used in the customary or designed manner for over 120 consecutive days.

This coverage only applies to loss or damage arising out of **vandalism**, sprinkler leakage, glass breakage, plumbing system leakage, sewer backup, theft or attempted theft.

ii. **VEHICLES – OVERLOAD OF CARRYING OR TOWING CAPACITY** means any loss or damage to your **vehicles** caused directly or indirectly by the weight of a load that exceeds the manufacturer's lifting, supporting, towing, or carrying capacity of the vehicle. This includes your failure to properly use equipment on **vehicles** that is designed to support or stabilize the vehicle (such as outriggers, stabilizers, or other similar equipment) while performing lifting, loading, unloading or digging operations.

jj. **VEHICLES – SOUND REPRODUCTION EQUIPMENT AND MEDIA** means loss by theft to aftermarket equipment or media (CD's, DVD's, tapes, MP-3's) designed for the reproduction of sound, including, but not limited to, stereo receivers, tape decks, CD players, MP-3 players, speakers, subwoofers, amplifiers, equalizers and DVD players.

# LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

## LOSS OF BUSINESS INCOME OR EXTRA EXPENSE

### A.   INSURING AGREEMENT

Subject to the terms and conditions of this policy, we will pay up to the applicable **combined loss of business income or extra expense limit**, **scheduled extra expense limit** or **business income or extra expense sub-limit** to cover **loss of business income** or **extra expense**. Coverage for **loss of business income** or **extra expense** must first occur during the policy period and arise from **Insured Causes of Business Income or Extra Expense Loss** to covered property. Coverage will cease 90 days beyond the time that would be required to rebuild, repair or replace the damaged property using due diligence and dispatch.

**Insured Causes of Business Income or Extra Expense Loss** means accidental loss or damage to covered property arising from **Direct Causes of Business Income or Extra Expense Loss**, **Sub-limited Causes of Business Income and Extra Expense Loss - Consequential Loss or Damage**.

Exposure to substantially the same cause or causes of loss or damage or a series of related acts or omissions shall be considered a single claim. In the event a claim relates to two or more of our policy periods, such claim shall be deemed to have originated in the earliest policy period in which the claim first occurred. If that claim is covered, all damages related to that claim shall be included in the applicable **combined loss of business income or extra expense limit**, **scheduled extra expense limit** or **business income or extra expense sub-limit** the earliest policy period during which the claim first began to occur.

1.   **LOSS OF BUSINESS INCOME** means your net business profit or increased loss (before income taxes) including continuing normal business operating expenses and ordinary employee payroll.

You are required to resume **normal business operations** as soon as possible and use all available means to eliminate any unnecessary delay.

**Normal business operations** mean the business operating condition that would have existed had no loss occurred.

Coverage for a **loss of business income** claim will begin 72 hours after the covered loss occurs.

2.   **EXTRA EXPENSE** means the reasonable and necessary expenses incurred, which you would not have incurred had there been no loss to property including:

   a.   Your expenses to avoid or minimize the suspension of business and to continue operations at the described premises, at a replacement premises or at temporary locations;

   b.   Your relocation expenses to equip and operate at the replacement premises or temporary locations;

   c.   Your expenses to prevent or minimize the suspension or discontinuation of business;

   d.   Your expenses to research, replace or restore lost or damaged business records but only to the extent the expenses reduce the amount of loss that would have been payable;

   e.   Your expenses for temporary or expedited repair or replacement of property.

### B.   YOUR DUTIES IN THE EVENT OF A LOSS OF BUSINESS INCOME OR EXTRA EXPENSE LOSS

This insurance contract requires you to perform certain duties. In the event of loss you must:

1.   Report all losses to us or to your agent as soon as practicable;

2.   Take all necessary and reasonable steps to protect property from further loss following an insured loss;

3.   Keep records of expenses incurred for consideration in settlement of the claim;

4.   Provide a signed and sworn Statement in Proof of Loss containing the information we request and on the form that we provide within 60 days after our request;

5.   Cooperate with us in any investigation, negotiation or lawsuit including pursuing any right against any person or entity that may be liable to indemnify us for any amounts paid for your covered loss. At our request, you will assist us in the conduct of lawsuits, attend all hearings and trials, secure and give evidence or testimony, and disclose the identity of, or assist in locating, witnesses;

# LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

6.   Allow us to examine and audit your books and records as they relate to this policy.

Your failure to fulfill any of these duties may result in a loss or reduction of coverage.

C.   COVERED PROPERTY

The following types of property may be insured under a **combined loss of business income or extra expense limit** or a **scheduled extra expense limit**

1.   **BUILDING** means a structure that has at least two walls and a roof (and does not meet the definition of a **dwelling**) including permanently installed equipment, fixtures and including tenant improvements and betterments.

   **Building** does not include **land and land improvements**

2.   **BUSINESS PERSONAL PROPERTY** means declared business personal property that you own and use in your business.  Examples include office furniture, fixtures, appliances, supplies or parts.   **Business personal property** does not include **household personal property**, **vehicles**, **stock**, and those items listed under section E. ADDITIONAL SCHEDULED LOSS OF BUSINESS INCOME OR EXTRA EXPENSE, part 6 **Miscellaneous Covered Property** in this Loss of Business Income or Extra Expense Section.

   **HOUSEHOLD PERSONAL PROPERTY** means personal property that is owned by you or family members who reside with you and that is not permanently installed in a **building** or **dwelling**.  Examples include home appliances and furnishings, clothing, sporting goods and personal belongings.   If no other coverage is applicable, we will also cover the personal property located within your covered owner occupied **dwelling** that belongs to your guests, but only while they reside with you.

   **Vehicles** mean your automobiles, motorcycles, trucks, trailers, forklifts, snowmobiles, all terrain vehicles (ATVs) and golf carts.   **Vehicles** also include other mobile equipment such as construction or farm machinery that is not permanently installed, attached or in service to a **building** or **dwelling**

3.   **BUILDING OR BUSINESS PERSONAL PROPERTY – NEWLY ACQUIRED OR CONSTRUCTED** means your newly acquired or constructed **building**, including a **building** in the course of construction or **business personal property**.

4.   **STOCK** means merchandise or commodities held in storage or for sale, raw materials and in-process or finished goods, including parts or supplies used to manufacture, package or ship your merchandise or commodities. We will also cover **stock** owned by others while in your care, custody and control.   **Stock** does not include **livestock**, **business personal property**, **household personal property** or **vehicles**

This coverage only applies to property that was reported to us at the policy inception, at renewal, as endorsed in the policy period, or following the expiration of any newly acquired property coverage afforded herein.

This coverage does not apply to any property that is described in the Policy Declarations and Schedules page as SELF-INSURED PROPERTY.

D.   LOSS PAYMENT PROVISIONS

1.   **COMBINED LOSS OF BUSINESS INCOME OR EXTRA EXPENSE LIMIT** This limit, if elected by you, is the amount of coverage in the Policy Declarations and Schedules.  This combined coverage limit includes both **loss of business income** or **extra expense**  We will pay your actual **loss of business income** or **extra expense** or the **combined loss of business income or extra expense limit** whichever is less, for claims arising out of **Insured Causes of Business Income or Extra Expense Loss.**

2.   **SCHEDULED EXTRA EXPENSE LIMIT** This limit, if elected by you, is itemized and separately scheduled in the Policy Declarations and Schedules.  This coverage is limited to **extra expense** only.  We will pay your actual **extra expense** or the **scheduled extra expense limit** whichever is less, for claims arising out of **Insured Causes of Business Income or Extra Expense Loss.**

3.   **BUSINESS INCOME OR EXTRA EXPENSE SUB-LIMIT** Certain causes of loss, consequential losses or damages are sub-limited and have a lower limit than the **combined loss of business income or extra expense limit** or the **scheduled extra expense limit** These lower limits are stated in your Policy Declarations and Schedules and are defined in ADDITIONAL SCHEDULED LOSS OF BUSINESS INCOME OR EXTRA EXPENSE and **Sub-limited Causes of Business Income or Extra Expense Loss - Consequential Loss or Damage** For these losses, the most we will pay is the applicable **business income or extra expense sub-limit**

# LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

4. COVERAGE UNDER TWO OR MORE LIMITS:  If the **combined loss of business income or extra expense limit** or **scheduled extra expense limit** or one or more **business income or extra expense sub-limit** apply to the same covered property, we will pay up to the largest single applicable **business income or extra expense sub-limit**. In any event, no stacking of any coverage is allowed regardless of the number of covered claims or any other cause of loss or event that contributes concurrently or in sequence to the cause of loss, consequential loss or damage to that covered property.

E.  ADDITIONAL SCHEDULED LOSS OF BUSINESS INCOME OR EXTRA EXPENSE

Subject to the terms and conditions of this policy, we will pay up to the limit stated in the Policy Declarations and Schedules for any and all loss resulting from **Insured Causes of Business Income or Extra Expense Loss** the following items:

1. **CONTINGENT BUSINESS INTERRUPTION** means your consequential **loss of business income** or **extra expense** arising from a loss at operations or premises of others upon which your business is dependant. This coverage only applies if you have scheduled the operations or premises of others upon which you are dependent. The interruption of your business must be caused by **fire**, smoke, explosion, lightning, windstorm, snowstorm, hail or **vandalism** to operations or premises of others upon which you are dependent.

   Coverage will begin 72 hours after the interruption of your business occurs and will cease upon the earliest of: restoration of your business operations; restoration of the operations or premises of others upon which you are dependent; or payment of this sub-limit.

   **Fire** means a chemical change that releases heat and light and is accompanied by flame.

   **Vandalism** means willful or malicious loss or damage to covered property, including actions during a **riot or civil commotion**.

   **Riot or civil commotion** means a public disturbance involving an act or acts of violence committed by two or more persons.

2. **ELECTRONIC DATA – EXTRA EXPENSE** means the **extra expense** of labor to transcribe or copy the lost data but only if a back up copy of the data is available.

3. **GOOD ECONOMY EFFECT** means **loss of business income** that could have been earned as a result of an increase in the volume of business or sales due to favorable business conditions that may arise during the period of shutdown or rebuilding.

4. **INTERNET LOSS OF INCOME AND EXTRA EXPENSE** means the **loss of business income** or **extra expense** that you sustain during the length of time starting with the actual disruption, interruption, delay or suspension of your ability to conduct your business on the Internet and ending with the resumption of your normal ability to conduct your business on the Internet.

5. **PRE-PAYMENT OBLIGATIONS** mean **loss of business income** suffered by you due to your contractual payment obligations made to others prior to the loss that are based on pre-payment or initial payments for **stock** being held or marketed by you.

6. **MISCELLANEOUS COVERED PROPERTY** means **loss of business income** or **extra expense** arising from:

   This **MISCELLANEOUS COVERED PROPERTY** coverage section parts a. through gg. is subject to a single combined sub-limit and is the most we will pay on any and all covered accidents.

   a. **Accounts receivable** means your inability to collect outstanding amounts due you caused by lost, damaged or destroyed customer records;

   b. **Aircraft damage** means physical damage to aircraft or aircraft parts that you own, hire, borrow, or aircraft in your care, custody or control at the time of the loss;

   c. **Antique property** means covered property that is universally recognized by the general public as antique or that has been established as such by a professional appraisal within the last three years;

   d. **Cargo – transportation of property** means covered **business personal property** or **stock** (other than **livestock** or **worldwide covered property**) lost or damaged while in the due course of transportation, but only when the instrument of transportation is owned, hired, borrowed, or operated by you;

   e. **Conditional sale of covered property** means covered property that you have sold and delivered to the purchasing party under conditional sale or trust agreement, or under any deferred-payment plan;

# LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

f. **Credit card forgery or counterfeit currency** means the fraudulent or unauthorized use of credit or fund-transfer cards issued to you or registered in your name; forgery or alteration of checks or negotiable instruments; or your acceptance in good faith of counterfeit United States or Canadian paper currency;

g. **Electronic data processing equipment, media and software** means computer or telephone hardware equipment (including operational peripherals and parts), and operating software used in the operation of your business;

h. **Fences** mean a structure or partition designed and constructed for providing a barrier, boundary, railing, enclosure or screen for ornamental, containment or security purposes on your property;

i. **Foundations, pavement, bridges and railroad sidetrack** means the foundation of a **building** or **dwelling**, bridges, railroad sidetracks, roadways, sidewalks, patios or other paved surfaces, or retaining walls;

j. **Growing crops or plants** mean products of the soil capable of being grown, raised and harvested; cultivated and non-cultivated orchards; timber; pasture grass; fodder; fiber or food plants other than declared containerized nursery **stock**;

k. **Intellectual property** means any intangible asset, goodwill, reputation, franchise, copyright, patent, business know-how, customer list and information, financial information, credit card information, competitive and other confidential or private information, including electronically stored, or any similar non-intrinsic property or right, owned by you, or in your care, custody or control;

l. **Irrigation systems** mean windmills, wheel-lines, center pivots, sprinkler lines, irrigation tubes or other such systems along with the miscellaneous pumps, panels, motors or parts that service them;

m. **Land and land improvements** mean ground, rock, soil or earth, fields, meadows, mountains, moors, marsh and any improvements constructed of land. **Land and land improvements** include, all dams; reservoirs; ditches, tunnels, pilings, piers, wharves and docks that you own, or are owned by others while in your care, custody and control;

n. **Landscaping or plants - Outdoors** mean outdoor landscaping plants, trees, shrubs, and lawns, (other than **growing crops or plants**) used for ornamental purposes and not held for sale;

o. **Leasehold interest** means the net present value of your pro rata portion or interest in bonuses or lease acquisition expenses, improvements and betterments, and advance rental payments from any covered **building**;

p. **Livestock** means all swine, equine, poultry, sheep or other declared animal that you produce or maintain for slaughter, breeding, production or saddle use;

q. **Money and securities** mean the following types of property but only while at your premises, in a bank or savings institution, while en route to or from a bank or savings institution, or within the living quarters of the custodian of such **money and securities Money and securities** include:

    1) Currency, coins and bank notes;

    2) Stocks and bonds;

    1) Traveler's checks, register checks and money orders, negotiable, and nonnegotiable instruments or contracts representing either money or other property;

    4) Tokens, travel tickets, revenue and other stamps in current use (whether represented by actual stamps or unused value in a meter);

    5) Evidences of debt issued in connection with credit cards, but only if the cards are not issued by you.

r. **Precious metals** mean gold, silver, platinum or other similar metals that have an established market price. **Precious metals** does not include coins, silverware, gold ware, pewter ware, flatware, hollowware, **jewelry**, tea sets, trays or trophies made of silver, gold, platinum or other similar metals;

s. **Tenant occupied building or dwelling - personal property** means any property (other than **vehicles** or watercraft) that is owned by your tenant while located in your tenant occupied **dwelling**. This coverage only applies if the tenant has no other applicable insurance;

# LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

t. **Tools and tack owned by your employee** means employee's tools and tack being used in your business at your request;

u. **Undeclared property** means property that was not reported or declared to us at the policy inception or renewal or following the expiration of any newly acquired property coverage afforded herein;

v. **Underground tanks** mean underground storage tanks including the contents contained therein;

w. **Utility systems** mean:

1) Communication systems, radio, microwave or television systems, overhead or coaxial cables and microwave relays, satellites, satellite dishes and other antenna (other than **electronic data processing equipment, media and software**;

2) Waste disposal and sewage treatment systems;

3) Power supply services, electricity, natural gas, fossil fuels or propane (other than **irrigation systems**;

4) Your utility-generating plants, switching stations, substations, transformers and supply lines;

5) Water supply services (other than **irrigation systems** including pumping stations, wells, deep well pumps, water mains and pipes, flues, drains supplying water;

6) Similar systems owned by a utility, landlord or other supplier with whom you have contracted, whereby you have agreed to maintain those services for your property.

x. **Valuable papers** mean catalogs, registrations, letters of credit, books, manuscripts, written documents, drawings, blueprints, films, bills or deeds and the cost of blank materials when valuable documents exist on electronic or magnetic media or media other than prepackaged software programs;

y. **Vehicles - newly acquired** means **vehicles** that you newly acquire through purchase or **lease**;

**Lease** means those **vehicles** you acquire for your use via a written lease agreement where the agreed time period is written into the agreement and your use of the **vehicles** will exceed 60 days.

z. **Vehicles - rented and non-owned** means **vehicles** that you use as a temporary replacement, or that you borrow for period of time that does not exceed 60 days.  This coverage includes **vehicles** that you **rent**;

**Rent** means those **vehicles** you acquire for your use via an agreement where the agreed time period is not specified or your use of the **vehicles** will not exceed 60 days.

aa. **Water resource** means any river, lake, stream, spring, well or other surface or underground water resource;

bb. **Watercraft - other** means any motorboat, sailboat, jet-ski, rowboat, canoe, kayak or rubber raft, or other craft that exceed 26 feet in length or 250 horsepower including accessory equipment, furnishings, outboard motors and trailers;

cc. **Watercraft - personal** means any motorboat, sailboat, jet ski, rowboat, canoe, kayak or rubber raft that does not exceed 26 feet in length or 250 horsepower including their accessory equipment, furnishings, outboard motors and trailers.  Coverage only applies to **watercraft - personal** crafts that are designed for and limited to seasonal recreational use within the United States territorial waters;

dd. **Watercraft - newly acquired** means any **watercraft - personal** that you have newly acquired, or that you hire, contract for use and do not own.  This coverage includes **watercraft - personal** that are a temporary replacement or that you lease, rent, or borrow;

ee. **Watercraft - rented and non-owned** means **watercraft - personal** that you use as a temporary replacement, or that you borrow for period of time that does not exceed 60 days.  This coverage includes **watercraft - personal** that you **rent**;

ff. **Wind generating machinery** means any machinery that is designed and used to move air to protect **growing crops or plants** from extremes of temperature;

gg. **Worldwide covered property** means your property that is lost or damaged while outside the territory of the United States of America or Canada.

# LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

F.   INSURED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS

Please note that certain causes of loss are not covered by this policy.

1.   ***DIRECT CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS*** means direct physical loss from insured risks (other than ***Sub-limited Causes of Business Income or Extra Expense Loss - Consequential Loss or Damage***) including but not limited to ***fire*** and smoke, explosion, lightning, windstorm, snowstorm, cyclone or tornado, hail, ***vandalism, riot or civil commotion,*** collision, falling objects, damage from ***vehicles,*** theft, or:

a.   ***COLLAPSE*** means a sudden and unexpected downfall or cave-in of a ***building*** or ***dwelling,*** or any part of a ***building*** or ***dwelling*** which results in the inability to utilize the ***building*** or ***dwelling*** for its intended purpose. A ***building*** or ***dwelling*** or any part of a ***building*** or ***dwelling*** that is in imminent danger of sudden and unexpected downfall or cave-in is also considered ***collapse.***

***Collapse*** only applies if caused by one or more of the following:

1)   Use of defective materials in construction, repair, renovation, or remodeling if ***collapse*** occurs during the construction, repair, renovation or remodeling;

2)   Decay that is hidden from view, unless the presence of decay is known or should have been known to you prior to ***collapse;***

3)   Damage from insects, birds or rodents that is hidden from view, unless the presence of damage is known or should have been known to you prior to ***collapse;***

4)   Breakage of ***building*** or ***dwelling*** glass;

6)   Weight of ice, snow or water;

7)   Weight of people, ***stock*** or ***livestock***

A ***building*** or ***dwelling*** that is standing is not in a state of ***collapse*** despite evidence of cracking, bulging, sagging, leaning, settling, shrinking, rupturing, bursting, contracting, wrinkling, swelling or expanding unless it is in imminent danger of ***collapse.***

b.   Sewer backup (other than as a consequence of ***ground water***);

***Ground water*** means:

1)   Flood;

2)   Surface water;

3)   Mudslide or mudflow;

4)   Waves, tides or tidal waves;

5)   Any overflow or continuous or repeated seepage of any body of water or spray, whether driven by wind or not;

6)   Any water under the ground surface pressing on, flowing on, or seeping through foundations, walls, floors, basements or paved surfaces

7)   Any water seepage through open doors, windows or other openings into your ***building*** or ***dwelling,***

8)   Any back-up of water, mud, sewage or other material through any sewer system or drain that is a direct result of any of the above.

c.   Water, snow, sand or dust damage to your ***business personal property*** that is located inside your covered ***building*** but only if damage is first sustained from windstorm or hail to the roof or walls of the ***building*** or ***dwelling*** which causes an opening and allows the water, snow, sand or dust to enter the ***building*** or ***dwelling,***

d.   Loss that results from any act of destruction to covered property ordered by governmental authority and taken at the time of a ***fire*** to prevent its spread to adjacent property;

## LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

e.  Loss to covered property caused by the sudden and accidental leakage of water from the fire suppression water sprinkler system of your *building* or *dwelling*;

f.  Loss to covered property caused by the sudden and accidental leakage of water from the fixtures or plumbing systems within your *building* or *dwelling* (other than *fungus, spores, mold, and mildew – all other fungus, spores, mold, and mildew – construction defect*);

g.  Loss or damage to covered property caused by an ensuing *fire* or explosion that is a consequence of *ground water*, nuclear reaction, or *earth movement or volcanic eruption*;

h.  Loss or damage to the specific covered property listed below caused by a *collapse*:

1) Outdoor radio, satellite, or television antennas;

2) Awnings, gutters and downspouts;

3) Yard fixtures;

4) Outdoor swimming pools, diving platforms and beach platforms;

5) *Fences*;

6) Retaining walls or bulkheads;

7) Piers, wharves or docks;

8) Underground pipes, flues, drains, drain fields, cesspools or septic tanks;

9) Walkways, roadways or other paved or concrete surfaces.

2. *SUB-LIMITED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS – CONSEQUENTIAL LOSS OR DAMAGE* means only those causes of loss that are listed below. This section applies a specific *business income or extra expense sub-limit* to these insured causes of loss, consequential losses or damages. The amount of coverage that is applicable to each *business income or extra expense sub-limit* is stated in the Policy Declarations and Schedules.

a.  *MISCELLANEOUS CAUSES OF LOSS* mean *loss of business income* or *extra expense* arising out of:

This *MISCELLANEOUS CAUSES OF LOSS* coverage section parts a. 1 through a. 25 is subject to a single combined sub-limit and is the most we will pay on any and all covered accidents.

1) *ANIMAL OR INSECT DAMAGE* (other than causing *collapse*) means any damage caused by insects, birds, vermin, rodents or other animals, including domesticated animals or pets. This coverage also includes damage from infestation and any resulting wastes from any animal or insect.

2) *ATMOSPHERIC CONDITION - OUTDOORS* means the outdoor atmospheric extremes of temperature or humidity that causes any and all settling, sagging, leaning, cracking, shrinking, expanding, rupturing, bursting, contracting, bulging, wrinkling or swelling of any part of property.

3) *BREAKAGE - FRAGILE PROPERTY* means the accidental shattering or sudden breaking of covered property that is substantially constructed or composed of glass, porcelain or similar brittle materials. *Breakage - fragile property* does not include glass windows or doors used as building materials, or windshields or windows in *vehicles* or *antique property*.

4) *COMPUTER ERROR OR VIRUS* means any programming error, oversight, defect, or any unauthorized, corrupting, or harmful piece of code known as a computer virus.

5) *CONTAMINATION* (other than *misapplication of chemicals/stock – miscellaneous causes of loss* *fungus, spores, mold and mildew – all other fungus, spores, mold and mildew – construction defect*) means any actual or suspected damage to or resulting impurity in your covered property caused by exposure, mixture or contact with an irritant or contaminant. *Contamination* includes all costs or expenses to remove, abate, mitigate, or dispose of the irritant or contaminant.

6) *CONTRACT, LEASE, LICENSE, OR ORDER* means the cancellation, lapse, revocation, suspension or voidance of any contract, lease, license, or order.

7) *CONSTRUCTION DEFECT* means the damage to or loss of use of a *building* or *dwelling* due to:

---

## LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

a) Faulty or substandard: planning, zoning, development, surveying, location, design, specifications, engineering, structural stress loading, workmanship, repair, construction, renovation, remodeling, grading or compaction;

b) Defective materials used in repair, construction, renovation, remodeling and or maintenance;

c) Failure to comply with applicable building codes or laws, rules or regulations governing such construction.

This **construction defect** sub limit does not apply to the ensuing loss to your covered property that arises from water, **fire** or **collapse** damage caused by **construction defect**.

8) **DELAY** means any holdup, postponement, suspension, setback or reschedule.

9) **DISEASE** means illness, sickness, ailment, virus, malady, and disorder including any accidental transmission of any disease by you or your property.

10) **EARTH MOVEMENT OR VOLCANIC ERUPTION** means:

a) Earthquake, sinkhole collapse, or landslide;

b) Mine subsidence or earth sinking, rising, or shifting;

c) Volcanic eruption, blast, airborne shockwaves, ash, dust, particulate matter or lava flow.

All **earth movement or volcanic eruption** that occurs within any 168-hour period will constitute a single loss.

11) **EMPLOYEE DISHONESTY** means your employee's intentional acts of wrongfully taking, obtaining, or withholding your property, including **money and securities** for his or her own personal use or benefit, the benefit of a third person or to deny you the benefit of your property or your employee's other dishonest or fraudulent acts

12) **FALSE PRETENSE** means the fraudulent taking, obtaining or withholding of your property or your purchase in good faith of lost, stolen or fraudulently obtained property.  This coverage only applies if the property has been returned to its rightful owner or legal authorities.

13) **FUNGUS, SPORES, MOLD and MILDEW - CONSTRUCTION DEFECT** means damage from fungi, spores, mildew, mold, or other organic irritants including the resulting release of mycotoxins to a **building**, **dwelling**, **business personal property** or **household personal property** arising out of:

a) Faulty or substandard: planning, zoning, development, surveying, location, design, specifications, engineering, structural stress loading, workmanship, repair, construction, renovation, remodeling, grading or compaction;

b) Defective materials used in repair, construction, renovation, remodeling and or maintenance;

c) Failure to comply with applicable building codes or laws, rules or regulations governing such construction.

14) **GOVERNMENTAL ACTION** means any loss or damages resulting from seizure, quarantine, condemnation, forfeiture, confiscation, nationalization, access restriction or destruction of any covered property by order of governmental authority.  This includes any governmental authority exercising its sovereign or quasi-sovereign interest or other theory on protecting or preserving any governmental property or property right or other interest in your property or property rights.

15) **GROUND WATER - ALL OTHER** means physical damage to your property (other than **vehicles - ground water**) from:

a) Flood;

b) Surface water;

c) Mudslide or mudflow;

d) Waves, tides, or tidal waves;

## LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

e)  Any overflow or continuous or repeated seepage of any body of water or spray;

f)  Any water under the ground surface pressing on, flowing on, or seeping through foundations, walls, floors or paved surfaces or basements;

g)  Any water seepage through open doors, windows or other openings into your covered **building** or **dwelling**;

h)  Any back up of water, mud, sewage or other material through any sewer system or drain that is a direct result of any of the above.

16) **LOSS OF MARKET** means the reduction or loss of any value or price of covered property set by a fair public marketplace based upon demand for such covered property.

17) **LOSS OF USE** means the inability to benefit from the employment, utilization, enjoyment, service, or other purposeful action of covered property.

18) **MISAPPLICATION OF CHEMICALS** mean any alteration, debasement, spoilage or corruption of **growing crops or plants, landscaping or plants - outdoors**, or **stock** due to the improper formulation or application of chemicals, fumigants, pesticides, herbicides, detergents or additives.

19) **MYSTERIOUS DISAPPEARANCE** means covered property that is missing where the shortage is only discovered on taking inventory or where the disappearance of property is unexplained.

**Mysterious disappearance** does not apply to the loss of precious stones from the settings of **jewelry**.

20) **PRESSURE TESTING** means any hydrostatic, pneumatic or gas pressure test of any pressure vessel or any insulation breakdown test of any type of electrical equipment or **steam boiler**.

21) **RACING OR STUNTING ACTIVITIES** mean the use of any property for contests of racing, speed, endurance, tractor pulls, or any demolition or stunting activity, including practicing for such contests or activities.

22) **STOCK – MISCELLANEOUS CAUSES OF LOSS** means we will pay the market value or the **property sub-limit** whichever is less for all loss or damage to **stock** caused by any of the following:

a)  **Stock** that has decayed, decomposed or is contaminated due to bin burn, internal heating, spontaneous combustion (other than ensuing **fire**), fungi, spores, mildew, mold, or other organic irritants including the resulting release of mycotoxins or odors;

b)  The deterioration of **stock** caused by the storage of **stock** for a period of time that exceeds the normal storage life of the **stock**;

c)  Your failure or inability to promptly place and maintain **stock** in storage under conditions usual to the standards of the industry such as proper temperature, gas concentration, or humidity;

d)  The placement in storage of covered **stock** of quality less than the usual standards of the industry;

e)  Your failure to protect against the deterioration or reduction in quality of **stock** in excess of the usual standards of the industry;

f)  Your failure to connect or maintain the connection to any refrigeration, heating, cooking or atmospheric control system; or

g)  Your failure to activate or deactivate electrical power needed for the proper storage, refrigeration, and heating, cooking or atmospheric control system.

23) **TANK LEAKAGE** (other than **underground tanks**) means the sudden and accidental discharge of liquid from above ground tanks.

24) **THEFT - SPECIFIC HOUSEHOLD PERSONAL PROPERTY** means loss of the following specified property by theft:

# LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

a) **Firearms** mean a pistol, revolver, rifle, shotgun or other device designed for the firing of a shot, projectile or other object by force of combustion, explosion, gas or mechanical means, whether operable or inoperable.

b) **Jewelry** means your bracelets, earrings, necklaces, pendants, rings, watches or other similar personal ornaments.

c) **Silverware, gold ware, pewter ware, and collectibles** mean your silverware, gold ware, pewter ware, collectibles or similar items on file with us.

25) **VACANT BUILDING OR DWELLING** means a **building** or **dwelling** that has been unoccupied or has not been used in the customary or designed manner for over 120 consecutive days.

This coverage only applies to loss or damage arising out of **vandalism**, sprinkler leakage, glass breakage plumbing system leakage, sewer backup, theft or attempted theft.

b. **CUSTOM DUTIES, STORAGE CHARGES OR ELEVATOR CHARGES** mean the **loss of business income** due you as a result of unpaid customs duties, storage charges or elevator charges for commodities being stored within your covered **building**.

c. **EMPLOYEE OCCUPIED DWELLING - EXTRA EXPENSE** (other than **rental building - loss of rents**) means we will pay the **fair rental value** loss you sustain when your covered employee occupied **dwelling** is rendered uninhabitable.

This coverage applies only when direct damage to your employee occupied **dwelling** occurs as a result of an **Insured Cause of Property Loss** as defined in the Property Section of this policy. Payment will terminate at the earliest of: the repair or replacement of the damaged employee occupied **dwelling**; six months from the date the employee occupied **dwelling** becomes uninhabitable; or payment of this sub-limit.

**Fair rental value** means the fair rental value of the **dwelling** where your employee resides, less any expenses that do not continue when the **dwelling** is uninhabitable.

d. **FOOD CONTAMINATION BUSINESS INCOME OR EXTRA EXPENSE** means the **loss of business income** or **extra expense** sustained by you to resume **normal business operations** caused by **food contamination.** The **food contamination** episode must be declared by any recognized governmental authority having jurisdiction over your business relative to the health and hygiene standards necessary for the protection of the public.

**Food contamination** means a condition in food that has caused or is suspected of causing a food borne illness to one or more of your patrons resulting from tainted food purchased by you; improper preservation, handling, or cooking of food; or a communicable disease from bacterial or viral organisms transmitted by one or more of your employees through human contact with food.

Coverage for a **food contamination business income or extra expense** claim will begin 72 hours after the official declaration of a **food contamination** occurs.

e. **HEPATITIS "A" INOCULATIONS COVERAGE** means the **extra expense** you incur for having to administer Hepatitis "A" inoculations to your customers who were potentially exposed to the virus during the period prior to the official declaration of a Hepatitis "A" episode by a recognized governmental authority.

f. **MECHANICAL OR ELECTRICAL BREAKDOWN - DIRECT DAMAGE** means the **loss of business income** or **extra expense** caused by the sudden and accidental malfunction or operational failure of equipment (other than **vehicles**) arising from the internal mechanical breakdown, internal electrical breakdown, rupture or bursting caused by: centrifugal force; an artificially generated electrical current that distributes through electrical devices, appliances or wires; or electrical arcing. This coverage only applies to the following types of property whether owned, leased, or operated by you:

1) **Computer equipment** means your covered computer or other electronic data processing equipment, personal computer systems, and related software;

2) **Irrigation systems**;

3) **Refrigeration and air handling equipment** means refrigerators, compressors, cooling towers, heat exchangers, coolers, air handlers, fans, CFC, anhydrous ammonia or similar refrigerant storage tanks, refrigerated milk storage tanks and miscellaneous related equipment that comprise the covered refrigeration system or air handling system;

## LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

4) ***Steam boiler*** means your covered steam boilers including steam piping, steam engines or steam turbines, boiler-feed water piping, or condensate-return piping;

5) ***Production machinery and equipment*** means all mechanical or electrical machinery, other than ***computer equipment, refrigeration and air handling equipment, steam boiler, utility systems***;

6) ***Wind generating machinery***

7) ***Utility systems***

g. ***MECHANICAL OR ELECTRICAL BREAKDOWN – PERISHABLE STOCK*** means ***loss of business income*** or ***extra expense*** caused by the ensuing adulteration, debasement, spoilage or corruption of perishable ***stock***, including any resulting change of grade caused by the sudden and accidental mechanical or electrical breakdown of ***refrigeration and air handling equipment*** including the computer hardware or software used to control or monitor such equipment, that causes or is caused by:

1) A change in pressure, temperature, humidity, or gas concentrations in your storage facility, and any subsequent accidental leakage or discharge of refrigerant;

2) Any loss of power or outage beyond your control;

3) Closure or suspension of your operations caused by the order of governmental authority due to your perishable ***stock***.

h. ***MECHANICAL OR ELECTRICAL BREAKDOWN – ALL OTHER*** means ***loss of business income*** or ***extra expense*** caused by the sudden and accidental malfunction or operational failure of equipment (other than ***vehicles*** or ***household personal property*** arising from the internal mechanical breakdown, internal electrical breakdown, rupture or bursting caused by: centrifugal force; an artificially generated electrical current that distributes through electrical devices, appliances or wires; or electrical arcing; but only to property that is owned, leased, or operated by you (other than ***mechanical or electrical breakdown – direct damage***.

i. ***OFF PREMISES UTILITY SERVICE*** means your ***loss of business income*** resulting from loss of ***utility systems*** not owned, leased, or operated by you, your employees, or your business. This coverage applies only if the interruption to the ***utility system*** is caused by any ***Direct Causes of Property Loss*** as defined in the Covered Property Section.

j. ***PROPERTY ACCESS*** means ***loss of business income*** or ***extra expense*** arising out of your impaired access to your real property resulting from, or in connection with, any ***Insured Causes of Business Income and Extra Expense Loss*** other than ***governmental action***.

k. ***STEAM BOILER EXPLOSION*** means ***loss of business income*** or ***extra expense*** arising out of the explosion of a ***steam boiler*** owned, leased or operated by you.

l. ***STRIKES, PROTEST AND OTHER INTERFERENCE*** means the ***loss of business income*** or ***extra expense*** caused by interference with rebuilding, repairing, or replacing covered property due to labor disputes, strikers, or other similar protestors.

m. ***SUPPLEMENTAL EXTRA EXPENSE COVERAGES*** mean ***extra expense*** arising from, and in sequence to, any ***Insured Causes of Property Loss*** as set forth in the preceding Covered Property Section of this policy for the following specified property:

1) ***Alcoholic beverages tax*** means your federal excise taxes and customs duties on alcoholic beverages that are not refundable pursuant to Public Law 94-423 in the event of loss by theft.

2) ***Auto – finance gap expense*** means the difference between the ***actual cash value*** of the automobiles, pickup trucks, semi's or heavy duty trucks at the time of loss and the amount required to settle your financial obligation to others for the damaged automobiles, pickup trucks, semi's or heavy duty trucks.

This coverage only applies to automobiles, pickup trucks, semis or heavy-duty trucks, which meet all of the following conditions:

a) They sustain a total loss;

b) They were manufactured within five years of the date of loss;

c) The finance contract is in final written form prior to the loss and said contract is written through an institution in the business of vehicle financing;

# LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

    d)   They are legally licensed for road use at the time of loss;

    e)   They are scheduled on this policy with physical damage coverage.

**Actual cash value** means we will pay up to the cost to repair or replace the covered property with materials of like kind and quality with deduction for depreciation.

3)   **CFC – related expense** means the repair or functional replacement of covered property due to the use or presence of a refrigerant containing CFC (chlorinated fluorocarbon substances) in the manner of our choice.

4)   **Debris removal and necessary demolition** means the removal of non-**pollutant** debris resulting from direct damage to your covered **building** or **dwelling** or your necessary demolition of an undamaged covered **building** or **dwelling** following a covered loss, but only if we authorize said removal or demolition.

5)   **Deep well pumps** mean the pulling and re-sinking of any deep well pump.

6)   **Demolition and increased cost of construction** means the repair or replacement of a covered **building** or **dwelling** as required by enforcement of:

    a)   Any current ordinance or law that regulates the construction or repair of a **building** or **dwelling**; or

    b)   Established zoning or land use requirement.

We will not pay for any increased construction costs until the covered property is actually repaired or replaced.

7)   **Dwelling – emergency prohibition against occupancy** means the **additional living expenses** you sustain when a civil authority prevents your occupancy of a **dwelling**.

**Additional living expenses** mean the reasonable and necessary increase in living expenses incurred after a covered loss to a **dwelling** to maintain your usual standard of living.

This coverage applies only when your loss results from direct damage to neighboring premises or your premises. In any event, payment will not extend beyond 90 days from the date a civil authority prevents your occupancy of a **dwelling**.

8)   **Dwelling – living expense** means the **additional living expenses** you incur when your covered owner-occupied **dwelling** is rendered uninhabitable.

The most we will pay in **additional living expenses** after any single covered loss to your covered owner-occupied **dwelling** is an amount equal to 20% of the owner-occupied **dwelling** limit to which the loss occurred. Payment will terminate at the earliest of the reasonable time required for repair or replacement of the damaged **dwelling**, or 12 months from the date your owner-occupied **dwelling** becomes uninhabitable.

9)   **Dwelling – lock replacement** means the re-keying or replacing your locks when the keys to your **dwelling** are lost or stolen and you notify us within 72 hours of discovering the loss. No **deductible** applies to this coverage.

10)  **Earthwork** means the excavation, grading, back filling or filling needed to repair or functionally replace foundations and footings of a **building** following any **Insured Causes of Property Loss.**

11)  **Fire department expense** means the **fire department service charges** resulting from covered accidents and, any additional **fire department service charges** resulting from special handling or precautions due to a **pollutant**, including the containment or cleanup of a contaminant or **pollutant**.

**Fire department service charges** mean those charges you assumed by contract or agreement prior to loss or that are required by local ordinance when the fire department is called to save or protect covered property.

**Pollutant** means a solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, waste or other forms of substance or matter whose release or escape has or will result in the direct pollution of the environment including costs of abatement.

---

## LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

12) ***Fungus, Spores, Mold and Mildew - Extra Expense*** means the ***additional living expenses*** and the ***extra expense*** you incur as a result of loss of use of a ***building, dwelling, business personal property*** or ***household personal property*** arising from fungi, mildew, mold, spores, or related organic irritants, including the resulting release of mycotoxins.

13) ***Internet extortion*** means all reasonable and necessary expenses (including any ransom paid with our consent) arising from any threat or connected series of threats to commit an intentional and unauthorized use or access that alters, copies, misappropriates, corrupts, destroys, disrupts, deletes, or damages your Internet accessible ***computer equipment*** regardless of the perpetrators' motives.

14) ***Loss assessment - property owners' association*** means your pro-rata share of any loss assessment charged during the policy period against you by a property owners' association.

15) ***Premises pollution*** means the extraction of a ***pollutant*** from covered property at your owned or leased premises, but only if the discharge, dispersal, seepage, migration, release or escape of the ***pollutant*** is sudden and accidental.

Covered expenses will be paid only if they are reported to us in writing within 180 days of the date of covered loss or the end of the policy period, whichever occurs first.

16) ***Preservation of property - repair and moving expense*** means the reasonable expense to move covered property to safety. This coverage includes storage fees while your covered property is temporarily stored at another location, and temporary repairs to covered property but only if necessary to prevent further loss. This coverage only applies if you obtain our express permission prior to moving covered property.

17) ***Product recall expenses*** mean the ***extra expense*** incurred by you for the loss of use withdrawal, recall, inspection, repair, replacement, adjustment, removal, disposal, of ***your product, impaired property*** or ***your work***, but only if ***your product, impaired property*** or ***your work*** is withdrawn or recalled from the market or from use by you, any person, organization or government. This coverage only applies if there is a known or suspected defect or dangerous condition in ***your product, impaired property*** or ***your work*** that creates an enhanced risk for ***bodily injury*** or ***property damage*** from the use of ***your product, impaired property*** or ***your work***.

***Your product*** means any goods or products (other than real property) grown, manufactured, sold, handled, distributed or disposed of by you, and those instructions, warranties and representations you make relating to those goods or products. ***Your product*** includes containers (other than ***vehicles*** or vending machines) materials, parts or equipment furnished in connection with such goods or products.

***Impaired property*** means tangible property (other than ***your product*** or ***your work***) that cannot be used, or is less useful, and has not been physically injured arising out of a known or suspected defect, deficiency, inadequacy or dangerous condition in ***your product*** or ***your work***.

***Your work*** means work or operations performed by you or on your behalf including related materials, parts or equipment furnished in connection with such work or operations and, warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of ***your work***. ***Your work*** includes your providing of, or failure to provide, any warnings or instructions.

18) ***Rental Building - Loss Of Rents*** mean the loss of rents or reduced rental income due you when your covered ***building*** that you hold for rent to others is rendered uninhabitable or untenable after an accidental loss. The accidental loss must arise from any ***Insured Causes of Property Loss*** as defined in the Covered Property Section.

19) ***Tree removal*** means the removal of those trees that have fallen and damaged your covered ***building, dwelling,*** or ***utility systems***.

20) ***Vehicles - towing or rental*** means the loss of use and expense that you may incur from towing or having to rent a replacement for your damaged ***vehicles***. Rental reimbursement will only apply if the rental expense is incurred as a result of disability to your ***vehicles*** because of collision, upset or mechanical breakdown. Rental reimbursement coverage will begin 24 hours after mechanical breakdown occurs.

# LEGAL LIABILITY AND DEFENSE SECTION

## LEGAL LIABILITY AND DEFENSE

A.  INSURING AGREEMENT

Subject to all the terms and conditions of this policy, we will pay your legal liability and defense costs up to the *blanket legal liability and defense limit* or up to the *legal liability and defense sub-limit* or *Covered Legal Liability and Defense Causes of Loss* or from *Sub-limited Legal Liability and Defense Causes of Loss - Consequential Loss or Damage* that first occurs during the policy period.

Exposure to substantially the same cause or causes of loss or damage or a series of related acts or omissions shall be considered a single claim. In the event a claim relates to two or more of our policy periods, such claim shall be deemed to have originated in the earliest policy period in which the loss first occurred. If that claim is covered, all damages related to that claim shall be included in the applicable *blanket legal liability and defense limit legal liability and defense sub-limit* of the earliest policy period during which the claim first began to occur.

This coverage applies to covered claims that take place anywhere in the world during the policy period. Please be aware that many foreign countries (including Mexico) do not accept or recognize any coverage (including vehicle liability coverage) issued by an insurance company not domiciled in that country. We are domiciled in the United States of America.

B.  OUR DUTY TO INVESTIGATE, DEFEND AND SETTLE

We have the duty to investigate, defend or settle any covered claim or suit. Our duty to investigate, defend or settle is completed when we have paid the applicable *blanket legal liability and defense limit legal liability and defense sub-limit* of insurance in investigation, attorney's fees, settlement, defense costs, interest or payment of claims.

C.  LEGAL COUNSEL

We have the right to select and retain appropriate legal representation, and to investigate and defend you in a covered lawsuit, claim, or other dispute resolution or arbitration proceeding. If you retain any other legal counsel it shall be at your expense.

D.  PRIOR WRITTEN CONSENT REQUIRED

You must obtain our prior written consent before entering into any settlement, dispute resolution or arbitration proceeding.

E.  LEGAL LIABILITY AND DEFENSE WITHIN POLICY LIMITS

1.  *BLANKET LEGAL LIABILITY AND DEFENSE LIMIT*: This limit is an annual aggregate policy limit and is the most we will pay (including attorney fees and defense costs) regardless of the number of accidents, settlements, claims, claimants, lawsuits, acts or parties involved. The *blanket legal liability and defense limit* applies separately to each consecutive policy period shown in the Policy Declarations and Schedules. For purposes of determining the *blanket legal liability and defense limit*, any extension of less than 12 months will be deemed part of the last preceding policy period.

2.  *LEGAL LIABILITY AND DEFENSE SUB-LIMIT*: Certain causes of loss, consequential loss or damages are sub-limited and have a lower limit than the *blanket legal liability and defense limit*. These lower limits are stated in the Policy Declarations and Schedules and are defined in *Sub-limited Legal Liability and Defense Causes of Loss - Consequential Loss or Damage*. Losses paid under this coverage part will reduce the available *blanket legal liability and defense limit* and do not represent additional limits of coverage.

3.  COVERAGE UNDER TWO OR MORE LIMITS: If the *blanket legal liability and defense limit* and one or more, *legal liability and defense sub-limits* apply to the same covered claim, we will only pay up to the largest single applicable *legal liability and defense sub-limit*. In any event, no stacking of any coverage is allowed, regardless of the number of covered claims or other cause of loss or event that contributes concurrently or in sequence to the cause of loss, consequential cause of loss or damage.

F.  YOUR DUTIES IN THE EVENT OF A LEGAL LIABILITY AND DEFENSE LOSS

This insurance contract requires you to perform certain duties in the event of a Legal Liability and Defense loss. In the event of loss you must:

1.  Promptly report all claims, losses or incidents which you reasonably believe may cause you legal liability;

# LEGAL LIABILITY AND DEFENSE SECTION

2. Immediately send us copies of any demands, notices, summons, or legal papers received concerning any covered lawsuit;

3. Take all necessary and reasonable steps to prevent further loss following a claim, loss or incident which you reasonably believe may cause you legal liability;

4. Set aside or make available your property or other relevant items or information in your control or possession for our inspection and examination;

5. Keep records of expenses incurred for which you seek reimbursement;

6. Authorize us to obtain any additional records or other information as may be required;

7. Provide notice to us in writing and include all known facts;

8. Submit to medical examinations or other evaluations that we deem necessary by the consultant of our choice;

9. Cooperate with us in the investigation, settlement, claim defense or lawsuit including pursuing any right against any person or organization that may be liable to indemnify us for, or contribute to, any amounts paid on your behalf.

Your failure to fulfill any of these duties may result in a loss or reduction of your coverage.

G. COVERED LEGAL LIABILITY AND DEFENSE COSTS

We will pay on your behalf, up to the applicable *blanket legal liability and defense limit* the *legal liability and defense sub-limit*, for the following:

1. Expenses or amounts relating to a covered claim, covered lawsuit, covered legal proceeding or covered arbitration to which you must respond. This includes expenses or amounts relating to investigation, attorney fees, defense costs, interest, settlement amounts, judgments or payment of claims;

2. The cost of bonds to release attachments (we do not have to furnish those bonds), but only for bond amounts within the applicable limit of coverage;

3. Any court costs assessed against you in a covered lawsuit;

4. Our costs for legal counsel to advise, evaluate, defend or prosecute a claim or covered lawsuit;

5. Reasonable expenses incurred by you at our request to assist us in the investigation or defense of a lawsuit, including actual loss of earnings up to $100 a day because of time off from work;

6. Interest that accrues after entry of the judgment and before we have paid, offered to pay or deposited in court (but only the part of the judgment that is covered by this policy and within the applicable limit or sub-limit) and prejudgment interest awarded against you on that part of the judgment we pay.

H. COVERED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS

*COVERED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS* means:

1. *ADVERTISING AND PUBLICATION LIABILITY - SPECIFIED CAUSES OF LOSS* means unintended loss or damage that first occurs during the policy period and arises from your oral or written publication of material that slanders or libels a person or organization; disparages a person's or organization's goods, products or services; violates a person's right of privacy; or misappropriates other's advertising ideas or style of doing business.

This coverage only applies if you are not in the business of advertising, broadcasting, publishing or telecasting.

2. *BODILY INJURY* means all liability and defense claims that first occur during the policy period and arise from human physical damage, sickness or disease (other than *disease-STD*) and the resulting emotional or mental distress or death from any of these conditions.

3. *CONTRACTUAL LIABILITY- SPECIFIED CONTRACTS* mean *bodily injury* or *property damage* that occurs after the execution date of a contract or agreement, or that you would have in the absence of a covered contract or agreement, and has resulted from liability assumed in:

   a. An easement contract or agreement;

# LEGAL LIABILITY AND DEFENSE SECTION

    b.   An elevator maintenance contract or agreement;

    c.   A lease of premises contract or agreement;

    d.   A license contract or agreement;

    e.   An obligation as required by ordinance to indemnify a municipality;

    f.   A railroad sidetrack agreement;

    g.   Any agreement to assume the tort liability of another party as part of a written or verbal contract.  Tort liability includes legal liability that would be imposed by law in the absence of any contract or agreement provided the ***bodily injury*** or ***property damage*** occurs after the execution date of the contract or agreement.

4.   ***EXCESS EMPLOYER'S LIABILITY – UNDERLYING WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE REQUIRED*** provides ***bodily injury*** coverage in excess of your statutorily required workers' compensation and employers liability coverage.

    This coverage applies only if you have other valid and collectible workers compensation and employers' liability insurance covering at least the first $500,000 per accident or disease per employee annually and in the aggregate. In no event will this policy respond before an amount greater than $500,000 has been paid on your behalf.

5.   ***HOST LIQUOR LIABILITY*** means ***bodily injury*** or ***property damage*** that first occurs during the policy period and arises from your causing or contributing to the intoxication of any person or the violation of any statute, ordinance or regulation relating to the gift or use of alcoholic beverages.

    This coverage only applies if you are not in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

6.   ***PERSONAL INJURY*** means all liability and defense claims that first occur during the policy period and arise from:

    a.   False arrest, detention or imprisonment;

    b.   Malicious prosecution;

    c.   The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, ***dwelling*** or premises that a person occupies by or on behalf of its owner, landlord or lessor.

    ***Dwelling*** means a structure that houses one or two family units and meets the community standards for human habitation.

7.   ***POLLUTION LIABILITY - SPECIFIED CAUSES OF LOSS*** means loss or damage that first occurs during the policy period and arises from:

    a.   ***Bodily injury*** if sustained within your covered ***building*** or ***dwelling*** and caused by smoke, fumes, vapor or soot that is released or escapes from the heating system or cooling system of your covered ***building*** or ***dwelling***.

    ***Building*** means a structure that has at least two walls and a roof and that does not meet the definition of a ***dwelling***.

    b.   ***Bodily injury*** or ***property damage*** arising out of a ***hostile fire*** (other than a ***hostile fire*** in ***vehicles***) including the effects of heat, smoke or fumes.

    ***Hostile fire*** means a ***fire*** that was not intentionally started or a ***fire*** that becomes uncontrollable or breaks out of the place where it is intended to be.

    ***Fire*** means a chemical change that releases heat and light and is accompanied by flame.

    ***Vehicles*** mean automobiles, motorcycles, trucks, trailers, forklifts, snowmobiles, all terrain vehicles (ATV), and golf carts. ***Vehicles*** also include other mobile equipment such as construction or farm machinery that is not permanently installed, attached or in service to a ***building*** or ***dwelling***.

    c.   ***Bodily injury*** or ***property damage*** caused by the sudden and accidental release of fumes or vapors from your above ground ammonia, propane, or liquefied petroleum gas (LPG) tank or delivery systems.

---

© 2003 General Fire & Casualty Company
Patent Pending

# LEGAL LIABILITY AND DEFENSE SECTION

    d.   **Bodily injury** or **property damage** caused by the sudden and accidental release of fuels, lubricants, or other fluids which are used by covered **vehicles** for fueling, lubrication, braking, cooling, hydraulic, or other purposes during the normal operation of **vehicles**. The sudden and accidental release of the fuel or other fluids must be caused by the collision, **hostile fire**, upset or overturn of covered **vehicles**.

8.   **PRODUCT LIABILITY - YOUR PRODUCT** means **bodily injury** or **property damage** that first occurs during the policy period and is caused by **your product**.

    **Your product** means any goods or products (other than real property) grown, manufactured, sold, handled, distributed or disposed of by you, and those instructions, warranties and representations you make relating to those goods or products. **Your product** includes containers (other than **vehicles** or vending machines) materials, parts or equipment furnished in connection with such goods or products.

9.   **PROPERTY DAMAGE** means loss or damage that first occurs during the policy period and arises from physical injury to or destruction of tangible property including all resulting loss of use of that property.

10.   **REASONABLE USE OF INTENTIONAL FORCE** means the use of lawful, physical force to protect persons or your property.

11.   **VEHICLE LIABILITY** means your legal liability for **bodily injury** or **property damage** that first occurs during the policy period and arises from the ownership, use, operation, maintenance, of owned, hired or borrowed **vehicles**.

    In the event your **blanket legal liability and defense limit** is exhausted, we will automatically reinstate an occurrence limit for **vehicle liability** equal to the applicable mandatory minimum liability limit of the automobile financial responsibility law (of the state where the loss occurs) for **bodily injury** and **property damage** until the policy expiration or cancellation, whichever occurs first.

12.   **WATERCRAFT - PERSONAL LIABILITY** means your legal liability for **bodily injury** or **property damage** that first occurs during the policy period and arises from the ownership, use, operation, and maintenance, loading or unloading of owned, hired or borrowed **watercraft - personal**.

    **Watercraft - personal** means any motorboats, sailboats, jet skis, rowboats, canoes, kayaks or rubber rafts that do not exceed 26 feet in length or 250 horsepower including their accessory equipment, furnishings, outboard motors and trailers that are designed for and limited to your seasonal recreational use within the United States territorial waters.

13.   **WORK LIABILITY** means **bodily injury** or **property damage** that arises from **your work** and occurs:

    a.   Away from any premises you own or rent; and

    b.   After the completion of **your work** on or to the damaged property. **Your work** will be considered complete at the earliest of any one of the following times:

        1)   When all work called for in your contract is complete; or

        2)   When all work at the job site has been completed if your contract calls for work at more than one job site.

    Work that may require service, maintenance repair or replacement, but which is otherwise complete, will be treated as completed.

    **Your work** means work or operations performed by you or on your behalf including related materials, parts or equipment furnished in connection with such work or operations; and warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**. **Your work** includes your providing of, or failure to provide, any warnings or instructions.

I.   SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS - CONSEQUENTIAL LOSS OR DAMAGE

    **SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS - CONSEQUENTIAL LOSS OR DAMAGE** means those specified causes of loss, consequential loss or damage listed below. Each cause of loss, consequential loss or damage is subject to a **legal liability and defense sub-limit**. All losses, consequential losses or damages paid under the **Sub-limited Legal Liability and Defense Causes of Loss - Consequential Loss or Damage** are not additional coverage limits. Any payments made under this coverage section will reduce the limit of insurance available under the **blanket legal liability and defense limit**.

    The applicable **legal liability and defense sub-limit** applies regardless of any other cause or event contributing to such loss or damage in any way or at any time.

# LEGAL LIABILITY AND DEFENSE SECTION

1. **ADVERTISING AND PUBLICATION LIABILITY - ALL OTHER** means all liability and defense claims arising out of the unintended loss or damage from your oral or written publication of material (other than **advertising and publication liability - specified causes of loss internet advertising liability**) including the failure of goods, products or services to conform with advertised quality of performance, or the wrong description of the price of goods, products, or services.

   This coverage only applies if you are in the business of advertising, broadcasting, publishing, or telecasting.

2. **AFFILIATED PARTIES - LIMITED FINANCIAL RESPONSIBILITY** means all liability and defense claims made against you by a resident family member or any other insured financially controlled or commonly owned entity of yours. In the case of an automobile accident, the amount of coverage applicable shall automatically conform to the mandatory minimum limit required by the automobile financial responsibility laws of the state where the accident took place.

3. AIRCRAFT:

   a. **AIRCRAFT LEGAL LIABILITY - HIRED AND NON-OWNED** means all liability and defense claims arising out of your use as a passenger of a hired (chartered) and non-owned aircraft. This coverage applies only to liability and defense claims arising out of your aircraft use as a passenger.

   b. **AIRCRAFT LEGAL LIABILITY - ALL OTHER** means all liability and defense claims arising out of the ownership, maintenance, use or entrustment to others of any aircraft owned and or operated by you.

4. **ATHLETIC OR EVENT PARTICIPANT** (other than **Livestock Liability - All Other**) means all liability and defense claims by any participant (whether paid, voluntary, or appointed) while practicing for or engaging in:

   a. Any sports or athletic contest;

   b. Any sports event, carnival, amusement park, zoos, petting zoos, circus, corn maze, festival, pumpkin patch, or other exhibitions or events you sponsor; or

   c. Any paid or free event held on your premises or any premises in your care, custody and control.

5. AUTOMOBILE:

   a. **BAIL BONDS** mean the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any **vehicles** (We do not have to furnish any bonds).

   b. **PERSONAL INJURY PROTECTION** means the minimum amount statutorily required to conform with specific state motor vehicle financial responsibility laws, or the scheduled amount you have selected, whichever is more. This coverage may be subject to specific state motor vehicle personal injury laws as set forth in the mandatory state endorsement to be attached and made a part of this policy.

      This coverage is further limited for undeclared drivers (other than your employees). The maximum **personal injury protection** available for an undeclared driver is the minimum amount statutorily required to conform to specific state motor vehicle laws. This undeclared driver coverage limitation applies regardless of whether you have selected a higher **personal injury protection** than the state required minimum.

   c. **UNINSURED OR UNDERINSURED MOTORIST:** This coverage is subject to specific state motor vehicle uninsured and/or underinsured motorist laws as set forth in the mandatory state endorsement to be attached to and made a part of this policy.

      This coverage is further limited for undeclared drivers (other than your employees). The maximum **uninsured or underinsured motorist** coverage available for an undeclared driver is the minimum amount statutorily required to conform to specific state motor vehicle laws. This undeclared driver coverage limitation applies regardless of whether you have selected a higher **uninsured or underinsured motorist** limit than the minimum limit defined in the motor vehicle financial responsibility laws.

   d. **AUTOMOBILE MEDICAL PAYMENTS** mean reasonable medical expenses, regardless of fault, for **bodily injury** to occupants of your **vehicles** caused by an accident in your covered **vehicles** that are licensed for road use on public highways and operated with your permission. We will pay for reasonable expenses for first aid administered at the time of an accident, necessary medical, surgical, x-ray and dental services, prosthetic devices, ambulance charges, hospital expenses, professional nursing and funeral services.

      **Automobile medical payments** coverage does not apply if **personal injury protection** is provided by this policy.

# LEGAL LIABILITY AND DEFENSE SECTION

Expenses must be incurred and reported to us within one year of the date of the accident and the injured person must submit to examination by physicians of our choice as often as we reasonably require.

In the event we make a payment under this coverage section, and the person to or for whom payment is made recovers damages from another, that person shall hold in trust for us the proceeds of the recovery and shall reimburse us to the extent of our payment.

6. **BODILY INJURY - SPECIFIED CAUSES OF LOSS** means all liability and defense claims that arise from **bodily injury**:

   a. **Bodily injury** arising out of or resulting from the toxic or pathological properties of lead, lead compounds, any materials containing lead, asbestos, asbestos compounds or any materials containing asbestos. This includes any responsibility any insured may have as a result of supervision, instructions, recommendations, warnings or advice given at any time or the lack of supervision, instructions, recommendations, warnings or advice by any insured;

   b. **Bodily Injury** arising out of or resulting from any physical, mental or emotional abuse (including sexual molestation) committed by you, your guests or tenants, or anyone in your employment (other than as may be afforded under **employment-related practices liability**)

7. **CARE CUSTODY OR CONTROL LIABILITY** means all liability and defense claims arising out of damage to any property other than **vehicles** or real property in your care, custody or control.

8. **CARE CUSTODY OR CONTROL - GARAGE KEEPERS** mean all liability and defense claims arising out of damage to **vehicles** of others that are in your care, custody or control.

9. **CONTRACTUAL LIABILITY - ALL OTHER CONTRACTS** mean all liability and defense claims for any contract or agreement (other than **contractual liability - specified contracts**) including:

   a. Liability assumed by any agreement that indemnifies a railroad for your construction or demolition operations;

   b. Liability assumed by any agreement arising out of engineering, architectural, inspection, appraisal and surveying operations.

10. **CUSTOM FARMING BROAD FORM PROPERTY DAMAGE** means all liability and defense claims (other than **livestock care custody or control liability**, **care custody or control - garage keepers**, **product liability - specified causes of loss** and **pollution risk - herbicide pesticide and fertilizer**) arising out of agricultural operations performed by you under contract for hire that damages:

   a. Property that is in your care, custody or control;

   b. **Your work** caused by **your work**;

   c. Tangible property other than **your product**

   d. **Your work** that cannot be used, or is less useful, and that has not been physically injured arising out of a known or suspected defect, deficiency, inadequacy or dangerous condition;

   e. **Your product** caused by **your product**

11. **DELAY** means all liability and defense claims arising out of any holdup, postponement, suspension, setback, or reschedule, or any indirect delay or failure by you or anyone acting on your behalf to perform in accordance with the terms of any contracts or agreements.

12. **DISEASE-STD** means all liability and defense claims arising from any sexually transmitted disease, including Acquired Immune Deficiency Syndrome (AIDS) and Human Immunodeficiency Virus (HIV) and any subsequent disease contracted as a result of the sexually transmitted disease.

13. **ENTRUSTMENT LIABILITY** means all liability and defense claims arising out of the entrustment of any owned, hired or borrowed property (other than **vehicles**) to persons, other than named insured's or your employees. This coverage also includes your vicarious liability for the actions of a minor child using any property owned, hired or borrowed by you.

14. **ERRORS OR OMISSIONS LIABILITY** means your liability arising from your errors or omissions including your rendering of substandard professional services or instructions from:

## LEGAL LIABILITY AND DEFENSE SECTION

a.  ***Attorney Liability*** means all liability and defense claims arising out of the failure to render proper, skilled, diligent, or prudent professional legal advice or services by you or your employed licensed attorney, but only while performing legal services in the course of your business.

b.  ***Computer Programming or Consulting Liability*** means all liability and defense claims arising from:

   1)  Any unintentional corrupting or harmful piece of code known as a computer virus or the transmission of any such virus;

   2)  The failure in project planning, including but not limited to mistakes in determining capacity needs;

   3)  The use, design or lack of performance of software programs;

   4)  Installation of a software patch;

   5)  Configuration or any other software programming problems.

c.  ***Consulting or Testing Liability*** means all liability and defense claims arising from testing performed, or from an evaluation, consultation or advice given by any insured, including any subsequent reporting of or reliance on such test, consultation, evaluation or advice.

d.  ***Directors and Officers Liability*** means all liability and defense claims against you (other than as described in the Uninsured Risks Section Part H Public Officials Errors and Omissions) by reason of serving as a director, officer, trustee or general manager in any corporation; a partner or general manager in any partnership; and a member or general manager in any limited-liability partnership or company or joint venture.

e.  ***Druggist's Liability*** means all liability and defense claims arising out of the failure by you or your employed licensed pharmacist to render proper, skilled, diligent, or prudent professional pharmaceutical:

   1)  Preparation of prescription medications;

   2)  Dispensing of prescription medications;

   3)  Advice;

   4)  Services or instruction.

   This coverage applies only while performing medical or pharmaceutical services in the course of your business.

f.  ***Employee Benefit Program Administration Liability - ERISA*** means all liability and defense claims arising from your violation of any of the responsibilities, obligations, or duties imposed upon fiduciaries and other parties of interest by ERISA (Employee Retirement Income Security Act) and committed in the administration of the following group benefits:

   1)  Life and disability plan;

   2)  Accident and health plan;

   3)  Profit-sharing plan;

   4)  Pension plan;

   5)  Private stock subscription plan;

   6)  Unemployment insurance;

   7)  Social security benefits.

   This coverage does not apply to your failure to fund or contribute to any pension, welfare plan, or the plan's instruments, including any failure to collect contributions owed to the plan from any source.

g.  ***Employee Benefit Program Administration Liability - All Other*** means all liability and defense claims arising from the administration of the following group benefits other than violations falling under ERISA (Employee Retirement Income Security Act):

   1)  Life and disability plan;

## LEGAL LIABILITY AND DEFENSE SECTION

    2)   Accident and health plan;

    3)   Profit-sharing plan;

    4)   Pension plan;

    5)   Private stock subscription plan;

    6)   Unemployment insurance;

    7)   Social security benefits.

This coverage does not apply to your failure to fund or contribute to any pension, welfare plan, or the plan's instruments, including any failure to collect contributions owed to the plan from any source.

h.    ***First Aid or Healthcare Liability*** means all liability and defense claims arising from the failure to render proper, skilled, diligent or prudent first aid or healthcare advice or treatment, services, or instruction including, prescribing drugs or other therapy by you or your employed licensed doctor or nurse, but only while performing first aid or healthcare services in the course of your business.

i.    ***Publishing or Broadcasting Liability - Specified Causes of Loss*** means all liability and defense claims arising out of your advertising, broadcasting, printing, publishing or telecasting business operations (other than ***internet advertising liability***) including:

    1)   Advertising;

    2)   Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    3)   Oral or written publication of material that violates a person's right of privacy.

This coverage only applies if you are in the business of advertising, broadcasting, printing, publishing, or telecasting.

j.    ***Seedmans Liability - Broad*** means all liability and defense claims arising out of your handling, storage, sale or distribution of ***seed*** including the failure of ***seed*** sold or handled by you to conform to the kind and quality warranted by you.

k.    ***Seedmans Liability - Replacement Seed*** means liability arising out of your handling, storage, sale or distribution of ***seed***, including the failure of ***seed*** sold or handled by you to conform to the kind and quality warranted by you.  This coverage is limited to the value of the ***seed*** only.

***Seed*** means products used for the propagation of plants including trees, tissue cultures, pollen, shrubs, vine cuttings, grafts, buds, bulbs, tubers, rootstock or similar means of plant propagation.

l.    ***Seedmans Liability - Replacement Seed and Replanting*** means liability arising out of your handling, storage, sale or distribution of ***seed*** including the failure of ***seed*** sold or handled by you to conform to the kind and quality warranted by you.  This coverage is limited to the value of the ***seed*** and the replanting expense only.

m.    ***Veterinary Liability*** means all liability and defense claims arising out of the failure by your or your employed licensed veterinarian to render proper, skilled, diligent, or prudent professional veterinary:

    1)   Advice;

    2)   Treatment or services;

    3)   Instruction including prescribing drugs or other therapy.

This coverage applies only while performing veterinary medical services in the course of your business.

15.  ***EMPLOYMENT - RELATED PRACTICES LIABILITY*** means all liability and defense claims arising from your relationship with employees including: personnel practices or policies, criticism, demotion, evaluation, reassignment, failure to promote, wrongful discipline, deprivation of a career opportunity, failure to grant tenure, evaluation, invasion of privacy, defamation, sexual and other harassment, humiliation, termination, hiring, retention, supervision, breach of employment contract, employment-related misrepresentation, sexual or other

# LEGAL LIABILITY AND DEFENSE SECTION

unlawful discrimination, unintentional violations of federal or state leave-of-absence or disabilities laws, and infliction of emotional distress.

16. ***FIRE DAMAGE LEGAL LIABILITY*** means all liability and defense claims arising out of the damage to your leased, rented, or borrowed premises, ***dwelling*** or ***building*** in your care, custody, or control resulting from ***hostile fire***

17. ***FUNGUS, SPORES, MOLD and MILDEW*** means all liability and defense claims arising out of exposure to or damage from fungi, spores, mildew, mold or related organic irritants, including the resulting release of mycotoxins or odors.

18. ***GENETICALLY MODIFIED ORGANISM (GMO)*** means all liability and defense claims arising out of the adulteration, debasement, or degradation:

    1) of ***your product*** from a genetically engineered product or ingredient; or

    2) by ***your product*** from a genetically engineered product or ingredient

19. ***HAZARDOUS OPERATIONS OR PURSUITS*** mean any and all liability and defense claims arising out of your engaging in operations or using your premises for:

    a. Engineering, architectural, inspection, appraisal and surveying operations;

    b. Hazardous materials contracting;

    c. Insurance agency operations;

    d. Law enforcement, security or patrol operations;

    e. Fossil fuel refining or production, including oil and gas pipelines or drilling operations;

    f. Taxi operations;

    g. Diagnostic testing laboratories;

    h. Mining or quarrying operations;

    i. Off-shore or subaqueous work (other than aquacultural operations);

    j. Public utilities or private companies providing water, gas or electricity; gas or utility works; or gas lease operators (other than private companies involved in co-generation with resulting electrical sales);

    k. Motion picture production;

    l. Drilling, pile driving, moving or shoring up buildings, coffer dam or caisson work;

    m. The manufacture, importation or wholesale distribution of tobacco based products.

20. ***INTANGIBLE AND INTELLECTUAL PROPERTY LIABILITY*** means all liability and defense claims arising out of:

    a. Infringement of copyright, trademark or patent;

    b. Misuse of business know-how, proprietary business information or trade secret;

    c. Violation of any non-compete agreement or other employment related obligation;

    d. Any other legally protected intangible property or rights of others.

21. INTERNET RISK:

    a. ***Internet Advertising Liability*** means all liability and defense claims arising from your broadcast, display or presentation of material over the worldwide public network known as the Internet and any private intranet, extranet, or virtual private network.

    b. ***Internet Contest Risk*** means all liability and defense claims arising out of any electronic promotion of lotteries, sweepstakes, contests or other games of chance, including rebates, price discounts, coupons, prizes, awards or other valuable consideration given in excess of the total contracted amount or expected amount.

# LEGAL LIABILITY AND DEFENSE SECTION

c. **Internet Infrastructure Risk** means all liability and defense claims arising out of any failure of the underlying foundation, methods or framework used for establishing and managing a secure method of exchanging electronic information over the Internet, private intranet, extranet or virtual private network. This includes the use of certification authorities, digital certificates, digital signatures, public or private keys or any other similar type of technology.

d. **Internet Services Risk** means all liability and defense claims arising out of:

   1) The designing, constructing or maintaining an Internet site;

   2) The integration of electronic information or business processes with an Internet site;

   3) Providing an end-user or customer access to the Internet through a browser which enables the customer or end-user to send and receive electronic data;

   4) Providing access to or dissemination of material, goods, or services;

   5) Internet search and navigational tools or Internet site building tools or technology;

   6) Providing an end-user or customer with an unique Internet address that can function as the beginning and end point of electronic data transfers;

   7) Electronic mail services;

   8) Maintenance of chat rooms or bulletin boards;

   9) Acquiring, researching, gathering, recording, collecting or preparing of material by means of the foregoing services;

   10) Any computer hardware, software, or related electronic product, equipment or device that is created, manufactured, developed, distributed, licensed, leased or sold by you, or by others acting under your trade name with your consent, others for a fee, including training in the use of such computer hardware, software, or related electronic products in connection with your Internet services;

   11) Any systems analysis, systems programming, data processing, system integration, development, design, management, repair or maintenance of computer networks or systems in connection with your Internet services.

e. **Internet Risk - Unauthorized Access or Use Risk** means all liability and defense claims arising out of the unauthorized access to or the unauthorized use of any computer, computer system or computer network by any person.

f. **Internet Service - Loss of Use** means all liability and defense claims arising out of the inability of your authorized customers or a third party to gain access to your Internet services through the Internet.

22. **LIQUOR LEGAL LIABILITY** means all liability and defense claims arising out of your causing or contributing to the intoxication of any person.  This coverage applies if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

23. **LIVESTOCK LIABILITY - SPECIFIED ACTIVITIES** mean all liability and defense claims arising out of the use of your **livestock** or your owned or leased premises for any rodeo, carnival, circus racing, parade, speed or stunting activity including practicing for such activities, riding schools or **livestock** training activities.

   **Livestock** means all swine, equine, poultry, sheep or other declared animal that you produce or maintain for slaughter, breeding, production, or saddle use.

24. **LIVESTOCK LIABILITY - OUTFITTING AND GUIDE ACTIVITY** means all liability and defense claims arising out of the use of your **livestock** or your owned or leased premises for any outfitting or guide business operations.

25. **LIVESTOCK LIABILITY - YOUTH EDUCATIONAL ACTIVITIES** mean all liability and defense claims arising out of the use of your **livestock** or your owned or leased premises for any fair exhibition, FFA (Future Farmers of America), 4-H or other similar youth group activities.

26. **POLLUTION LIABILITY:**

## LEGAL LIABILITY AND DEFENSE SECTION

a.  **Pollution Risk – Herbicide, Pesticide and Fertilizer** means all liability and defense claims arising from the formulation, handling, preparation for application, safekeeping, storage or the actual application of herbicides, chemicals, pesticides or fertilizers, including organic **livestock** manure.

b.  **Pollution Risk - Vehicle** means all liability and defense claims arising from the release of a **pollutant** from the cargo contained on or within covered **vehicles.** The release of the **pollutant** from the cargo must be caused by the sudden and accidental collision, upset, overturn or **hostile fire** of covered **vehicles**.

c.  **Pollution Risk - All Other** (other than **Pollution Risk – Herbicide, Pesticide and Fertilizer, Pollution Risk – Vehicle** and any of the coverage's listed under **Pollution Liability – Specified Causes of Loss**) means all loss, costs or expenses including all liability and defense claims arising out of:

  1) The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **pollutant**:

     a) At or from any premises, site or location which was at any time owned, occupied by, rented to, or loaned to any insured or to any person or organization that the insured may be legally responsible for;

     b) At or from any premises, site or location which is or was at any time used by or for any insured (including any person or organization for which any insured may be legally responsible) for the handling, storage, disposal, processing or treatment of waste;

     c) Which is or was at any time transported, handled, stored, treated, disposed of, or processed as waste by any insured or by any person or organization that the insured may be legally responsible for.

     This includes your obligation, and your obligation to others under any environmental law, regulation, statute or ordinance to monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutant from any premises site or location.

  2. Any request, demand or order upon any insured (including any person or organization for which any insured may be legally responsible) that requires any insured to test for, monitor, clean up, remove, contain, detoxify, neutralize, or in any way respond to any **pollutant** on any site or location including your premises. This also includes any request, demand or order, to assess the effects of a **pollutant** on any site or location including your premises.

  **Pollutant** means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, lead, waste or other forms of substance or matter whose release or escape has or will result in the direct pollution of the environment including costs of abatement.

27.  **PREMISES MEDICAL PAYMENTS** mean all reasonable medical expenses, regardless of fault, for **bodily injury** caused by an accident at your covered **building** or **dwelling**. We will pay for reasonable expenses for first aid administered at the time of an accident, necessary medical, surgical, x-ray and dental services, prosthetic devices, ambulance charges, hospital expenses, professional nursing and funeral services.

Expenses must be incurred and reported to us within one year of the date of the accident and the injured person must submit to examination by physicians or professional consultants of our choice as often as we reasonably require.

In the event we make a payment under this coverage section and the person to or for whom payment is made recovers damages from another (other than an insured under this policy), that person shall hold in trust for us the proceeds of the recovery and promptly reimburse us to the extent of our payment.

28.  **PRODUCT LIABILITY - SPECIFIED CAUSES OF LOSS** (other than **custom farming broad form property damage**):

a.  **Impaired Property** means all liability and defense claims arising out of damage to tangible property of others that has not been physically injured, but cannot be used or is less useful because it contains **your product** or **your work** and there is a known or suspected defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**. This coverage only applies if the damaged tangible property of others can be restored by the removal, repair, replacement, or adjustment of **your product** or **your work**.

This coverage does not apply to damage to **your work** or **your product**.

b.  **Inherent Product Flaw Liability** means all liability and defense claims arising out of **property damage** to **your product** arising from **your product**.

# LEGAL LIABILITY AND DEFENSE SECTION

c. **Erroneous Delivery of Liquid Products** mean all liability and defense claims arising from the erroneous delivery of your liquid product.

d. **Product or Work Recall** means all liability and defense claims arising from the loss of use withdrawal, recall, inspection, repair, replacement, adjustment, removal, disposal, of **your product, impaired property** or **your work**, but only if **your product, impaired property** or **your work** is withdrawn or recalled from the market or from use.

e. **Product Rejection** means all liability and defense claims arising out of the rejection of **your product** when the buyer or recipient of **your product** refuses to accept delivery of **your product** or demands recall of **your product** based on their determination that **your product** did not meet certain quality or appearance standards or delivery time agreements.

29. **PUBLISHING OR BROADCASTING LEGAL LIABILITY - SPECIFIED CAUSES OF LOSS** means all liability and defense claims arising out of false advertising, defamation, slander, or libel.

   This coverage only applies if you are in the business of advertising, broadcasting, publishing or telecasting.

30. **RACING OR STUNTING ACTIVITIES - LIABILITY** means all liability and defense claims arising out of the ownership, maintenance or use of any **vehicles** or **watercraft - personal** for organized or prearranged contests of racing, speed, endurance, demolition, tractor pulls, or any stunting activity.   This includes practicing for such contests or activities.

31. **SECURITIES RISK** means all liability and defense claims arising from or in any way involving security transactions including but not limited to:

   a. Any transaction by or for you, your affiliate, or your security holder, even where such security holder is acting independently of you;

   b. Any transaction by or on your behalf including claims in the form of a cross claim, third-party claim, or for contribution or indemnity;

   c. Your failure to effect or maintain adequate directors and officers coverage or other similar coverage for securities transactions;

   d. Hostile business takeover or acquisitions;

   e. Your trading in any public market, public offering, private or public sale, distribution or issuance of securities;

   f. The accounting for profits made from the purchase or sale by you of your securities within the meaning of Section 16(b) of the Securities Exchange Act of 1934 or amendments thereto or any similar law or regulation;

   g. Payment by you of allegedly inadequate compensation in connection with your purchase of securities issued by you.

32. **STEVEDORES LIABILITY** (other than **Watercraft - Personal Liability** and **Watercraft - All Other**) means all liability and defense claims arising out of the loading or unloading of any vessels while in your care, custody or control.

33. **VEHICLE LIABILITY - UNDECLARED DRIVERS** mean all liability and defense claims arising out of the operation or use of your **vehicles** by undeclared operators or drivers (other than employees).  The maximum liability limits available to the undeclared operators or drivers (other than employees) for the accident are as follows according to the type of **vehicles** involved:

   a. Automobiles, pick-ups, motorcycles, and trucks not subject to Federal Department of Transportation motor carrier regulations; are limited to the statutorily required minimum coverage amount as defined by the automobile financial responsibility laws of the state where the accident occurs;

   b. Trucks subject to Federal Department of Transportation motor carrier regulations are limited to the statutorily required minimum coverage amount as defined in Part 387 of the Federal Department of Transportation motor carrier regulations;

   c. Snowmobiles, all terrain vehicles (ATV), golf carts, forklifts, trailers, and other mobile equipment such as construction or farm machinery that is not permanently installed, attached or in service to a **building** or **dwelling** are limited to $50,000 per accident.

---

© 2003 General Fire & Casualty Company
Patent Pending

# LEGAL LIABILITY AND DEFENSE SECTION

These *vehicle liability – undeclared drivers* coverage limitations apply regardless of whether you have selected a higher liability limit than the limitations listed above.

*Vehicles* mean automobiles, motorcycles, trucks, trailers, forklifts, snowmobiles, all terrain vehicles (ATV), and golf carts.   *Vehicles* also include other mobile equipment such as construction or farm machinery that is not permanently installed, attached or in service to a *building* or *dwelling*.

34. ***VENDORS SCHEDULED LIABILITY***

Any coverage afforded herein for any vendor is excess over any other applicable coverage.

a.   ***Vendors - undeclared vendors or declared vendors controlled risks*** mean all liability and defense claims arising out of the sale of *your product* by:

1)   Any vendor that is not scheduled as an additional insured in the Policy Declaration and Schedules; or

2)   Any vendor declared as an additional insured in the Policy Declaration and Schedules when a claim results from:

a)   Any unauthorized express warranty by a vendor;

b)   Any physical or chemical change in *your product* made intentionally by a vendor;

c)   Any repackaging, unless such repackaging is under the manufacturer's instruction and then repackaged in an original container;

d)   A vendor's failure to make inspections, adjustments, tests or servicing as agreed to as a normal course of business in connection with the sale or distribution of *your product*;

e)   Any demonstration, installation, servicing or repair operations performed by your vendor off their premises in connection with the sale of *your product*;

f)   *Your product* (after distribution or sale by you) that was relabeled or used as a container, part or ingredient of any other thing or substance by or for a vendor.

b.   ***Vendors Blanket Protection - All Other*** means all liability and defense claims arising out of *your product* sold by your vendors scheduled as additional insureds in the Policy Declaration and Schedules (other than *vendors - undeclared vendors or declared vendors controlled risks*). This insurance does not apply when the liability arises or results from:

1)   Any unauthorized express warranty by a vendor;

2)   Any physical or chemical change in *your product* made intentionally by a vendor;

3)   Any repackaging by a vendor, unless such repackaging is under the manufacturer's instruction and then repackaged in an original container;

4)   A vendor's failure to make inspections, adjustments, tests or servicing as agreed to as a normal course of business in connection with the sale or distribution of *your product*;

5)   Any demonstration, installation, servicing or repair operations performed by your vendor off their premises in connection with the sale of *your product*;

6)   *Your product* (after distribution or sale by you) that was relabeled or used as a container, part or ingredient of any other thing or substance by or for a vendor.

35. ***WATERCRAFT - ALL OTHER*** means all liability and defense claims arising out of the ownership, use, operation, maintenance, and loading or unloading of any watercraft in excess of 26 feet in length or 250 Horsepower, including accessory equipment, furnishings, outboard motors, and trailers.   *Watercraft - all other* includes the ownership, use, operation, maintenance, and loading or unloading of *watercraft - personal* while outside of United States territorial waters.

36. ***WHARFINGERS LIABILITY*** (other than *Watercraft-Personal Liability* and *Watercraft - All Other*) means all liability and defense claims arising out of:

a.   Loss or damage to (including the loss of use of) any vessel or craft including their equipment, freight, cargo or any other onboard interests while in your care, custody or control at any location; or

## LEGAL LIABILITY AND DEFENSE SECTION

   b.   ***Property damage*** or ***bodily injury*** caused by vessel or craft including their equipment, cargo, or freight, while in your care, custody or control.

37.   ***WORKMANSHIP LIABILITY*** means all liability and defense claims arising out of ***property damage*** to:

   a.   ***Your work*** caused by substandard workmanship, diligence and labor in ***your work***,

   b.   That particular part of real property upon which you, your employees, or your subcontractors are performing operations, if the ***property damage*** occurs during those operations.

# UNINSURED RISKS SECTION

## UNINSURED RISKS

This coverage does not apply to the following uninsured risks, causes of loss, actions, or conduct regardless of any other insured cause of loss or event that contributes concurrently or in sequence to an uninsured risks, causes of loss, actions, or conduct.

A.   **DUTY TO DEFEND - INSURED ELSEWHERE**

We will not pay for, nor are we obligated to defend any claim or lawsuit that any other insurer has a duty to defend.

B.   **ILLEGAL ACTS**

We will not pay for any loss or damages (or defend any claim) arising out of your illegal or criminal acts including but not limited to:

1.   Any willful violation of a local, state, federal, international or foreign law, statute or ordinance;

2.   Any unlawful infringement of copyright, trademark, patent, illegal infringement of business know-how, or any similar property or right owned by others;

3.   The unlawful application, use or disposal of herbicides, pesticides, fertilizers (including animal waste), detergents, solvents, chemicals or other substance that is in violation of any applicable local, state, or federal, civil or criminal ordinance, statute, regulation or order;

4.   Any unlawful retaliatory treatment or action arising out of and in the course of your human resource management or employment practices;

5.   Fraud or extortion;

6.   Any securities transaction that resulted in, is based upon, or is attributable to the gaining of any profit or advantage to which you were not legally entitled;

7.   Employment of persons in violation of the law with your actual knowledge or the actual knowledge of any of your executive officers, partners or members;

8.   Any activity involving persons, contraband, or property in the course of illegal transportation or trade;

9.   Illegal use, sale, manufacture, delivery, transfer or possession of any controlled substance as defined by the federal food and drug law at 21 U.S.C.A. Sections 811 and 812 including your use of a prescription drug or narcotic that is not in compliance with the physician's prescription or the manufacturer's instructions;

10.  The illegal transmission of any kind, of any disease or communicable disease by you, your family members, your guests or tenants, or anyone in your employment.

C.   **SPECIFIED ACTS OR DECISIONS**

We will not pay any loss or damage, (or defend any claim) arising out of these specific acts:

1.   Any loss or damage caused by acts committed with your having actual knowledge of their wrongful nature or with the intent to cause damage including any unforeseen or unintended consequential loss or damage that results concurrently or in sequence to such act;

2.   Your failure to act or decide, including your failure to use due diligence, dispatch and all reasonable means to reduce loss, or the failure of any person, group, organization or governmental body to act or decide;

3.   Oral or written publication of material if done by you or at your direction with knowledge of its falsity;

4.   Any loss or damage caused by acts committed by you (or by others at your direction) involving securities transactions that you had actual knowledge of their wrongful nature or with the intent to cause damage.  This includes a final and unappealable judgment or adjudication that is rendered adverse to other covered persons or entities;

5.   Your concealment or misrepresentation of a material fact concerning this policy, the insured property, your interest in the insured property, or a claim under this policy by you as it relates to this policy at any time;

# UNINSURED RISKS SECTION

6.  Any failure to fund or contribute to any pension, welfare plan, or the plan's instruments, and including any failure to collect contributions owed to the plan from any source;

7.  If you assume or incur any obligation and voluntarily make a payment without our consent;

8.  Any willful violation of a manufacturer's label instructions or warnings regarding the formulation, handling, preparation for or actual application of herbicides, pesticides, fertilizer (including animal waste), detergents, solvents, chemicals or other substances;

9.  The providing of any evaluations, consultations or other advice by you in which your evaluation, consultation or advice knowingly violates a manufacturer's label instructions or warnings regarding the formulation, handling, preparation for or actual application of herbicides, pesticides, fertilizer (including animal waste), detergents, solvents, chemicals or other substances.

D.  EMPLOYER'S LIABILITY RISK - STATUTORY

We will not pay for any loss or damages, or defend any claim arising out of the following:

1.  Any workers compensation, disability benefits, unemployment compensation law or any similar law, regardless of whether there is any valid collectible workers compensation coverage or whether the exclusive remedy provisions of workers compensation apply or not;

2.  Your failure to secure or maintain valid and collectible workers compensation coverage;

3.  Your election not to include workers compensation coverage on eligible employees or otherwise exempt employment classes of employees including family members, directors and officers, farm employees, and others as allowed under state or federal workers compensation laws or statute, and including any person injured at work and subject to:

    a)  The Longshoreman and Harbor Worker's Compensation Act (33 USC Sections 901-950) including any master or member of the crew of any vessel, The Non-appropriated Fund Instrumentalities Act (5 USC Sections 8171-8173), The Outer Continental Shelf Lands Act (43 USC Sections 1331-1356), The Defense Base Act (42 USC Sections 1651-1654), The Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942), The Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872); or

    b)  Any other federal or similar foreign workers' law or occupational disease law or any amendments to these laws, including damages awarded under all violations of law or regulations issued there under.

E.  GOVERNMENTAL AUTHORITIES RISK

We will not pay for any loss or damages (or defend any claim) resulting from any Governmental authority action (other than **Governmental Action** as defined in the Covered Property Section and in the Loss of Business Income or Extra Expense Section), including, but not limited to the Federal Trade Commission, Federal Communications Commission, or any licensing organization such as ASCAP, SESAC or BMI.

F.  NUCLEAR AND RADIATION RISK

1.  We will not pay for any damages to property (other than ensuing **fire** damage) arising out of the **hazardous properties** of nuclear material nuclear waste; spent fuel; containment structures; explosion or discharge of radiation from any device employing atomic fission fusion or any other type of nuclear reaction; or solar storm; whether from the source or as a by-product of the source.

    **Hazardous properties** mean radioactive contamination, radiation, toxicity, heat, or explosion (other than ensuing **fire**).

    **Fire** means a chemical change that releases heat and light and is accompanied by flame.

2.  We will not pay for any legal liability or defense costs arising out of the **hazardous properties or conditions** of nuclear material; nuclear waste; spent fuel; containment structures; explosion or discharge of radiation from any device employing atomic fission, fusion or any other type of nuclear reaction; or solar storm; whether from the source or as a by-product of the source.

    **Hazardous properties or conditions** mean radioactive contamination, radiation, toxicity, heat, explosion or **fire**.

---

# UNINSURED RISKS SECTION

G.  PRIOR LOSSES OR OFFENSES

We will not pay for any damages (or defend any claim) resulting from:

1.  Oral or written publication of material whose first publication took place before the inception of this policy period;

2.  Any cause or causes of loss or damage, or a series of related acts or omissions that occurred, commenced were discovered or known to you before the policy inception date or before you acquired or formed any insured entity. This includes continuous or repeated exposure to substantially the same general harmful conditions. Any cause or causes of loss or damage or a series of related acts or omissions shall be deemed to be known to you when any insured or additional insured:

a.  Received a verbal or written demand for damages or performance;

b.  Reports a claim to any insurer; or

c.  Becomes or should become aware by any means that a loss has occurred or has begun to occur.

3.  Any securities transaction involving subsidiaries that you do not own a majority interest in, or from claims occurring prior to your acquiring majority interest.

H.  PUBLIC OFFICIALS ERRORS AND OMISSIONS

We will not pay for any damages (or defend any claim) resulting from any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other related matters claimed against you by reason of serving as a publicly elected or appointed director, officer, trustee, or general manager or in any other capacity.

I.  PUNITIVE DAMAGES AND MISCELLANEOUS EXPENSES

We will not pay for any and all punitive or exemplary damages assessed against you including any and all fines or penalties imposed.

J.  UNINSURED PREMISES MEDICAL PAYMENTS

We will not pay any *premises medical payments* sustained by:

1.  You;

2.  Your family members;

3.  Dependents;

4.  Your employees or tenants; or

5.  The dependents of your employees or tenants;

*Premises medical payments* mean all reasonable medical expenses, regardless of fault, for *bodily injury* caused by an accident at your covered *building* or *dwelling*. We will pay for reasonable expenses for first aid administered at the time of an accident, necessary medical, surgical, x-ray and dental services, prosthetic devices, ambulance charges, hospital expenses, professional nursing and funeral services.

K.  SPECIFIC UNINSURED LIABILITY LOSSES

We will not pay for any loss or damage, (or defend any claim) arising out of:

1.  *Property Damage* to:

a.  Real property that you own, rent, or occupy (other than *Fire Damage Legal Liability*;

b.  Any premises you sell, donate, give away, or abandon if the *property damage* arises out of any part of that premises;

c.  Property owned by, occupied by, used by, rented to, or in the care, custody or control of any insured, but only if the *property damage* is caused by you or your employee while in the course and scope of their employment

## UNINSURED RISKS SECTION

by you (other than **care custody or control liability** or **care custody or control – garage keepers** as defined in the Legal Liability and Defense Section);

d.   **Vehicles** rented or leased to any insured.

**Property damage** means loss or damage that first occurs during the policy period and arises from physical injury to or destruction of tangible property including all resulting loss of use of that property.

2.   **Bodily Injury** or **Personal Injury** to:

a.   An employee arising out of and in course of their employment by you;

**Bodily injury** means all liability and defense claims that first occur during the policy period and arise from human physical damage, sickness or disease (other than **disease-STD**) and the resulting emotional or mental distress or death from any of these conditions.

**Personal injury** means all liability and defense claims that first occur during the policy period and arise from false arrest, detention or imprisonment; malicious prosecution; the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, **dwelling** or premises that a person occupies by or on behalf of its owner, landlord or lessor.

L.   SPECIFIC UNINSURED PROPERTY LOSSES

We will not pay for any loss or damage to covered property, including gradually developing causes of loss, arising out of:

1.   Smog;

2.   Wear and tear;

3.   Rust or corrosion;

4.   Marring or scratching;

5.   Erosion or depletion;

6.   Any damages resulting from expenses you do not incur including but not limited to commissions, loading and unloading charges, and freight;

7.   Any prejudgment interest on that period after we make an offer of settlement of the applicable limit of insurance that may be awarded against you on that part of the judgment;

8.   Dry rot or wet rot;

9.   Shrinking, bulging, settling, cracking, expanding, or contracting of a **building** or **dwelling** (other than **atmospheric conditions - outdoors** as defined in the Covered Property Section of this policy);

10.  Latent defects or inherent vice;

11.  Your failure to exercise prudent and reasonable means to save and preserve property at the time of loss and at anytime after the loss;

M.   SPECIFIC UNINSURED PROPERTY

We do not cover animals, birds or fish (other than **livestock**).

**Livestock** means all swine, equine, poultry, sheep or other declared animal that you produce or maintain for slaughter, breeding, production or saddle use.

N.   ROAD HAZARD TO TIRES

We will not pay for any loss or damage to tires arising out of road hazards including blowouts, punctures or other road damage.

O.   UNREASONABLE NEGLECT BY YOU

---

# UNINSURED RISKS SECTION

We will not pay any loss or damage that results from or is caused by:

1. Water or other liquids, powder or molten material that leaks or flows from plumbing, heating, air-conditioning or other equipment caused by or resulting from freezing when you do not maintain heat in the **building** or **dwelling** or you do not drain the equipment and shut off the supply (if the heat is not maintained);

2. Your failure to notify us immediately when you know of any suspension or impairment in your protective safeguard systems (**automatic alarm, security or watchman's service; automatic fire sprinkler systems** or **service contracts**). If part of an automatic sprinkler system is shut off due to breakage, leakage, freezing condition or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours. Additionally, you must notify us immediately of any lapse of over 60 days in any **refrigeration equipment maintenance** contract.

   a. **Automatic Alarm** means systems protecting property that is connected to a central station or reporting to a public or private fire alarm station.

   b. **Automatic Fire Sprinkler System** means any automatic fire protective or extinguishing system including connected sprinklers and discharge nozzles, ducts, pipes, valves and fittings, tanks, their component parts and supports and pumps. It includes private fire protection mains, hydrants, standpipes, outlets and passive sprinkler systems.

   c. **Refrigeration Equipment Maintenance** means the usual and customary service and care advised by the manufacturer to assure proper operation and to extend the useful life of the equipment. If you or your employees provide maintenance or service, such services must be performed and recorded following usual and customary industry standards.

   d. **Security or Watchman's Service** means an organized program of surveillance with a recording system or watchmen with watch-clocks making periodic rounds to specific reporting stations throughout the premises during periods of inactivity or non-operation.

   e. **Service Contracts** mean written contracts with privately owned fire departments providing fire protection service to your premises.

P.  BIOLOGICAL AND CHEMICAL AGENTS

1. We will not pay for any damage to property (other than ensuing **fire** damage) resulting from the unlawful release, dispersal or application of pathogenic, poisonous, biological, or chemical agents or other harmful materials intended to disrupt, intimidate, coerce or influence any government, human population, industry or commerce.

2. We will not pay for any liability or defense claims (other than ensuing **fire** damage) resulting from the unlawful release, dispersal or application of pathogenic, poisonous, biological, or chemical agents or other harmful materials intended to disrupt, intimidate, coerce or influence any government, human population, industry or commerce.

Q.  WAR

We will not pay for any damages arising out of war whether or not declared or any act or condition incident to war. War includes civil war, insurrection, rebellion, or revolution.

# COMMON SECTION

## COMMON POLICY TERMS AND CONDITIONS

A.  **BANKRUPTCY**

Your bankruptcy, insolvency, or that of your estate will not relieve us of our obligations.

B.  **BREACH OF POLICY PROVISIONS**

The breach of any term or condition of this policy at any one or more locations will not affect insurance at any location where the breach of term or condition does not exist at the time of insured loss.

C.  **BAILEE**

No other person or organization having custody of your covered property will benefit from this policy, including any governmental entity under any theory of sovereign rights or common benefit.

D.  **CANCELLATION**

You may cancel this policy by mailing or delivering to us advance written notice of cancellation.  Cancellation will be effective on the later of the date requested by you or the date we receive the request.

We may cancel all or part of this policy when it has been in effect for 60 days or less by written notice at least 10 days before the effective date of cancellation, if we cancel for nonpayment of premiums, or 30 days if we cancel for any other reason.  If this policy has been in effect for more than 60 days or is a renewal of a policy we issued, we may only cancel this policy or part of this policy for one or more of the following reasons:

1.  Nonpayment of premiums;

2.  Fraud or material misrepresentation made by you or your representative, or with your knowledge when the policy was obtained or when presenting a claim under the policy;

3.  Acts or omissions on your part or conviction of a crime arising out of acts increasing any of the hazards insured against;

4.  Change in risk which materially increases the risk of loss after the policy has been issued or renewed including but not limited to an increase in exposure due to regulation, legislation or court decision;

5.  Loss or decrease in reinsurance that provided us with coverage for all or part of the risk insured;

6.  A determination by any Director of Insurance that continuation of this policy would jeopardize our solvency or place us in violation of insurance laws;

7.  Violation or breach by you of any policy terms or conditions other than nonpayment of premiums.

If we cancel for one or more of the aforementioned reasons, notice will be mailed or delivered at least 60 days before the effective date of the cancellation, except for non-payment, which remains 10 days.  All notices of cancellation will be mailed by certified mail or delivered to you at the last address known to us and simultaneous notice will be sent to your agent.

E.  **CHANGES TO POLICY**

The Riskmanager, the Policy Declarations and Schedules, and endorsements contain all the agreements between you and us concerning the coverage afforded.  You are authorized to make changes in the terms of this policy only with our expressed, prior written consent.  This policy's terms can be amended or waived only by Policy Declarations and Schedules or endorsement issued by us and made a part of this policy.  Changes, amendments and waivers to this policy will take effect on the date we specify in the Policy Declarations and Schedules or endorsement, and will not relate back to the policy inception.

F.  **CONFORMITY WITH STATE LAW**

In the event of any conflict with the mandatory provisions of applicable state law by any provision herein, this policy automatically changes to the extent needed to conform.

# COMMON SECTION

G.  DEDUCTIBLE

*Deductible* means the amount of a covered loss that is your responsibility.  We will withhold that amount from any payment due you.  We waive the deductible on certain covered losses or damages as stated herein.  In case of multiple losses (with more than one applicable deductible) from a single covered event, only the largest single deductible will apply.  In the case of a Blanket Legal Liability and Defense deductible, you will be responsible for direct reimbursement to us in the amount of that deductible.

H.  EXAMINATION UNDER OATH

We may require you to submit to an examination under oath at any reasonable time and without the presence of any other insured, about any matter relating to this coverage.   Such examination may include your books and records.  You agree to execute a sworn statement of said answers contained therein if requested.

I.  EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

J.  INSPECTIONS AND SURVEYS

We have the right but are not obligated to make inspections and surveys at any time, give you reports on the conditions found, and recommend changes.  Any inspections, surveys, reports, or recommendations relate only to insurability and the premiums to be charged.  We do not make safety inspections.  We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public.  We do not warrant that conditions are safe or healthful or comply with laws, regulations, codes, or standards.  This condition applies not only to us, but also to any rating, advisory, rate service or similar organization that makes insurance inspections, surveys, reports, or recommendations.

K.  INTEGRATION

The Riskmanager, the Policy Declarations and Schedules, and the endorsements represent the entire and integrated agreement between you and us and supercedes all prior negotiations, representations, or agreements either written or oral.

L.  LEGAL ACTION AGAINST US

No one may bring a legal action against us under this policy unless there has been full compliance with all of the terms and conditions of this policy and the action is brought within two years after the date on which the direct physical loss or damage occurred.  No entity has a right to join us as a party or bring us into a lawsuit asking for damages from you.  Any entity may sue us to recover on an *agreed settlement* or on a final judgment against you obtained after an actual trial, but we will not be liable for damages that are not covered or that are in excess of the applicable limit of insurance.

*Agreed Settlement* means a settlement and release of liability signed by us, you, and the claimant or the claimant's legal representative.

Any suit brought by you against us must be filed within two years of the direct physical loss or damage.

M.  LIBERALIZATION

If we adopt any revision that would broaden the insurance under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

N.  MORTGAGE HOLDERS - LOSS PAYEES

We will pay for insured loss to covered property to *mortgage holders - loss payees* as scheduled in their order of precedence and as their interests may appear.   *Mortgage holders - loss payees* have the right to receive loss payment even if the *mortgage holders - loss payees* have started foreclosure or similar action on covered property.

*Mortgage holders - loss payees* means persons, trustees, or organizations that have a financial interest in covered property insured herein and scheduled in the policy declaration.

© 2003 General Fire & Casualty Company
Patent Pending

# COMMON SECTION

If your claim is denied because of your failure to comply with the terms and conditions of this policy, the **mortgage holders – loss payees** may have the right to receive loss payment. The **mortgage holder – loss payees** right to receive loss payment is conditioned on: the **mortgage holders – loss payees** payment of all premium due under this policy, if you have failed to do so; the **mortgage holders – loss payees** submission of a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and the **mortgage holders – loss payees** must notify us of any change in ownership, occupancy or substantial change in risk known to the **mortgage holders – loss payees**. All of the terms of this policy will then apply to the **mortgage holders – loss payees**.

If we pay the **mortgage holders – loss payees** for any loss and deny payment to you because of your failure to comply with the terms and conditions of this policy, the **mortgage holders – loss payees** rights under the mortgage will be transferred to us to the extent of our payment, and the **mortgage holders – loss payees** right to recover the full amount of the **mortgage holders – loss payees** claim will not be impaired. At our option, we may pay the whole principal on the mortgage plus any accrued interest to the **mortgage holders – loss payees**. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

If we cancel this policy for nonpayment of premium, we will give written notice to the **mortgage holders – loss payees** at least 10 days before the effective date of cancellation or 60 days before the effective date of cancellation if we cancel for any other reason. If we elect not to renew this policy, we will give written notice to the **mortgage holders – loss payees** at least 60 days before the expiration date of this policy.

O.   NON-RENEWAL

If we elect not to renew this policy, we will mail or deliver written notice of intention not to renew at least 60 days prior to the expiration or anniversary date of the policy.

If notice is not mailed or delivered at least 60 days before the expiration or anniversary date of this policy, this policy will remain in effect until 60 days after notice is mailed or delivered. Earned premium for the extended period will be calculated pro rata at the rates applicable to the expiring policy. We need not mail or deliver this notice if we have offered to renew this policy, you have obtained replacement coverage, or you have agreed in writing to obtain replacement coverage.

If our non-renewal is based on a condition at an insured location, you will be given 30 days notice to remedy the identified conditions. If the identified conditions are remedied, coverage will be renewed. If the identified conditions are not remedied to our satisfaction, you will be given an additional 30 days upon payment of premium to correct the identified condition.

All notices of non-renewal will be mailed or delivered to you at the last address known to us, and simultaneous notice will be sent to your agent.

P.   OTHER INSURANCE

This insurance is excess over any other valid and collectible insurance, whether primary, excess, contingent, or on any other basis. When this insurance is excess, we have no duty to defend you in any lawsuit or other civil proceeding where any other insurer has a duty to defend you against such lawsuit or civil proceeding. If no other insurer defends you, we will undertake your defense, (subject to all terms and conditions of this policy) but we will be entitled to your rights against those other insurers.

If there is any other insurance that is also excess covering the same insured loss, our share is the pro rata proportion that the applicable scheduled limit, or sub-limit, under this policy bears to all other applicable excess coverage, but we will not pay more than the applicable scheduled limit, or sub-limit.

In any event, no stacking of multiple insurance limits provided by us is allowed under any circumstances, regardless of the number of covered claims made, persons covered, premises or projects insured, or claims or lawsuits involved.

Q.   PREMIUMS

You are responsible for the payment of all premiums. Your failure to pay the required premiums will result in a lapse of your coverage.

R.   RENEWAL PREMIUM OR COVERAGE CHANGES

If we elect to renew this policy and the premium will increase by more than 10%, your **deductible** will change, or we will reduce limits or coverage, we will mail written notice to you at the mailing address last known to us at least 30 days before the expiration date of the policy.

## COMMON SECTION

If notice is not mailed or delivered at least 30 days before the expiration or anniversary date of this policy, this policy will remain in effect until 30 days after notice is mailed or delivered or the effective date of replacement coverage obtained by you.

If you accept the renewal, the new premium and renewal changes will be effective on and after the first day of the renewal term.

If you elect not to renew, any earned premium for the resulting extended period of coverage will be calculated pro rata at the rates or rates applicable to the expiring policy.

S. SEPARATION OF COVERED ENTITIES

The coverage afforded under this policy shall affix as if each covered entity is alone and apart from each covered entity against which a lawsuit has commenced or claim been made.

T. SETTLEMENT RIGHTS

We reserve the right to settle any and all claims.

U. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured. If you die, your rights and duties will be transferred to your legal representative but only while acting within the course and scope of duties as your legal representative. Until your legal representative is appointed, anyone having temporary proper custody of covered property will have your rights and duties but only with respect to the covered property.

V. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this insurance policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. You may waive your rights against another party, in writing, prior to a loss or after a loss only if at the time of the loss that party is someone insured by this insurance or a business firm owned or controlled by you or that owns or controls you or your tenant. This will not restrict your insurance.

**IN WITNESS THEREOF, WE CAUSED THIS POLICY TO BE EXECUTED AND ATTESTED. THIS POLICY SHALL REMAIN VALID AND IN FULL EFFECT EVEN IF WE HAVE NOT PROVIDED APPROPRIATE COUNTERSIGNATURE FROM OUR AUTHORIZED REPRESENTATIVE AS MAY BE REQUIRED BY STATE LAW.**

President                                                Secretary

Custom Farming Broad Form Property Damage .............. 37

# A

Accounts Receivable ............................................... 8, 21
Actual Cash Value ................................................... 4, 30
Additional Living Expenses ..........................................30
Advertising and Publication Liability - All Other ..............36
Advertising and Publication Liability - Specified Causes of
    Loss..................................................................33
Affiliated Parties - Limited Financial Responsibility ..........36
Agreed Value...............................................................4
Aircraft Damage.................................................... 8, 21
Aircraft Legal Liability - All Other...................................36
Aircraft Legal Liability - Hired and Non-Owned ...............36
Alcoholic Beverages Tax..............................................29
Animal or Insect Damage ....................................... 14, 25
Antique Property .................................................... 8, 21
Arbitration...................................................................6
Athletic or Event Participant .......................................36
Atmospheric Condition - Outdoors ........................... 14, 25
Attorney Liability.......................................................38
Auto - Finance Gap Expense .......................................29
Automatic Alarm.......................................................50
Automatic Fire Sprinkler System ..................................50
Automobile Medical Payments.....................................36

# B

Bail Bonds................................................................36
Blanket Covered Property Limit .......................................4
Blanket Legal Liability and Defense Limit........................32
Bodily Injury...................................................... 33, 49
Bodily Injury - Specified Causes Of Loss.........................37
Breakage - Fragile Property ..................................... 14, 25
Building ..........................................................6, 20, 34
Building or Business Personal Property - Newly Acquired or
    Constructed ...................................................... 8, 20
Building Valuation .......................................................6
Bulk Stock - Stored In The Open .....................................9
Business Income or Extra Expense Sub-Limit..................20
Business Personal Property.....................................  7, 20

# C

Care Custody and Control Liability .................................37
Care Custody or Control - Garage Keepers ....................37
Cargo - Transportation of Property ...........................9, 21
CFC - Related Expense................................................30
Collapse ............................................................ 12, 24
Combined Loss of Business Income or Extra Expense Limit
    ......................................................................20
Computer Equipment.......................................... 17, 28
Computer Error or Virus........................................ 14, 25
Computer Programming or Consulting Liability...............38
Conditional Sale of Covered Property ........................9, 22
Construction Defect .............................................. 14, 26
Consulting or Testing Liability ......................................38
Contamination .................................................... 14, 25
Contingent Business Interruption .................................21
Contract, Lease, License, or Order................................ 14, 25
Contractual Liability - All Other Contracts......................37
Contractual Liability- Specified Contracts.......................33
Coverage Under Two or More Limits ...................5, 21, 32
Credit Card Forgery or Counterfeit Currency ..............9, 22
Custom Duties, Storage Charges or Elevator Charges ......28

# D

Debris Removal and Necessary Demolition.....................30
Deductible ...............................................................52
Deep Well Pumps.......................................................30
Delay ...................................................... 14, 26, 37
Demolition and Increased Cost of Construction................30
Direct Causes of Business Income or Extra Expense Loss. 24
Direct Causes of Property Loss .....................................12
Directors and Officers Liability .....................................38
Disease .............................................................14, 26
Disease-Std ..............................................................37
Druggist's Liability .....................................................38
Dwelling ..............................................................7, 34
Dwelling - Appurtenant Structures ..................................7
Dwelling - Emergency Prohibition Against Occupancy ...... 30
Dwelling - Living Expense ...........................................30
Dwelling - Lock Replacement.......................................30
Dwelling - Newly Acquired or Constructed.......................9
Dwelling Valuation .....................................................7

# E

Earth Movement or Volcanic Eruption ......................13, 26
Earth Movement or Volcanic Eruption - All Other............. 14
Earth Movement or Volcanic Eruption - Vehicles ............ 13
Earthwork ...............................................................30
Electronic Data - Extra Expense....................................21
Electronic Data Processing Equipment, Media and Software
    ......................................................................10, 22
Employee Benefit Program Administration Liability - All
    Other................................................................38
Employee Benefit Program Administration Liability - Erisa 38
Employee Dishonesty ............................................14, 26
Employee Occupied Dwelling - Extra Expense................. 28
Employment - Related Practices Liability........................39
Entrustment Liability .................................................37
Erroneous Delivery of Liquid Products............................42
Errors or Omissions Liability ........................................38
Excess Employer's Liability - Underlying Workers
    Compensation and Employers Liability Insurance Required
    ......................................................................34
Extra Expense ..........................................................19

# F

Fair Rental Value ......................................................28
False Pretense.......................................................14, 26
Fences ...............................................................10, 22
Fire ....................................................... 21, 34, 47
Fire..........................................................................9
Fire Damage Legal Liability .........................................40
Fire Department Expense.............................................30
Fire Department Service Charges...................................30
Firearms.............................................................18, 27
First Aid or Healthcare Liability ....................................39
Food Contamination ..................................................28
Food Contamination Business Income and Extra Expense 28
Foundations, Pavement, Bridges and Railroad Sidetrack . 10, 22
Functional Replacement Cost..........................................4
Fungus, Spores, Mold and Mildew ................................ 40
Fungus, Spores, Mold and Mildew - All Other................. 14

Fungus, Spores, Mold and Mildew - Construction Defect ..14, 26
Fungus, Spores, Mold and Mildew - Extra Expense...........30

## G

Genetically Modified Organism (GMO) ...........................40
Good Economy Effect...............................................21
Governmental Action .........................................15, 26, 47
Ground Water ................................................... 13, 24
Ground Water - All Other .....................................15, 26
Growing Crops or Plants........................................ 10, 22

## H

Hazardous Operations or Pursuits.................................40
Hazardous Properties...............................................47
Hazardous Properties or Conditions .............................47
Hepatitis A Inoculations Coverage ...............................28
Host Liquor Liability ...............................................34
Hostile Fire .........................................................34
Household Personal Property ................................... 7, 20

## I

Impaired Property ............................................. 31, 42
Inherent Product Flaw Liability ....................................42
Insured Causes of Business Income or Extra Expense Loss
  ....................................................................19
Insured Causes of Property Loss ...................................3
Intangible and Intellectual Property Liability ...................40
Intellectual Property .......................................... 10, 22
Internet Advertising Liability......................................40
Internet Contest Risk...............................................40
Internet Extortion...................................................31
Internet Infrastructure Risk........................................41
Internet Loss of Income and Extra Expense....................21
Internet Risk .......................................................40
Internet Risk - Unauthorized Access or Use Risk..............41
Internet Service - Loss of Use....................................41
Internet Services Risk...............................................41
Irrigation Systems........................................... 10, 22

## J

Jewelry ........................................................ 18, 28

## L

Land and Land Improvements................................. 10, 22
Landscaping or Plants - Outdoors ........................... 10, 22
Lease....................................................... 11, 23
Leasehold Interest...................................................22
Legal Liability and Defense Sub-Limit............................32
Liquor Legal Liability...............................................41
Livestock...............................................16, 22, 41
Livestock - Basic Causes of Loss..................................15
Livestock - Cargo and Transportation.............................16
Livestock - Miscellaneous Causes of Loss.......................16
Livestock - Road Kill...............................................16
Livestock Liability - Outfitting and Guide Activity ............41
Livestock Liability - Specified Activities ........................41
Livestock Liability - Youth Educational Activities .............41
Livestock Rustling ...................................................16
Loss Assessment - Property Owners' Association .............31

Loss of Business Income...............................................19
Loss of Market.................................................17, 27
Loss of Use ...................................................17, 27

## M

Mechanical or Electrical Breakdown - All Other .........17, 29
Mechanical or Electrical Breakdown - Direct Damage..17, 28
Mechanical or Electrical Breakdown - Perishable Stock 17, 29
Misapplication of Chemicals...................................17, 27
Miscellaneous Causes of Loss .....................................25
Miscellaneous Covered Property...................................21
Money and Securities..........................................10, 22
Mortgage Holders - Loss Payees .................................52
Mysterious Disappearance......................................17, 27

## N

Normal Business Operations........................................ 19

## O

Off Premises Utility Service ...................................... 29

## P

Personal Injury..............................................34, 49
Personal Injury Protection..........................................36
Pollutant.....................................................30, 42
Pollution Liability ...................................................41
Pollution Liability - Specified Causes of Loss...................34
Pollution Risk - All Other ..........................................42
Pollution Risk - Herbicide, Pesticide and Fertilizer...........42
Pollution Risk - Vehicle ............................................42
Precious Metals ..............................................10, 22
Premises Medical Payments...................................42, 48
Premises Pollution...................................................31
Pre-Payment Obligations ...........................................21
Preservation of Property - Repair and Moving Expense .... 31
Pressure Testing ............................................17, 27
Product Liability - Specified Causes of Loss ...................42
Product Liability - Your Product...................................35
Product or Work Recall .............................................43
Product Recall Expenses ...........................................31
Product Rejection...................................................43
Production Machinery and Equipment ......................17, 29
Property Access ....................................................29
Property Damage..............................................35, 49
Property Sub-Limit....................................................5
Publishing or Broadcasting Legal Liability - Specified Causes
  of Loss ...........................................................43
Publishing or Broadcasting Liability - Specified Causes of
  Loss ............................................................. 39

## R

Racing or Stunting Activities ...............................18, 27
Racing or Stunting Activities - Liability..........................43
Reasonable Use of Intentional Force............................. 35
Refrigeration and Air Handling Equipment................17, 28
Refrigeration Equipment Maintenance ......................... 50
Rent.........................................................11, 23
Rental Building - Loss of Rents ...................................31
Replacement Cost.....................................................4
Riot or Civil Commotion.........................................9, 21

## S

Scheduled Covered Property Limit ....................................4
Scheduled Extra Expense Limit ....................................20
Securities Risk ................................................................43
Security or Watchman's Service ..................................50
Seed...............................................................................39
Seedmans Liability - Broad ..........................................39
Seedmans Liability - Replacement Seed ........................39
Seedmans Liability - Replacement Seed and Replanting ...39
Service Contracts ..........................................................50
Silverware, Gold Ware, Pewter Ware, and Collectibles 18, 28
Steam Boiler..............................................................17, 28
Steam Boiler Explosion ...........................................18, 29
Stevedores Liability ......................................................43
Stock................................................................................7, 20
Stock – Miscellaneous Causes of Loss ...........................27
Stock Valuation..............................................................7
Strikes, Protest and Other Interference..........................29
Sub-Limited Causes of Business Income or Extra Expense
    Loss - Consequential Loss or Damage........................25
Sub-Limited Causes of Property Loss - Consequential Loss
    or Damage.................................................................13
Sub-Limited Legal Liability and Defense Causes of Loss -
    Consequential Loss or Damage..................................35
Supplemental Extra Expense Coverages........................29

## T

Tank Leakage ...................................................... 18, 27
Tenant Occupied Building or Dwelling - Personal Property 11,
    22
Theft - Specific Household Personal Property ........... 18, 27
Tools and Tack Owned By Your Employee................. 11, 23
Tree Removal ...............................................................31

## U

Undeclared Property ............................................. 11, 23
Underground Tanks ............................................... 11, 23
Undervaluation ...............................................................5
Uninsured or Underinsured Motorist.............................36
Utility Systems...................................................... 11, 23

## V

Vacant Building or Dwelling......................................18, 28
Valuable Papers......................................................11, 23
Vandalism...........................................................................9, 21
Vehicle Glass Coverage .................................................. 8
Vehicle Liability ............................................................ 35
Vehicle Liability - Undeclared Drivers............................ 43
Vehicle Valuation ........................................................... 8
Vehicles.................................................... 8, 20, 34, 44
Vehicles - Ground Water............................................... 13
Vehicles - Newly Acquired........................................11, 23
Vehicles – Overload of Carrying to Towing Capacity ........ 18
Vehicles - Rented and Non-Owned ...........................11, 23
Vehicles - Sound Reproduction Equipment and Media ...... 18
Vehicles - Towing or Rental.......................................... 31
Vendors - Undeclared Vendors or Declared Vendors
    Controlled Risks ..................................................... 44
Vendors Blanket Protection - All Other.......................... 44
Vendors Scheduled Liability.......................................... 44
Veterinary Liability....................................................... 39

## W

Water Resource.......................................................11, 23
Watercraft - Newly Acquired....................................11, 23
Watercraft - Other .................................................11, 23
Watercraft - Personal ....................................... 11, 23, 35
Watercraft - Personal Liability...................................... 35
Watercraft - Rented and Non-Owned.......................12, 23
Watercraft- All Other.................................................... 44
Wharfingers Liability .................................................... 44
Wind Generating Machinery ....................................12, 23
Work Liability .............................................................. 35
Workmanship Liability .................................................. 45
Worldwide Covered Property ...................................12, 23

## Y

Your Product ........................................................31, 35
Your Work ............................................................31, 35

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty COMPANY ™

**FIRST NAMED INSURED**

Aurora Dairy Corporation

1401 Walnut Street, Suite 500
Boulder, CO 80302

LEGAL ENTITY: Corporation

**YOUR AGENT**

Premier Insurance - Twin Falls Division
P O Box 6
Twin Falls, ID 83303
PHONE: (208) 734-1711  FAX: (208) 734-9846

---

**POLICY NUMBER:** RM00734-00

**POLICY PERIOD:** **01-Jul-2004** at 12:01 am to **01-Jul-2005** at 12:01 a.m. Standard Time
at the address shown above.

---

In return for the payment of the premium and subject to all the terms and conditions of this policy, we agree to provide the insurance as stated herein:

|  | PREMIUM |
|---|---|
| **COVERED PROPERTY** | $80,983.00 |
| **LOSS OF BUSINESS INCOME OR EXTRA EXPENSE** | $19,627.00 |
| **LEGAL LIABILITY AND DEFENSE\*** | $70,371.00 |
| Blanket Legal Liability and Defense Limit: **$15,000,000** | |
| Property Damage Deductible : **Waived** | |
| **TOTAL PREMIUM** | $170,981.00 |

---

**FORMS AND ENDORSEMENTS MADE A PART OF THIS POLICY AT TIME OF ISSUANCE:**

| | | | |
|---|---|---|---|
| RM (01 2003) | RM 401 10 03 | RMCO (10 2003) | RMTX (06 2004) |
| RM 101 04 04 | RM 200 04 04 | | |

---

**\*IMPORTANT: This is a "defense within the limits" policy. Our responsibility to pay all covered costs including judgments, settlements, or defense costs will end when we have paid out an amount equal to the applicable LEGAL LIABILITY AND DEFENSE limit of insurance.**

---

Countersigned: _____ Date: _____ By: _____

Authorized Representative

©2003 General Fire & Casualty Company
Patent Pending

RiskManager™
Policy Declarations and Schedules



## COVERED PROPERTY SECTION

**COVERED PROPERTY**
See page 3 of the policy form for definition and limitation.

**BLANKET PROPERTY**
See page 4 of the policy form for definition and limitation.

**YOUR COVERED PROPERTY**
See pages 6, 7 and 8 of the policy form for definition and limitation.

**Buildings, Business Personal Property, Dwellings, Dwelling - Appurtenant Structures, Household Personal Property, and Stock**

**Mobile Equipment and Miscellaneous Covered Property**

**Vehicles other than Mobile Equipment and Miscellaneous Covered Property**

| Year | Description / State / VIN | Valuation Method / Coverage | Deductible | Property Limit |
|------|---------------------------|----------------------------|------------|----------------|
| None | | | | |

\* Blanket Deductible Applies  $0

## SCHEDULED PROPERTY
See page 4 of the policy form for definition and limitation.

**YOUR COVERED PROPERTY**
See pages 6, 7 and 8 of the policy form for definition and limitation.

**Buildings, Business Personal Property, Dwellings, Dwelling - Appurtenant Structures, Household Personal Property, and Stock**

| Location | Description of Property | Valuation Method | Deductible | Property Limit |
|----------|------------------------|------------------|------------|----------------|
| 1 | Bldg #01 - Milk Parlor #1 (10,000 s.f.) | Functional Replacement | $10,000 | $236,900 |
| 1 | Bldg #02 - Milk Parlor #2 (10,000 s.f.) | Functional Replacement | $10,000 | $298,700 |
| 1 | Bldg #03 - Milk Parlor #3 (10,000 s.f.) | Functional Replacement | $10,000 | $298,700 |
| 1 | Bldg #04 - Milk Parlor #4 (10,000 s.f.) | Functional Replacement | $10,000 | $298,700 |
| 1 | Bldg #05 - Calf Shed (2,600 s.f.) | Functional Replacement | $10,000 | $26,471 |
| 1 | Bldg #06 - Shop (1,920 s.f.) | Functional Replacement | $10,000 | $17,716 |
| 1 | Bldg #07 - Commodity Building #1 (4,500 s.f.) | Functional Replacement | $10,000 | $44,084 |
| 1 | Bldg #08 - Feed Mill (5,000 s.f.) | Functional Replacement | $10,000 | $71,688 |
| 1 | Bldg #09 - Vet Building w/Scales (800 s.f.) | Functional Replacement | $10,000 | $17,098 |
| 1 | Bldg #10 - Loafing Sheds (6,000 s.f.) | Functional Replacement | $10,000 | $20,909 |
| 1 | Bldg #11 - Loafing Sheds (14,400 s.f.) | Functional Replacement | $10,000 | $92,957 |
| 1 | Bldg #12 - Loafing Sheds (36,400 s.f.) | Functional Replacement | $10,000 | $243,595 |
| 1 | Bldg #13 - Loafing Sheds (14,000 s.f.) | Functional Replacement | $10,000 | $92,597 |
| 1 | Bldg #14 - Loafing Sheds (7,200 s.f.) | Functional Replacement | $10,000 | $46,247 |
| 1 | Bldg #15 - Loafing Sheds  (48,000 s.f.) | Functional Replacement | $10,000 | $317,446 |
| 1 | Bldg #16 - Loafing Sheds (1,600 s.f.) | Functional Replacement | $10,000 | $9,888 |
| 1 | Bldg #17 - Loafing Sheds (3,200 s.f.) | Functional Replacement | $10,000 | $13,184 |

©2003 General Fire & Casualty Company
Patent Pending

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty COMPANY ™

---

**THE INSURED**
See page 1 of the policy form for definition and limitation.

| Name of Insured | Doing Business As: |
|---|---|
| Aurora Dairy Corporation | Aurora Organic Dairy |
| Aurora Dairy - Texas, LLC | |

---

**ADDITIONAL INSUREDS**
See pages 1 and 2 of the policy form for definition and limitation.

Name of Additional Insured        Interest:
None Declared

---

**VENDORS**
See page 1 of the policy form for definition and limitation.

Name of Vendor        Interest:
None Declared

---

**MORTGAGE HOLDERS - LOSS PAYEES**
See pages 52 and 53 of the policy form for definition and limitation.

| Name of Loss Payee | Type of Interest | Interest: |
|---|---|---|
| Farm Credit Leasing<br>5500 Wayzata Blvd<br>Minneapolis MN 55416 | Loss Payee | Int'l Truck w/Harsh #6668 |
| Ford Motor Credit Corp<br>PO Box 7151<br>Springfield OH 45501 | Loss Payee | 2001 Ford Ranger Super Cab Pickup<br>#08773 |
| Gordon Brothers Capital LLC<br>40 Broad Street<br>Boston MA 02109 | Loss Payee | Miscellaneous Tools & Equipment<br>Cat Generator Barn #1, #3853871<br>Cat Generator Barn #2, #66D23160<br>Pivot Irrigation System |

---

**LOCATION SCHEDULE**

| | | | |
|---|---|---|---|
| 1 | 7388 State Highway 66<br>Platteville CO 80651 | (150 Acres)<br>Weld | |
| 2 | 1401 Walnut Street, Suite #500<br>Boulder CO 80302 | Boulder | |
| 3 | 6788 State Highway 66<br>Platteville CO 80651 | (150 Acres)<br>Weld | |
| 4 | 6820 State Highway 66<br>Platteville CO 80651 | Weld | |
| 5 | 3075 County Road 340<br>Dublin TX 76446 | (769 Acres)<br>Erath | |

---

©2003 General Fire & Casualty Company
Patent Pending

Policy Number: RM00734-00        Print Date: 08/02/2004

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty Company ™

| | | | | |
|---|---|---|---|---|
| 1 | Bldg #18 - Commodity Building #2 (2,500 s.f.) | Functional Replacement | $10,000 | $61,800 |
| 1 | Bldg #19 - Calf Shed & Barn (10,000 s.f.) | Functional Replacement | $10,000 | $266,770 |
| 1 | Bldg #20 - Commodity Building #3 (2,500 s.f.) | Functional Replacement | $10,000 | $61,800 |
| 1 | Milking Equipment | Functional Replacement | $10,000 | $804,000 |
| 1 | Bldg #21 - Managers 1960 Dwelling (1,440 s.f.) | Functional Replacement | $10,000 | $88,168 |
| 1 | Bldg #22 - Managers 3-Car Garage (800 s.f.)) | Functional Replacement | $10,000 | $22,042 |
| 1 | Bldg #23 - 1982 Employee Mobilehome (800 s.f.) | Functional Replacement | $10,000 | $22,500 |
| 1 | Bldg #24 - 1983 Employee Mobilehome (800 s.f.) | Functional Replacement | $10,000 | $22,500 |
| 1 | Bldg #25 - 1984 Employee Mobilehome (800 s.f.) | Functional Replacement | $10,000 | $24,600 |
| 1 | Bldg #26 - 1984 Employee Mobilehome (800 s.f.) | Functional Replacement | $10,000 | $27,800 |
| 1 | Bldg #27 - 1984 Employee Mobilehome (1,200 s.f.) | Functional Replacement | $10,000 | $27,800 |
| 1 | Bldg #28 - 1984 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #29 - 1984 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #36 - 1982 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #37 - 1982 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #38 - 1984 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $17,700 |
| 1 | Bldg #39 - 1984 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $17,700 |
| 1 | Bldg #40 - 1984 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $17,700 |
| 1 | Bldg #41 - 1984 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $17,700 |
| 1 | Bldg #42 - 1984 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $17,700 |
| 1 | Bldg #43 - 1975 Employee Dwelling (1,140 s.f.) | Functional Replacement | $10,000 | $71,688 |
| 1 | Bldg #44 - 1975 Employee Dwelling (1,000 s.f.) | Functional Replacement | $10,000 | $69,600 |
| 1 | Bldg #30 - 1982 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #31 - 1982 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #32 - 1982 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #33 - 1982 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #34 - 1982 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | Bldg #35 - 1982 Employee Mobilehome (980 s.f.) | Functional Replacement | $10,000 | $16,100 |
| 1 | STOCK - Milk in Tanks | Market Valuation (Stock) | $10,000 | $25,000 |
| 2 | Office Business Personal Property ONLY | Actual Cash Value | $2,500 | $15,000 |
| 3 | Office | Actual Cash Value | $2,500 | $5,000 |
| 3 | Shop #1 | Functional Replacement | $10,000 | $20,000 |
| 3 | Shop #2 | Functional Replacement | $10,000 | $20,000 |
| 3 | Ground Scales (70ft) | Functional Replacement | $10,000 | $20,000 |
| 3 | Ground Scales (20ft) | Functional Replacement | $10,000 | $20,000 |
| 3 | 1970 Employee Dwelling (750 s.f.) | Functional Replacement | $10,000 | $40,000 |
| 4 | 2004 Organic Milk Processing Plant (26,803 s.f.) | Functional Replacement | $10,000 | $9,000,000 |
| 4 | Processing Plant Equipment | Functional Replacement | $10,000 | $9,000,000 |
| 5 | Bldg #01 - Manager's 1998 Brick Dwelling (1,200 s.f.) | Functional Replacement | $10,000 | $89,024 |
| 5 | Bldg #02 - Employee 1998 Dwelling (700 s.f.) | Functional Replacement | $10,000 | $31,200 |
| 5 | Bldg #03 - Employee 1998 Dwelling (600 s.f.) | Functional Replacement | $10,000 | $16,744 |
| 5 | Bldg #04 - Employee 1998 Brick Dwelling (1,000 s.f.) | Functional Replacement | $10,000 | $66,766 |
| 5 | Bldg #05 - Employee 1998 Brick Dwelling (1,000 s.f.) | Functional Replacement | $10,000 | $66,766 |
| 5 | Bldg #06 - Employee 1998 Brick Dwelling (1,250 s.f.) | Functional Replacement | $10,000 | $83,512 |
| 5 | Bldg #07 - Milk Barn #1 (16,000 s.f.) | Functional Replacement | $10,000 | $656,880 |
| 5 | Bldg #08 - Milk Barn #2 (15,500 s.f.) | Functional Replacement | $10,000 | $615,200 |

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty COMPANY™

| 5 | Milking Equipment | Functional Replacement | $10,000 | $550,000 |
|---|---|---|---|---|
| 5 | Bldg #09- Office Building (800 s.f.) | Functional Replacement | $10,000 | $60,320 |
| 5 | Office Business Personal Property ONLY | Actual Cash Value | $2,500 | $25,000 |
| 5 | Bldg #10 - Commodity Barn (2,000 s.f.) | Functional Replacement | $10,000 | $85,072 |
| 5 | Bldg #11 - Hay Barn #1 | Functional Replacement | $10,000 | $35,568 |
| 5 | Bldg #12 - Hay Barn #2 | Functional Replacement | $10,000 | $33,280 |
| 5 | Bldg #13 - Hay Barn #3 | Functional Replacement | $10,000 | $33,280 |
| 5 | Bldg #14 - Shop (1,300 s.f.) | Functional Replacement | $10,000 | $64,584 |
| 5 | Bldg #15 - (2) Cow Sheds | Functional Replacement | $10,000 | $228,800 |
| 5 | Bldg #16 - (5) Cow Sheds | Functional Replacement | $10,000 | $260,000 |
| 5 | Bldg #17 - Cow Sheds | Functional Replacement | $10,000 | $81,120 |
| 5 | Bldg #18 - Cow Shed | Functional Replacement | $10,000 | $41,600 |
| 5 | Bldg #19 - Cow Shed | Functional Replacement | $10,000 | $16,640 |
| 5 | Bldg #20 - (22) Cow Sheds | Functional Replacement | $10,000 | $205,920 |
| 5 | Bldg #21 - (8) Calf Pens | Functional Replacement | $10,000 | $16,640 |
| 5 | Hay in Barns | Market Valuation (Stock) | $10,000 | $160,000 |

## Mobile Equipment and Miscellaneous Covered Property

| Description of Property | Valuation Method | Deductible | Property Limit |
|---|---|---|---|
| Fairbanks Morse Scales | Actual Cash Value | $2,500 | $20,000 |
| Bobcat Loader #B4201880 | Actual Cash Value | $2,500 | $8,000 |
| John Deere 302 Tractor #9267 | Actual Cash Value | $2,500 | $6,100 |
| Komatsu Wheel Loader WA180-3PT #A85237 | Actual Cash Value | $2,500 | $76,357 |
| John Deere Tractor 5320 #L05320S132322 | Actual Cash Value | $2,500 | $26,245 |
| Komatsu WA 250 Loader #A71722 | Actual Cash Value | $2,500 | $146,700 |
| Komatsu WA 250 Loader #A71721 | Actual Cash Value | $2,500 | $146,700 |
| John Deere Tractor #L06420V351815 | Actual Cash Value | $2,500 | $68,000 |
| John Deere Tractor #L06420V351304 | Actual Cash Value | $2,500 | $68,000 |
| Komatsu Loader WA320 #31785 | Actual Cash Value | $2,500 | $131,000 |
| CAT 3208 Generator #6GA00699 (B3) | Actual Cash Value | $2,500 | $24,000 |
| CAT Generator #6GA010088 (B4) | Actual Cash Value | $2,500 | $19,000 |
| CAT Generator #6JA00548 (B1 & B2) | Actual Cash Value | $2,500 | $23,000 |
| Misc.Tools & Equipment @ $1,000 Max per Item | Actual Cash Value | $2,500 | $25,000 |
| 2003 Caterpillar Wheel Loader 924G #DDA00465 | Actual Cash Value | $2,500 | $124,928 |
| John Deere 7405 Tractor #P07406X001539 | Actual Cash Value | $2,500 | $41,000 |
| John Deere 7405 Tractor #P0705X002017 | Actual Cash Value | $2,500 | $41,000 |
| John Deere 1517 Rotary Cutter #W01517E002920 | Actual Cash Value | $2,500 | $8,500 |
| Hay Buster H1100 Tub Grinder #HT12949 | Actual Cash Value | $2,500 | $22,000 |
| Roto Mix 855 Feed Wagon #891084150 | Actual Cash Value | $2,500 | $40,000 |
| Schuler Mixer Feed Wagon #G3096-113 | Actual Cash Value | $2,500 | $20,000 |
| 2003 Caterpillar Wheel Loader 924G #DDA00464 | Actual Cash Value | $2,500 | $114,386 |
| John Deere 4440 Tractor w/Duals #4440P051096 | Actual Cash Value | $2,500 | $25,500 |
| John Deere 4230 Tractor #230W039833 | Actual Cash Value | $2,500 | $9,750 |
| John Deere Gator 6x4 DSL #2006Y4D010383 | Actual Cash Value | $2,500 | $3,000 |
| 1998 Case IH MX 150 Tractor #JJA0097324 | Actual Cash Value | $2,500 | $55,000 |
| John Deere Tractor 7810 #RW7810H010904 | Actual Cash Value | $2,500 | $52,000 |
| John Deere Tractor 7610 #RW7610H010472 | Actual Cash Value | $2,500 | $48,000 |
| Loewen 1022 Feed Mixer #32548 | Actual Cash Value | $2,500 | $34,000 |
| CAT Generator #3853871 (Barn #1) | Actual Cash Value | $2,500 | $18,000 |
| CAT Generator #66D23160 (Barn #2) | Actual Cash Value | $2,500 | $11,500 |
| Misc. Tools & Equipment @ $1,000 Max per Item | Actual Cash Value | $2,500 | $25,000 |

## Vehicles other than Mobile Equipment and Miscellaneous Covered Property

| Year | Description / State / VIN | Valuation Method / Coverage | Deductible | Property Limit |
|---|---|---|---|---|

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty ™
COMPANY

| Year | Description / State / VIN | Valuation Method / Coverage | Deductible | Property Limit |
|------|---------------------------|------------------------------|-----------|----------------|
|  | End-Dump Trailer<br>CO          50003 | Actual Cash Value<br>Full Coverage | $1,000 | $8,500 |
| 1978 | Ford Water Truck (Premise Use Only)<br>CO          R80DYCA5108 | Actual Cash Value<br>Full Coverage | $1,000 | $25,000 |
| 1984 | Wilson Trailer<br>CO          1W15C56N8E55X9380 | Actual Cash Value<br>Full Coverage | $1,000 | $17,000 |
| 1993 | Ford F250 Pickup<br>CO          1FTHF26H8SLB05596 | Actual Cash Value<br>Full Coverage | $1,000 | $5,500 |
| 1994 | Ford F250 Pickup<br>CO          2FTH26H6RCA222164 | Actual Cash Value<br>Full Coverage | $1,000 | $5,900 |
| 1995 | Int'l Truck w/Harsh (Premise Use Only)<br>CO          1HTSCAAN5SH266668 | Actual Cash Value<br>Full Coverage | $1,000 | $64,800 |
| 1992 | Ford LTA9000 Aero Max Tractor<br>CO          1FTYY95R3NVA21538 | Actual Cash Value<br>Full Coverage | $2,500 | $60,000 |
| 1984 | Peterbilt Conventional 359 Tractor<br>CO          1XP9DB9XEN168542 | Actual Cash Value<br>Full Coverage | $2,500 | $50,000 |
| 1988 | Great Dane Trailer<br>CO          1GRDM9625J022501 | Actual Cash Value<br>Full Coverage | $1,000 | $20,000 |
| 1994 | Ford F250 Pickup<br>CO          2FTHF26H24CA47823 | Actual Cash Value<br>Full Coverage | $1,000 | $5,000 |
| 1978 | Hobbs Trailer<br>CO          FHZ912802 | Actual Cash Value<br>Full Coverage | $1,000 | $7,500 |
| 1978 | Hobbs Trailer<br>CO          EHZ913501 | Actual Cash Value<br>Full Coverage | $1,000 | $6,000 |
| 1992 | Ford Ranger Super Cab Pickup<br>CO          1FTCR14A6NPA38830 | Actual Cash Value<br>Full Coverage | $1,000 | $3,500 |
| 2001 | Ford Ranger Super Cab Pickup<br>CO          1FTZR15E11PB08773 | Actual Cash Value<br>Full Coverage | $1,000 | $9,700 |
| 1999 | Ford F350 Super Duty Crew Pickup<br>CO          1FTSW31S4XEA79467 | Actual Cash Value<br>Full Coverage | $1,000 | $14,000 |
| 1995 | Ford F150 Pickup<br>CO          1FTEF14N2SLA73162 | Actual Cash Value<br>Full Coverage | $1,000 | $5,000 |
| 2003 | Int'l Feed Truck w/Haysizor<br>CO          HTGGAHE63H56497 | Actual Cash Value<br>Full Coverage | $1,000 | $168,000 |
| 2000 | Ford F150 Pickup<br>CO          1FTRF18W3YNA32234 | Actual Cash Value<br>Full Coverage | $1,000 | $9,000 |
| 1992 | Ford Feed Truck w/Haysizor (Premise Use)<br>CO          1FTYA95R3NVA08714 | Actual Cash Value<br>Full Coverage | $1,000 | $138,900 |

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty COMPANY™

| Year | Description / State / VIN | Valuation Method / Coverage | Deductible | Property Limit |
|---|---|---|---|---|
| 2000 | Murdock Stock Trailer<br>CO        4TGG20206Y1016197 | Actual Cash Value<br>Full Coverage | $1,000 | $7,000 |
| 2001 | Dodge Ram 2500 Quad Ext Cab Truck<br>TX        3B7KF23601G725145 | Actual Cash Value<br>Full Coverage | $1,000 | $23,000 |
| 1997 | Dodge Ram 1500 Pickup<br>TX        1B7HC16Y6VS100693 | Actual Cash Value<br>Full Coverage | $1,000 | $9,000 |
| 1999 | Ford Ranger Super Cab Pickup<br>TX        1FTZR15XPB52784 | Actual Cash Value<br>Full Coverage | $1,000 | $8,000 |
| 1995 | Chevrolet K2500 Club Cab Pickup<br>TX        1GCGK29KXSE115607 | Actual Cash Value<br>Full Coverage | $1,000 | $8,800 |
| 2002 | Lexus RX300<br>CO        JTJHFB10U67028003 | Actual Cash Value<br>Full Coverage | $1,000 | $72,000 |
| 2002 | Honda Accord SE 4dr Sedan<br>CO        JHMCG56742C019290 | Actual Cash Value<br>Full Coverage | $1,000 | $18,000 |
| 2003 | Mercedes Benz SL500R Roadster<br>CO        WDBSK75FX3F027750 | Actual Cash Value<br>Full Coverage | $1,000 | $103,378 |
| 2003 | Mercedes Benz S500 4dr Sedan<br>CO        WDBNG84JX3A369478 | Actual Cash Value<br>Full Coverage | $1,000 | $86,000 |

## ADDITIONAL SCHEDULED COVERED PROPERTY
See pages 8 through 12 of the policy form for definition and limitation.

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Accounts Receivable | $2,500 | $100,000 | $200,000 |
| Aircraft Damage | $500 | $1,000 | $2,000 |
| Antique Property | $500 | $1,000 | $2,000 |
| Buildings or Business Personal Property - Newly Acquired or Constructed | $500 | $250,000 | $500,000 |
| Bulk Stock - Stored in the Open | | | |
|     Hay or Haylage in the Open | $10,000 | $400,000 | $800,000 |
|     Stock Stored in the Open (Other than hay or haylage) | $500 | $1,000 | $2,000 |
| Cargo - Transportation of Property | $500 | $1,000 | $2,000 |
| Conditional Sale of Covered Property | $500 | $1,000 | $2,000 |
| Credit Card Forgery or Counterfeit Currency | $500 | $1,000 | $2,000 |
| Dwelling - Newly Acquired or Constructed | $500 | $250,000 | $500,000 |
| Electronic Data Processing Equipment, Media, and Software CO $25,000, TX $5,000 | $2,500 | $30,000 | $60,000 |
| Fences | $500 | $1,000 | $2,000 |
| Foundations, Pavement, Bridges and Railroad Sidetrack | $500 | $1,000 | $2,000 |
| Growing Crops or Plants | $500 | $1,000 | $2,000 |

©2003 General Fire & Casualty Company<br>Patent Pending

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty Company

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Intellectual Property | $500 | $1,000 | $2,000 |
| Irrigation Systems | $10,000 | $140,000 | $280,000 |
| Land and Land Improvements | $500 | $1,000 | $2,000 |
| Landscaping or Plants - Outdoors | $500 | $1,000 | $2,000 |
| Money and Securities | $500 | $1,000 | $2,000 |
| Precious Metals | $500 | $1,000 | $2,000 |
| Tenant Occupied Building or Dwelling - Personal Property | $500 | $1,000 | $2,000 |
| Tools and Tack Owned by Your Employee | $500 | $1,000 | $2,000 |
| Undeclared Property | $500 | $1,000 | $2,000 |
| Underground Tanks | $500 | $1,000 | $2,000 |
| Utility Systems | $2,500 | $20,000 | $40,000 |
| Valuable Papers | $2,500 | $100,000 | $200,000 |
| Vehicles - Newly Acquired | $500 | $150,000 | $300,000 |
| Vehicles - Rented and Non-Owned | $2,500 | $10,000 | $20,000 |
| Water Resource | $500 | $1,000 | $2,000 |
| Watercraft - Other | $500 | $1,000 | $2,000 |
| Watercraft - Personal | $500 | $1,000 | $2,000 |
| Watercraft - Newly Acquired | $500 | $10,000 | $20,000 |
| Watercraft - Rented and Non-Owned | $500 | $1,000 | $2,000 |
| Wind Generating Machinery | $500 | $1,000 | $2,000 |
| Worldwide Covered Property | $500 | $10,000 | $20,000 |

## PROPERTY SUB-LIMIT
See page 5 of the policy form for definition and limitation.

### SUB-LIMITED CAUSES OF PROPERTY LOSS - CONSEQUENTIAL LOSS OR DAMAGE
See pages 13 through 18 of the policy form for definition and limitation.

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Animal or Insect Damage | $500 | $1,000 | $2,000 |
| Atmospheric Condition - Outdoors | $500 | $1,000 | $2,000 |
| Breakage - Fragile Property | $500 | $1,000 | $2,000 |
| Computer Error or Virus | $500 | $1,000 | $2,000 |
| Construction Defect | $500 | $1,000 | $2,000 |
| Contamination | $500 | $1,000 | $2,000 |
| Contract, Lease, License or Order | $500 | $1,000 | $2,000 |
| Delay | $500 | $1,000 | $2,000 |
| Disease | $500 | $1,000 | $2,000 |

©2003 General Fire & Casualty Company
Patent Pending

# RiskManager™
## Policy Declarations and Schedules


General Fire & Casualty COMPANY™

|  | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Earth Movement or Volcanic Eruption - All Other | 15% of Limit | $1,000 | $2,000 |
| Employee Dishonesty | $2,500 | $100,000 | $200,000 |
| False Pretense | $500 | $1,000 | $2,000 |
| Fungus, Spores, Mold and Mildew - All Other | $500 | $1,000 | $2,000 |
| Fungus, Spores, Mold and Mildew - Construction Defect | $500 | $1,000 | $2,000 |
| Governmental Action | $500 | $1,000 | $2,000 |
| Ground Water - All Other | $500 | $1,000 | $2,000 |
| Livestock - Basic Causes of Loss | $500 | $1,000 | $2,000 |
| Livestock - Cargo and Transportation | $500 | $1,000 | $2,000 |
| Livestock - Miscellaneous Causes of Loss | $500 | $1,000 | $2,000 |
| Livestock - Road Kill | $500 | $1,000 | $2,000 |
| Loss of Market | $500 | $1,000 | $2,000 |
| Loss of Use | $500 | $1,000 | $2,000 |
| Mechanical or Electrical Breakdown - Direct Damage | | | |
| Computer Equipment | $2,500 | $20,000 | $40,000 |
| Irrigation Systems | $500 | $1,000 | $2,000 |
| Refrigeration and Air Handling Equipment | $500 | $1,000 | $2,000 |
| Steam Boiler | $500 | $1,000 | $2,000 |
| Production Machinery and Equipment | $500 | $1,000 | $2,000 |
| Wind Generating Machinery | $500 | $1,000 | $2,000 |
| Utility Systems | $500 | $1,000 | $2,000 |
| Mechanical or Electrical Breakdown - Perishable Stock | $2,500 | $100,000 | $200,000 |
| Mechanical or Electrical Breakdown - All Other | $500 | $1,000 | $2,000 |
| Misapplication of Chemicals | $500 | $1,000 | $2,000 |
| Mysterious Disappearance | $500 | $1,000 | $2,000 |
| Pressure Testing | $500 | $1,000 | $2,000 |
| Racing or Stunting Activities | $500 | $1,000 | $2,000 |
| Steam Boiler Explosion | $500 | $1,000 | $2,000 |
| Stock - Miscellaneous Causes of Loss | $500 | $1,000 | $2,000 |
| Tank Leakage | $2,500 | $20,000 | $40,000 |
| Theft - Specific Household Personal Property | | | |
| Firearms | $500 | $1,000 | $2,000 |
| Jewelry | $500 | $1,000 | $2,000 |
| Silverware, gold ware, pewter ware and collectibles | $500 | $1,000 | $2,000 |

©2003 General Fire & Casualty Company
Patent Pending

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty™ COMPANY

|  | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Vacant Building or Dwelling | $500 | $1,000 | $2,000 |
| Vehicles - Overload of Carrying or Towing Capacity | $500 | $500 | $1,000 |
| Vehicles - Sound Reproduction Equipment and Media | $500 | $500 | $1,000 |

**SELF-INSURED PROPERTY**
See page 3 of the policy form for definition and limitation.

©2003 General Fire & Casualty Company
Patent Pending

RiskManager™
Policy Declarations and Schedules

 General Fire & Casualty Company ™

## LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

**LOSS OF BUSINESS INCOME**
See page 19 of the policy form for definition and limitation.

**EXTRA EXPENSE**
See page 19 of the policy form for definition and limitation.

**COMBINED LOSS OF BUSINESS INCOME OR EXTRA EXPENSE LIMIT**
See page 20 of the policy form for definition and limitation.

| Location | Description of Property | Deductible | Limit |
|---|---|---|---|
| 1 | Milk Parlor #3 | $10,000 | $1,670,000 |
| 1 | Milk Parlor #4 | $10,000 | $1,670,000 |
| 1 | Milk Parlor #1 | $10,000 | $1,000,000 |
| 1 | Milk Parlor #2 | $10,000 | $1,500,000 |
| 4 | Organic Milk Processing Plant | $10,000 | $4,000,000 |
| 5 | Milk Barn #1 | $10,000 | $1,105,000 |
| 5 | Milk Barn #2 | $10,000 | $600,000 |

**SCHEDULED EXTRA EXPENSE LIMIT**
See page 20 of the policy form for definition and limitation.

| Location | Description of Property | Deductible | Limit |
|---|---|---|---|
| None | | | |

**SELF-INSURED PROPERTY**
See page 20 of the policy form for definition and limitation.

**Loss of business income** or **extra expense** coverage other than ADDITIONAL SCHEDULED LOSS OF BUSINESS INCOME OR EXTRA EXPENSE or SUB-LIMITED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS - CONSEQUENTIAL LOSS OR DAMAGE does not apply to the following locations or property:

Location # 2        1401 Walnut Street, Suite #500   Boulder, CO 80302
Location # 3        6788 State Highway 66   Platteville, CO 80651

**BUSINESS INCOME OR EXTRA EXPENSE SUB-LIMIT**
See page 20 of the policy form for definition and limitation.

**ADDITIONAL SCHEDULED LOSS OF BUSINESS INCOME OR EXTRA EXPENSE**
See pages 21 through 23 of the policy form for definition and limitation.

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Contingent Business Interruption | $500 | $1,000 | $2,000 |
| Electronic Data - Extra Expense | $500 | $1,000 | $2,000 |
| Good Economy Effect | $500 | $1,000 | $2,000 |
| Internet Loss of Income and Extra Expense | $500 | $1,000 | $2,000 |
| Pre-payment Obligations | $500 | $1,000 | $2,000 |
| Miscellaneous Covered Property (Items a - gg, pages 21-23) | $500 | $1,000 | $2,000 |

**SUB-LIMITED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS - CONSEQUENTIAL LOSS OR DAMAGE**
See pages 25 through 31 of the policy form for definition and limitation.

©2003 General Fire & Casualty Company
Patent Pending

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty COMPANY ™

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Miscellaneous Causes of Loss (Items 1 - 25, pages 25 - 28) | $500 | $1,000 | $2,000 |
| Custom Duties, Storage Charges or Elevator Charges | $500 | $1,000 | $2,000 |
| Employee Occupied Dwelling - Extra Expense | $500 | $1,000 | $2,000 |
| Food Contamination Business Income or Extra Expense | $500 | $1,000 | $2,000 |
| Hepatitis "A" Inoculations Coverage | $500 | $1,000 | $2,000 |
| Mechanical or Electrical Breakdown - Direct Damage | | | |
| Computer Equipment | $500 | $1,000 | $2,000 |
| Irrigation Systems | $500 | $1,000 | $2,000 |
| Refrigeration and Air Handling Equipment | $500 | $1,000 | $2,000 |
| Steam Boiler | $500 | $1,000 | $2,000 |
| Production Machinery and Equipment | $500 | $1,000 | $2,000 |
| Wind-Generating Machinery | $500 | $1,000 | $2,000 |
| Utility Systems | $500 | $1,000 | $2,000 |
| Mechanical or Electrical Breakdown - Perishable Stock | $500 | $1,000 | $2,000 |
| Mechanical or Electrical Breakdown - All Other | $500 | $1,000 | $2,000 |
| Off Premises Utility Service | $500 | $1,000 | $2,000 |
| Property Access | $500 | $1,000 | $2,000 |
| Steam Boiler Explosion | $500 | $1,000 | $2,000 |
| Strikes, Protest and Other Interference | $500 | $1,000 | $2,000 |
| Supplemental Extra Expense Coverages | | | |
| Alcoholic Beverages Tax | $500 | $1,000 | $2,000 |
| Auto - Finance Gap Expense | $500 | $1,000 | $2,000 |
| CFC - Related Expense | $500 | $1,000 | $2,000 |
| Debris Removal and Necessary Demolition | $10,000 | $250,000 | $500,000 |
| Deep Well Pumps | $500 | $1,000 | $2,000 |
| Demolition and Increased Cost of Construction | $10,000 | $100,000 | $200,000 |
| Dwelling - Emergency Prohibition Against Occupancy | $500 | $1,000 | $2,000 |
| Dwelling - Living Expense (See page 30 of the policy form for definition and limitation.) | | | |
| Dwelling - Lock Replacement | $500 | $1,000 | $2,000 |
| Earthwork | $500 | $1,000 | $2,000 |
| Fire Department Expense | $500 | $1,000 | $2,000 |
| Fungus, Spores, Mold and Mildew - Extra Expense | $500 | $1,000 | $2,000 |
| Internet Extortion | $500 | $1,000 | $2,000 |
| Loss Assessment - Property Owners' Association | $500 | $1,000 | $2,000 |
| Premises Pollution | $10,000 | $100,000 | $200,000 |
| Preservation of Property-Repair and Moving Expense | $500 | $5,000 | $10,000 |
| Product Recall Expenses | $2,500 | $25,000 | $50,000 |
| Rental Building - Loss of Rents | $500 | $1,000 | $2,000 |
| Tree Removal | $500 | $1,000 | $2,000 |

©2003 General Fire & Casualty Company
Patent Pending

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty COMPANY ™

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Vehicles - Towing or Rental | $500 | $500 | $1,000 |

# RiskManager™
## Policy Declarations and Schedules



General Fire
& Casualty
COMPANY

### LEGAL LIABILITY AND DEFENSE SECTION

The basis for the premium charged for Blanket Legal Liability and Defense is as follows:

| State | Coverage Category | Description | Premium | Basis |
|---|---|---|---|---|
| CO | Milk Production | 4100 Head (24,455 lb per animal) | 100,265,500 | Pounds |
| CO | Office Bldg - Multi Occ | Loc #2 - Corporate Office | 1,200 | Area |
| CO | Dwelling - Mobile Home - Tenant Occ | | 20 | Each |
| CO | Dwelling - Tenant Occupied | | 4 | Each |
| CO | Agri Premises w/ Buildings | | 4 | Locations |
| TX | Agri Premises w/ Buildings | | 1 | Locations |
| TX | Dwelling - Tenant Occupied | | 6 | Each |
| TX | Milk Production | 3700 Head (24,455 lb per animal) | 90,483,500 | Pounds |

The following vehicles have been declared:

| Year | Vehicle | VIN |
|---|---|---|
| | End Dump Trailer | 50003 |
| 1978 | Ford Water Truck (Premise Use Only) | R80DYCA5108 |
| 1984 | Wilson Trailer | 1W15C56N8E55X9380 |
| 1993 | Ford F250 Pickup | 1FTHF26H8SLB05596 |
| 1994 | Ford F250 Pickup | 2FTH26H6RCA222164 |
| 1995 | Int'l Truck w/Harsh (Premise Use Only) | 1HTSCAAN5SH266668 |
| 1983 | LUF Trailer | 1F01B4828D1062940 |
| 1992 | Ford LTA9000 Aero Max Tractor | 1FTYY95R3NVA21538 |
| 1984 | Peterbilt Conventional 359 Tractor Truck | 1XP9DB9XEN168542 |
| 1988 | Great Dane Trailer | 1GRDM9625J022501 |
| 1988 | Ford F150 Pickup | 1FTEF14N5JKA69045 |
| 1994 | Ford F250 Pickup | 2FTHF26H24CA47823 |
| 1978 | Hobbs Trailer | FHZ912802 |
| 1978 | Hobbs Trailer | EHZ913501 |
| 1992 | Ford Ranger Super Cab Pickup (Premise Use) | 1FTCR14A6NPA38830 |
| 1992 | Ford Pickup | 2FTHEF26NCA20974 |
| 2001 | Ford Ranger Super Cab Pickup | 1FTZR15E11PB08773 |
| 1999 | Ford F350 Super Duty Crew Pickup | 1FTSW31S4XEA79467 |
| 1995 | Ford F150 Pickup | 1FTEF14N2SLA73162 |
| 1990 | Ford Ranger Super Cab Pickup | 1FTCR15T6LPA13326 |
| 2003 | Int'l Feed Truck w/Haysizor (Premise Use Only) | HTGGAHE63H56497 |
| 2000 | Ford F150 Pickup | 1FTRF18W3YNA32234 |
| 1992 | Ford Feed Truck w/Haysizor (Premise Use Only) | 1FTYA95R3NVA08714 |
| 2000 | Murdock Stock Trailer | 4TGG20206Y1016197 |
| 1982 | Ford F150 Pickup (Premise Use) | 1FTDF15E2CPA45351 |
| 1983 | Ford F150 Pickup (Premise Use) | 1FTDF15F3DPA01062 |
| 2001 | Dodge Ram 2500 Quad Ext Cab Truck | 3B7KF23601G725145 |
| 1997 | Dodge Ram 1500 Pickup | 1B7HC16Y6VS100693 |
| 1999 | Ford Ranger Super Cab Pickup | 1FTZR15XPB52784 |

©2003 General Fire & Casualty Company
Patent Pending

Policy Number: RM0G734-00     Print Date: 08/02/2004

# RiskManager™
## Policy Declarations and Schedules



General Fire
& Casualty
COMPANY

| Year | Vehicle | VIN |
|------|---------|-----|
| 1995 | Chevrolet K2500 Club Cab Pickup | 1GCGK29KXSE115607 |
| 1987 | Mazda Pickup (Premise Use) | JM2UF1130H013821 |
| 2002 | Lexus RX300 | JTJHFB10U67028003 |
| 2002 | Honda Accord SE 4dr Sedan | JHMCG56742C019290 |
| 2003 | Mercedes Benz SL500R Roadster | WDBSK75FX3F027750 |
| 2003 | Mercedes Benz S500 4dr Sedan | WDBNG84JX3A369478 |

The following drivers or operators have been declared:

| Name | State |
|------|-------|
| Fortunato Arellano Gonzales | CO |
| William Edward Cronin, III | CO |
| Jose Isidro Herranda Hernandez | CO |
| Jose D. Herrada Martinez | CO |
| Juan Herrada | CO |
| Guillermo E Mora Martinez | CO |
| Dora Libia Moreno Pena | CO |
| J Idabel Pliego-Montes | CO |
| Roman Frisco Cortes | CO |
| Jaime Quesada-Quinonez | CO |
| Wallace Richard Tryon, Jr. | CO |
| Julie Ann Walker | CO |
| Robert Walter Whitcomb | CO |
| Karen Thompson Peperzak | CO |
| Marc Peperzak | CO |
| Mauro Caldera | TX |
| Efrain Rodriguez | TX |
| Noe Tijerina | TX |
| Alane McGee Timmens | TX |
| Albert Chuck Timmens | TX |
| Diane Lee Pacini | CO |
| Dagoberto Rodriguez | CO |
| Alonso Rodriguez-Silva | CO |
| Tom Adornetto | TX |
| Jose Ramirez | TX |

## LEGAL LIABILITY AND DEFENSE SUB-LIMIT
See page 32 of the policy form for definition and limitation.

## SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS - CONSEQUENTIAL LOSS OR DAMAGE
See pages 35 through 45 of the policy form for definition and limitation.

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Advertising and Publication Liability - All Other | Waived | $1,000 | $2,000 |
| Affiliated Parties - Limited Financial Responsibility | Waived | $1,000 | $2,000 |
| Aircraft | | | |
|     Aircraft Legal Liability - Hired and Non-Owned | Waived | $1,000 | $2,000 |
|     Aircraft Legal Liability - All Other | Waived | $1,000 | $2,000 |
| Athletic or Event Participant | Waived | $1,000 | $2,000 |

©2003 General Fire & Casualty Company
Patent Pending

# RiskManager™
## Policy Declarations and Schedules



General Fire<br>
& Casualty COMPANY ™

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| **Automobile** | | | |
| Bail Bonds | Waived | $250 | $500 |
| Personal Injury Protection (See State Endorsement) | | | |
| Uninsured or Underinsured  (See State Endorsement) | | | |
| Uninsured or Underinsured – Property Damage | $250 | $15,000 | $15,000 |
| Automobile Medical Payments | Waived | $5,000 | $10,000 |
| Bodily Injury - Specified Causes of Loss | Waived | $1,000 | $2,000 |
| Care, Custody or Control Liability | Waived | $1,000 | $2,000 |
| Care, Custody or Control - Garage Keepers | Waived | $1,000 | $2,000 |
| Contractual Liability - All Other Contracts | Waived | $1,000 | $2,000 |
| Custom Farming Broad Form Property Damage | Waived | $1,000 | $2,000 |
| Delay | Waived | $1,000 | $2,000 |
| Disease - STD | Waived | $1,000 | $2,000 |
| Entrustment Liability | Waived | $1,000 | $2,000 |
| **Errors or Omissions Liability** | | | |
| Attorney Liability | Waived | $1,000 | $2,000 |
| Computer Programming or Consulting Liability | Waived | $1,000 | $2,000 |
| Consulting or Testing Liability | Waived | $1,000 | $2,000 |
| Directors and Officers Liability | Waived | $1,000 | $2,000 |
| Druggist's Liability | Waived | $1,000 | $2,000 |
| Employee Benefit Program Administration Liability - ERISA | Waived | $1,000 | $2,000 |
| Employee Benefit Program Administration Liability - All Other | Waived | $25,000 | $50,000 |
| First Aid or Healthcare Liability | Waived | $1,000 | $2,000 |
| Publishing or Broadcasting Liability - Specified Causes of Loss | Waived | $1,000 | $2,000 |
| Seedmans Liability - Broad | Waived | $1,000 | $2,000 |
| Seedmans Liability - Replacement Seed | Waived | $1,000 | $2,000 |
| Seedmans Liability - Replacement Seed and Replanting | Waived | $1,000 | $2,000 |
| Veterinary Liability | Waived | $1,000 | $2,000 |
| Employment - Related Practices Liability | Waived | $1,000 | $2,000 |
| Fire Damage Legal Liability | Waived | $100,000 | $200,000 |
| Fungus, Spores, Mold and Mildew | Waived | $1,000 | $2,000 |
| Genetically Modified Organism (GMO) | Waived | $1,000 | $2,000 |
| Hazardous Operations or Pursuits | Waived | $1,000 | $2,000 |
| Intangible and Intellectual Property Liability | Waived | $1,000 | $2,000 |
| **Internet Risk** | | | |
| Internet Advertising Liability | Waived | $1,000 | $2,000 |
| Internet Contest Risk | Waived | $1,000 | $2,000 |
| Internet Infrastructure Risk | Waived | $1,000 | $2,000 |
| Internet Services Risk | Waived | $1,000 | $2,000 |

©2003 General Fire & Casualty Company<br>
Patent Pending

Policy Number: RM00734-00          Print Date: 08/02/2004

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty COMPANY ™

| | Deductible | Occurrence Limit | Aggregate Limit |
|---|---|---|---|
| Internet Risk - Unauthorized Access or Use Risk | Waived | $1,000 | $2,000 |
| Internet Service - Loss of Use | Waived | $1,000 | $2,000 |
| Liquor Legal Liability | Waived | $1,000 | $2,000 |
| Livestock Liability - Specified Activities | Waived | $1,000 | $2,000 |
| Livestock Liability - Outfitting and Guide Activity | Waived | $1,000 | $2,000 |
| Livestock Liability - Youth Educational Activities | Waived | $1,000 | $2,000 |
| Pollution Liability | | | |
| Pollution Risk - Herbicide, Pesticide and Fertilizer | Waived | $50,000 | $100,000 |
| Pollution Risk - Vehicle | Waived | $25,000 | $50,000 |
| Pollution Risk - All Other | Waived | $2,500 | $5,000 |
| Premises Medical Payments (4) CO, (1) TX | Waived | $5,000 | $10,000 |
| Product Liability - Specified Causes of Loss | | | |
| Impaired Property | Waived | $1,000 | $2,000 |
| Inherent Product Flaw Liability | Waived | $1,000 | $2,000 |
| Erroneous Delivery of Liquid Products | Waived | $1,000 | $2,000 |
| Product or Work Recall | Waived | $1,000 | $2,000 |
| Product Rejection | Waived | $1,000 | $2,000 |
| Publishing or Broadcasting Legal Liability - Specified Causes of Loss | Waived | $1,000 | $2,000 |
| Racing or Stunting Activities - Liability | Waived | $1,000 | $2,000 |
| Securities Risk | Waived | $1,000 | $2,000 |
| Stevedores Liability | Waived | $1,000 | $2,000 |
| Vehicle Liability - Undeclared Drivers (See pages 43 and 44 of the policy form for definition and limitation.) | | | |
| Vendors Scheduled Liability | | | |
| Vendors - Undeclared Vendors or Declared Vendors Controlled Risks | Waived | $1,000 | $2,000 |
| Vendors Blanket Protection - All Other | Waived | $1,000,000 | $1,000,000 |
| Watercraft - All Other | Waived | $1,000 | $2,000 |
| Wharfingers Liability | Waived | $1,000 | $2,000 |
| Workmanship Liability | Waived | $1,000 | $2,000 |

©2003 General Fire & Casualty Company
Patent Pending

# RiskManager™
## Policy Declarations and Schedules



General Fire & Casualty COMPANY ™

---

### THIS SPECIAL SECTION CHANGES YOUR COVERAGE
### PLEASE READ IT CAREFULLY

COVERED PROPERTY SECTION – BSE/TSE Sub-limit

The following deductible and sub-limits apply to subsection O. 2. kk. **Animal Products:**

**Deductible:** $500          **Occurrence Limit:** $1,000          **Aggregate Limit:** $2,000

LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION – BSE/TSE Sub-limit

The following deductible and sub-limits apply to subsection F. 2. n. **Animal Products:**

**Deductible:** $500          **Occurrence Limit:** $1,000          **Aggregate Limit** $2,000

---

### THIS SPECIAL SECTION CHANGES YOUR COVERAGE
### PLEASE READ IT CAREFULLY

LEGAL LIABILITY AND DEFENSE SECTION - BSE/TSE Sub-limit

The following deductible and sub-limit apply to subsection I. 28. f. **Livestock Products Liability:**

**Deductible:** Waived          **Occurrence Limit:** $1,000          **Aggregate Limit:** $2,000

# COLORADO MANDATORY ENDORSEMENT

This endorsement changes your RISKMANAGER policy to comply with the laws of the State of Colorado.   Please read this endorsement carefully.

## COVERED PROPERTY SECTION

D.   YOUR DUTIES IN THE EVENT OF A PROPERTY LOSS is amended by the replacement of subsection "8." as follows:

    8.   Provide a signed and sworn statement in Proof of Loss containing the information we request and on the form that we provide within 60 days after our request.  If you demonstrate that it was not reasonably possible to give the notice or file the Proof of Loss within the prescribed time and that notice was given or the Proof of Loss filed as soon as reasonably possible, your claim will not be invalidated for such failure.

The balance of section "D.  YOUR DUTIES IN THE EVENT OF A PROPERTY LOSS" remains unchanged.

## LEGAL LIABILITY AND DEFENSE SECTION

I.   SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS – CONSEQUENTIAL LOSS OR DAMAGE is amended by the replacement of the entire subsection "5. c. **UNINSURED OR UNDERINSURED MOTORIST**" as follows:

    5.   AUTOMOBILE:

        c.   **UNINSURED MOTORISTS.** The Colorado Revised Statutes requires us to offer **uninsured motorists coverage** in each liability insurance policy we issue in at least the amount of $25,000 because of bodily injury to or death of one person in any one accident, and subject to the limit for one person, the amount of $50,000 because of bodily injury to or death of two or more persons in any one accident, and the amount of $15,000 (subject to a $250 deductible) because of injury to or destruction of property of others in any one accident.  You may, however, reject the coverage in writing.  You may also choose a higher limit for **uninsured motorists coverage** for bodily injury.  The selected limit, however, may not exceed your Legal Liability and Defense Limit.  See the attached UNINSURED MOTORISTS SELECTION FORM for limits and options

        1)   **Uninsured motorists coverage** applies to your property damage, bodily injury or death:

            a)   Caused by another motorist who has no liability bond or insurance policy at the time of an occurrence as required by applicable state law;

            b)   Caused by a hit-and-run vehicle where neither the driver nor the owner can be identified;

            c)   Caused by another motorist who's bonding or insurance company denies coverage or becomes insolvent.

        2)   **Uninsured motorists coverage** does not apply to:

            a)   Damages sustained by you while occupying, or when struck by, any motor vehicle or trailer owned by you which is not insured under this policy;

            b)   Damages sustained by you while occupying, or when struck by, a motor vehicle or trailer owned by another which is provided for your regular use;

            c)   Damages sustained by you and which you are legally entitled to recover from the owner or operator of any vehicle owned by a governmental unit or agency;

            d)   Damages sustained from any vehicle designed for use mainly off public roads while not on public roads;

            e)   Damages sustained when suit is filed against the uninsured motorist without notice to the insurance carrier;

            f)   Damages sustained to the extent that personal injury protection benefits apply.

# COLORADO MANDATORY ENDORSEMENT

The maximum we will pay is the limit shown in your selection regardless of the number of **vehicles** covered under this policy or the number of insureds suffering bodily injury in a single occurrence. We will not make a duplicate payment under this coverage for any element of loss for which payment has been made by or for anyone who is legally responsible, including all sums paid under the policy's LEGAL LIABILITY AND DEFENSE SECTION. We will not pay for any element of loss for which an insured is entitled to receive payment under any worker' compensation, disability benefits or similar law. We will also not pay for any element of loss if an insured is injured while occupying a vehicle which is used as a public or livery conveyance, which is rented to others, or is used in a business primarily to transport property or equipment.

This coverage is further limited for undeclared drivers (other than your employees). The limit of **uninsured motorist coverage** for an undeclared driver is the minimum amount statutorily required to conform to specific state motor vehicle laws. This undeclared driver coverage limitation applies regardless of whether you have selected a higher **uninsured motorist coverage** limit than the minimum limit defined in the Colorado Revised Statutes.

The balance of section "1. SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS – CONSEQUENTIAL LOSS OR DAMAGE " and subsection "5. AUTOMOBILES" remains unchanged.

# COMMON SECTION

D.   CANCELLATION is amended by the replacement of the entire section "D. CANCELLATION" as follows:

You may cancel this policy by mailing or delivering to us advance written notice of cancellation. Cancellation will be effective on the later of the date requested by you or the date we receive the request.

We may cancel all, or part of this policy when it has been in effect for less than 60 days by written notice at least 10 days before the effective date of cancellation, if we cancel for nonpayment of premium, or 30 days if we cancel for any other reason. If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may only cancel this policy, or part of this policy, for one or more of the following reasons:

1.   Nonpayment of premium;

2.   A false statement knowingly made by you, the insured, on the application for insurance;

3.   A substantial change in the exposure or risk other than that indicated in the application and underwritten as of the effective date of the policy unless you, the insure, have notified us, the insurer, of the change and we, the insurer, accept such change;

If we cancel for one or more of the aforementioned reasons, notice will be mailed at least 45 days before the effective date of cancellation, except for non-payment, which remains 10 days. All notices of cancellation will be mailed by first-class mail or certified mail to the **FIRST NAMED INSURED** as set forth in the Policy Declarations and Schedules at the last address shown in our records. Simultaneous notice will also be sent to your agent.

If this policy is cancelled, we will send the **FIRST NAMED INSURED** as set forth in the Policy Declarations and Schedules any premium refund due. If we cancel, the refund will be pro rata. If you cancel, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

O.   NON-RENEWAL is amended by the replacement of the entire section "O. NON-RENEWAL" as follows:

If we elect not to renew this policy, we will mail, by first-class mail to the **FIRST NAMED INSURED** as set forth in the Policy Declarations and Schedules written notice of intention not to renew at least 45 days before the expiration or anniversary date of this policy.

Our failure to mail notice of intent not to renew shall be considered a manifestation of our willingness to renew. We need not mail notice if we have offered to renew this policy, you have obtained replacement coverage, or you have agreed in writing to obtain replacement coverage.

A renewal of this policy shall not constitute a waiver or estoppel with respect to grounds for cancellation which existed before the effective date of such renewal.

# COLORADO MANDATORY ENDORSEMENT

If our non-renewal is based on the condition of the premises, you will be given 45 days notice to remedy the identified conditions. If the identified conditions are remedied, coverage will be renewed. If the identified conditions are not remedied to our satisfaction, you will be given an additional 30 days upon payment of premium to correct the defective condition.

All notices of non-renewal will be mailed to you by first class mail at the last address shown in our records, and simultaneous notice will be sent to your agent.

R.   RENEWAL PREMIUM OR COVERAGE CHANGES is amended by the replacement of the entire section "R. RENEWAL PREMIUM OR COVERAGE CHANGES" as follows:

If we elect to renew this policy, and the premium will increase by more than 10%, or your *deductible* changes, or we reduce limits or coverage, we will mail written notice to the **FIRST NAMED INSURED** as set forth in the Policy Declarations and Schedules at the last address shown in our records at least 45 days prior to the expiration date of the policy.

If notice is not mailed or delivered at least 45 days prior to the expiration of the policy, you have the option of continuing the policy for the remainder of the notice period plus an additional 30 days at the premium rate of the existing policy.

If you accept the renewal, the new premium and renewal changes will be effective on and after the first day of the renewal term.

If you elect not to renew, any earned premium for the resulting extended period of coverage will be calculated pro rata at the lower of the new rates or rates applicable to the expiring policy.

# COLORADO MANDATORY ENDORSEMENT

After reviewing this UNINSURED MOTORIST SELECTION FORM, you must return the attached form only if you wish to make changes to your coverage or to reject coverage completely.

## DO NOT SIGN UNTIL YOU READ

**UNINSURED MOTORIST COVERAGE:**

Your current *Uninsured Motorist Coverage* – Bodily Injury limit is: **$500,000**
Your *Uninsured Motorist Coverage* – Property Damage limit is:

☐  I reject *Uninsured Motorist Coverage* – Bodily Injury and Property Damage.

☐  I select the following per occurrence limits for *Uninsured Motorist Coverage* – Bodily Injury: (choose only one)

| | Limits | Premium Charges | | Limits | Premium Charges |
|---|---|---|---|---|---|
| ☐ | $ 50,000 | $300 PER 80,000 ANNUAL MILES | ☐ | $ 500,000 | $1,020 PER 80,000 ANNUAL MILES |
| ☐ | $100,000 | $420 PER 80,000 ANNUAL MILES | ☐ | $1,000,000 | $1,384 PER 80,000 ANNUAL MILES |
| ☐ | $250,000 | $720 PER 80,000 ANNUAL MILES | | | |

☐  I select the following per occurrence limits for *Uninsured Motorist Coverage* - Property Damage: (choose only one)

| | Limits | Premium Charges |
|---|---|---|
| ☐ | $15,000 | $80 PER 80,000 ANNUAL MILES |

In selecting one of these options, the undersigned affirms that the requested change or rejection of coverage is made with the knowledge and agreement of all Insureds, as defined in this policy. The undersigned represents that it has authority to bind all Insureds to this change or rejection of coverage. It is acknowledged that the undersigned, not the insurer, will be liable for any financial responsibility should the undersigned not have such agreement and authority.

(Please note: The *Uninsured Motorist Coverage* limit you select may not exceed your Legal Liability and Defense limit.)

I understand and agree that selection of any of the above options applies to my liability insurance policy and future renewals or replacements of this policy. If I decide to select another option at some future time, I inform the Company in writing. The Insured or an authorized representative MUST sign to activate changes.

_____
Signature of Names Insured or Authorized Representative

_____
Title

_____
Date Signed

Policy Number:   RM00734-00

MAIL TO:      2710 Sunrise Rim Road, Boise, Idaho 83705
              Or return to your insurance agent:

              **Premier Insurance - Twin Falls Division**
              **P O Box 6**
              **Twin Falls, ID  83303**

# TEXAS MANDATORY ENDORSEMENT

This endorsement changes your RiskManager™ policy to comply with the laws of the state of Texas. Please read this endorsement carefully.

## COVERED PROPERTY SECTION

D.   YOUR DUTIES IN THE EVENT OF A PROPERTY LOSS is amended by the replacement of subsection "8." as follows:

    8.   Provide a signed and sworn Statement in Proof of Loss containing the information we request on the form that we provide within 91 days after our request;

The balance of section "D. YOUR DUTIES IN THE EVENT OF A PROPERTY LOSS" remains unchanged.

E.   OUR DUTY TO RESPOND is amended by the replacement of the entire section as follows:

We will give notice of our acceptance or denial of your claim within 15 working days after we receive your sworn Statement in Proof of Loss. If we deny your claim on the grounds of a specific policy provision, condition, or exclusion, our written denial will include reference to the provision, condition, or exclusion. Once we have reached agreement with you on the amount of loss, or if an appraisal award has been rendered in accordance with the terms and conditions of this policy, we will then pay the amount due within 30 days.

K.   INSURANCE TO VALUE REQUIRED is amended by the replacement of the entire subsection "5. *ARBITRATION*" as follows:

    5.   *ARBITRATION*: In the event you or we do not accept the *valuation dispute resolution* outcome described above, the matter will be submitted to *ARBITRATION*. If a single arbitrator is not agreeable, you will, and we will, each select an arbitrator and those two arbitrators will appoint an umpire. You will bear the cost of your chosen arbitrator, and you will equally bear the cost of the umpire with us. The decision agreed to by any two will be binding on both parties as to the amount of loss. Regardless of the outcome of the *ARBITRATION*, each party will bear their own attorney fees and other costs.

The balance of section "K. INSURANCE TO VALUE REQUIRED" remains unchanged.

## LEGAL LIABILITY AND DEFENSE SECTION

I.   SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS – CONSEQUENTIAL LOSS OR DAMAGE is amended by the replacement of the entire subsections "5. b. *PERSONAL INJURY PROTECTION*" and "5. c. *UNINSURED OR UNDERINSURED MOTORIST*" as follows:

    5.   AUTOMOBILE:

        b.   **PERSONAL INJURY PROTECTION:** We will pay *personal injury protection* benefits because of *bodily injury* caused by an accident and sustained by any person who is in, upon, or getting into or out of a land motor vehicle when the accident occurs. Coverage is limited to those losses or reasonable expenses incurred by you, or any authorized operator or passenger of your land motor vehicle, within three years from the date of the accident. See the attached PERSONAL INJURY PROTECTION SELECTION FORM for limits and options.

        1)   Covered *personal injury protection* benefits consist of:

           a)   Necessary medical expenses including prosthetic devices, ambulance, hospital and nursing services;

           b)   Loss of Income benefits, if, at the time of the land motor vehicle accident, the injured person was an employed income or wage producer. The most we will pay per injured person is eighty percent (80%) of any loss of gross income, subject to the limits. This loss of income benefit does not apply to any loss after the injured person dies;

           c)   Replacement Service Reimbursement for essential family or household care and maintenance services ordinarily performed by an injured insured person who was not an income or wage producer at the time of the land motor vehicle accident; and

           d)   Funeral, burial or cremation expenses.

# TEXAS MANDATORY ENDORSEMENT

apply;

h)   Damages you sustain to the extent that such damages are or were available to be paid to you under any liability bonds or policies applicable to the **uninsured motor vehicle**;

i)   Damages you sustain while you are in, upon, getting into or out of, or using any vehicle or trailer which is:

   1)   used as a public or livery conveyance;

   2)   rented or leased to others; or

   3)   owned by another and used in a business primarily to transport property or equipment;

j)   Punitive or exemplary damages;

k)   Damages sustained by anyone using an insured auto without a reasonable belief that their use is with the permission of the owner;

l)   Damages sustained to the extent that **personal injury protection** or **automobile medical payments** benefits apply;

m)   Damages sustained by you while you are in, upon, getting into or out of or using, any: motorcycles; forklifts; snowmobiles; all terrain vehicles (ATVs); golf carts; or mobile equipment such as construction or farm machinery that is not permanently installed, attached or in service to a **building** or **dwelling;** and

n)   damages to any property owned by the insured other than the land motor vehicle involved in the accident.

3)   **Uninsured or Underinsured Motorists** coverage losses payable to or for any person may be reduced:

a)   By the amount paid and the present value of all amounts payable to him or her, his or her executor, administrator, heirs, or legal representative under any workers' compensation law, exclusive of non-occupational disability benefits;

b)   By the amount the insured is entitled to recover from any other person insured under the underlying liability insurance policy of which the uninsured motorist endorsement or coverage is a part, including any amounts tendered to the insured as advance payment on behalf of the other person by the insurer providing the underlying liability insurance;

c)   By the amount, if the insured has valid and collectible automobile medical payment insurance available to him or her, paid or due to be paid under the automobile medical payment insurance.

The maximum we will pay is the amount that you select and that we approve on your UNINSURED AND UNDERINSURED MOTORIST SELECTION FORM regardless of the number of vehicles covered under this policy or the number of insured's suffering **bodily injury** or **property damage** in a single occurrence.

If there is other applicable insurance available under one or more policies or provisions of coverage the maximum recovery under all coverage forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any coverage forms or policy providing coverage on either a primary or excess basis.

We will not make a duplicate payment under this coverage for any element of loss for which payment has been made by or for anyone who is legally responsible, including all sums paid under the policy's LEGAL LIABILITY AND DEFENSE SECTION.

We will not pay for any element of loss for which an insured is entitled to receive payment under any worker's compensation, disability benefits or similar law.

This coverage is further limited for undeclared drivers (other than your employees).  The maximum **Uninsured or Underinsured Motorist** coverage available for an undeclared driver is the minimum amount statutorily required by the Texas Insurance Code.  The undeclared driver coverage limitation applies regardless of whether you have selected a higher **Uninsured or Underinsured Motorist** coverage limit than the Texas Insurance Code minimum.

In the event we make a payment under this coverage section, and the person to or for whom payment is made

# TEXAS MANDATORY ENDORSEMENT

under the policy, has been under suspension or revocation during the policy period or, if the policy is a renewal, during its policy period or the one hundred eighty (180) days immediately preceding the effective date of the renewal policy.

J.   INSPECTIONS AND SURVEYS is amended by the addition of a new paragraph as follows:

If we undertake to perform inspections specifically related to the conditions of a high-pressure boiler in order to establish the insurability of these boilers, we will be attempting to satisfy specific state regulations regarding the performance of these boilers for use in the certification process should such certification be necessary.

The balance of section "J.  INSPECTIONS AND SURVEYS" remains unchanged.

K.   LEGAL ACTION AGAINST US is amended by the replacement of the entire section "L. LEGAL ACTION AGAINST US" as follows:

No one may bring a legal action against us under this policy unless there has been full compliance with all of the terms and conditions of this policy and the action is brought within one year after the date on which the direct physical loss or damage occurred, if the loss or damage is to be covered property, or within one year after the date that the cause of action accrues in connection with any other coverage provided by this policy.  No entity has a right to join us as a party or otherwise bring us into a lawsuit asking for damages from you.  Any entity may sue us to recover on an **agreed settlement** or on a final judgment against you obtained after an actual trial, but we will not be liable for damages that are not covered or that are in excess of the applicable limit of insurance.

**Agreed settlement** means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

Any suit you bring against us must be filed within one year of the date on which the direct physical loss or damage occurred, if the loss or damage is to be covered property, or within one year of the date that the cause of action accrues in connection with any other coverage provided by this policy.

N.   MORTGAGE HOLDERS – LOSS PAYEES is amended by the replacement of the entire section "M.  MORTGAGE HOLDERS – LOSS PAYEES as follows:

Loss or damage, if any, under this policy shall be payable first to the loss payee or mortgagee (hereinafter called secured party), and, second, to the insured, as their interests may appear; provided, that, upon demand for separate settlement by the secured party, the amount of said loss shall be paid directly to the secured party to the extent of its interest.

This insurance as to the interest of the secured party shall not be invalidated by any act or neglect of the insured named in said policy or his agents, employees or representatives, nor by any change in the title or ownership of the insured property, provided, however, that, the conversion, embezzlement or secretion by the named insured or his agents, employees or representatives is not covered under said policy unless specifically insured against and premiums paid therefore.

In applying the pro rata provisions of the policy, the amount payable to the secured party shall be reduced only to the extent of pro rata payments receivable by the secured party under other policies.

The company reserves the right to cancel the policy at any time as provided by its terms, but in such case the company shall mail to the secured party a notice stating when such cancellation shall become effective as to the interest of said secured party.  The amount and form of such notice shall be not less than that required to be given the FIRST NAMED INSURED by law or by the policy provisions, whichever is more favorable to the secured party.

If the insured fails to render proof of loss within the time granted in the policy conditions, such secured party shall do so within sixty days after having knowledge of a loss, in form and manner as provided by the policy, and, further, shall be subject to the provisions of the policy relating to appraisal and the time of payment and bringing suit.

Whenever the company shall pay the secured party any sum for loss or damage under policy and shall claim that, as to the insured, no liability exists, the company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all collateral held to secure the debt, or may, at its option, pay to the secured party the whole principal due or to grow due on the mortgage or other security agreement, with interest, and shall thereupon receive a full assignment and transfer of the mortgage or other security agreement and of all collateral held to secure it; but no subrogation shall impair the right of the secured party to recover the full amount due it.

All terms and conditions of the policy remain unchanged except as herein specifically provided.

All notices sent to the secured party shall be sent to its last reported address, which must be stated in the policy or in this endorsement below.

O.   NON-RENEWAL is amended by the replacement of the entire section "O.  NON-RENEWAL" as follows:

# TEXAS MANDATORY ENDORSEMENT

## PERSONAL INJURY PROTECTION SELECTION FORM

## DO NOT SIGN UNTIL YOU READ

After reviewing this PERSONAL INJURY PROTECTION SELECTION FORM, you must return the attached form only if you wish to reject coverage completely.

The Texas Insurance Code requires us to offer *personal injury protection* benefits in each motor vehicle insurance policy we issue in specified minimum amounts. You may, however, reject the coverage in writing.

You have a legal right to reject *Personal Injury Protection* in its entirety.

---

Your current aggregate limit per person is: **$2,500**

☐     I reject *Personal Injury Protection*

I understand and agree that selection of any of the above options applies to my liability insurance policy and future renewals or replacements of this policy. If I decide to select another option at some future time, I must let the Company know in writing. **The FIRST NAMED INSURED or an authorized representative MUST sign to activate changes.**


_____            _____
Signature of FIRST NAMED INSURED or Authorized          Title
Representative


_____            
Date Signed                      Policy Number: **RM00734-00**

MAIL TO:   2710 Sunrise Rim Road, Suite 100, Boise, Idaho 83705
           Or return to your agent.

           **Premier Insurance – Twin Falls Division**
           **P O Box 6**
           **Twin Falls,ID 83303**

---

# TEXAS MANDATORY ENDORSEMENT

## UNINSURED OR UNDERINSURED MOTORIST SELECTION FORM

## DO NOT SIGN UNTIL YOU READ

The Texas Insurance Code requires us to offer *Uninsured or Underinsured Motorist* coverage in each liability policy we issue. You may, however, reject *Uninsured or Underinsured Motorist* coverage in writing. You may also choose a higher limit for *Uninsured or Underinsured Motorist* coverage. See the attached UNINSURED OR UNDERINSURED MOTORIST COVERAGE SELECTION FORM for limits and options.

After reviewing this UNINSURED OR UNDERINSURED MOTORIST SELECTION FORM, you must return the attached form only if you wish to make changes to your coverage or to reject coverage completely.

You have a legal right to choose the limit of *Uninsured or Underinsured Motorist* coverage with your insurance policy.

---

Your current *Uninsured or Underinsured Motorist Coverage – Bodily Injury* limit is: $500,000

Your current *Uninsured or Underinsured Motorist Coverage – Property Damage* limit is: $15,000 with a $250 deductible.

☐   I select the following limit for *Uninsured or Underinsured Motorist Coverage- Bodily Injury*: (choose only one)

Per Occurrence
☐   $   100,000          ☐   $   500,000
☐   $   250,000          ☐   $ 1,000,000

☐   I reject both *Uninsured or Underinsured Motorist Coverage – Bodily Injury* and *Uninsured or Underinsured Motorist Coverage – Property Damage.*

☐   I reject *Uninsured or Underinsured Motorist Coverage – Property Damage* only*.*

> In selecting one of these options, the undersigned affirms that the requested change or rejection of coverage is made with the knowledge and agreement of all Insureds, as defined in this policy. The undersigned represents that it has authority to bind all Insureds to this change or rejection of coverage. It is acknowledged that the undersigned, not the insurer, will be liable for any financial responsibility should the undersigned not have such agreement and authority.

(Please note: The *Uninsured or Underinsured Motorist Coverage – Bodily Injury* limit you select may not exceed your Legal Liability and Defense limit.)

I understand and agree that selection of any of the above options applies to my liability insurance policy and future renewals or replacements of this policy. If I decide to select another option at some future time, I must inform the Company in writing. **The FIRST NAMED INSURED or an authorized representative MUST sign to activate changes.**

_____          _____
Signature of FIRST NAMED INSURED or Authorized
Representative                                             Title

_____          _____
Date Signed                                                Policy Number: **RM00734-00**

MAIL TO:          2710 Sunrise Rim Road, Suite 100, Boise, Idaho 83705
                          Or return to your agent.

                          **Premier Insurance - Twin Falls Division**
                          **P O Box 6**
                          **Twin Falls, ID 83303**

---

# LIVESTOCK PRODUCTS PROPERTY ENDORSEMENT

### THIS SPECIAL ENDORSEMENT CHANGES YOUR RISKMANAGER™ POLICY.
### PLEASE READ IT CAREFULLY.

## COVERED PROPERTY SECTION

O.   INSURED CAUSES OF PROPERTY LOSS

2.   *SUB-LIMITED CAUSES OF PROPERTY LOSS – CONSEQUENTIAL LOSS OR DAMAGE* is amended by the addition of a new subsection "kk. *ANIMAL PRODUCTS*" as follows:

kk.   *ANIMAL PRODUCTS* means any loss or damage to your goods or products grown, rendered, manufactured, sold, harvested or distributed by you, derived in whole or in part from animals, that are caused by any of the neurodegenerative disorders known as Transmissible Spongiform Encephalopathies including those commonly referred to as:

1.   Bovine Spongiform Encephalopathy (BSE): a degenerative disease affecting the central nervous system.

2.   Creutzfeldt - Jakob disease (CJD): a rare neurological disease that usually afflicts persons over 55 years of age and or new variant CJD (nvCJD) or variant CJD (vCJD): name given to a newly identified human TSE which is significantly different from other forms of CJD.

3.   Transmissible Spongiform Encephalopathy (TSE): name for a group of brain diseases that causes sponge-like abnormalities in brain cells including, but not limited to:

a.   Astrocytosis: an increase in the number, and often in the size, of astrocytes (one of the large neuroglia cells of nervous tissue) frequently observed in an irregular, poorly or moderately well-defined zone adjacent to degenerative lesions, focal inflammations or neoplasms in the brain.

b.   Prion: A prion is a novel infectious particle that differs from bacteria, viruses, fungi, viroids and plasmids. It consists of one protein, is resistant to inactivation by most procedures that destroy biological agents such as heat, and shows heterogeneity with respect to size. Also referred to as protease resistant protein (PrP $^{res}$) or PrP Scrapie (PrP $^{Sc}$).PrP$^c$ (prion protein cellular): a naturally occurring protein found in cells of central nervous system and other tissues. Changes in the structure of the protein result in an abnormal shaped protein (often referred to as PrP $^{res}$ or PrP $^{Sc}$ ) that accumulates in the brains of subjects affected by a TSE disease. Some scientists believe that TSE diseases are caused solely by the abnormal protein, and they refer to these diseases as "prion" diseases. Other scientists believe that an infectious agent, such as a virus, causes the conversion of normal PrP to abnormal PrP.

c.   Scrapie Associated Fibrils (SAF): term used to describe aggregated PrP $^{res}$ or PrP $^{Sc}$.

d.   Chronic Wasting Disease (CWD).

The balance of section "O.   INSURED CAUSES OF PROPERTY LOSS" and subsection "2. *SUB-LIMITED CAUSES OF PROPERTY LOSS – CONSEQUENTIAL LOSS OR DAMAGE*" remains unchanged.

## LOSS OF BUSINESS INCOME OR EXTRA EXPENSE SECTION

F.   INSURED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS

2.   *SUB-LIMITED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS – CONSEQUENTIAL LOSS OR DAMAGE* is amended by the addition of a new subsection "n. *ANIMAL PRODUCTS*" as follows:

n.   *ANIMAL PRODUCTS* means any loss or damage to your goods or products grown, rendered, manufactured, sold, harvested or distributed by you, derived in whole or in part from animals, that are caused by any of the neurodegenerative disorders known as Transmissible Spongiform Encephalopathies including those commonly referred to as:

1.   Bovine Spongiform Encephalopathy (BSE): a degenerative disease affecting the central nervous system.

# LIVESTOCK PRODUCTS PROPERTY ENDORSEMENT

2.  Creutzfeldt - Jakob disease (CJD): a rare neurological disease that usually afflicts persons over 55 years of age and or new variant CJD (nvCJD) or variant CJD (vCJD): name given to a newly identified human TSE which is significantly different from other forms of CJD.

3.  Transmissible Spongiform Encephalopathy (TSE): name for a group of brain diseases that causes sponge-like abnormalities in brain cells including, but not limited to:

    a.  Astrocytosis: an increase in the number, and often in the size, of astrocytes (one of the large neuroglia cells of nervous tissue) frequently observed in an irregular, poorly or moderately well-defined zone adjacent to degenerative lesions, focal inflammations or neoplasms in the brain.

    b.  Prion: A prion is a novel infectious particle that differs from bacteria, viruses, fungi, viroids and plasmids. It consists of one protein, is resistant to inactivation by most procedures that destroy biological agents such as heat, and shows heterogeneity with respect to size. Also referred to as protease resistant protein (PrP $^{res}$) or PrP Scrapie (PrP $^{Sc}$).PrP$^c$ (prion protein cellular): a naturally occurring protein found in cells of central nervous system and other tissues. Changes in the structure of the protein result in an abnormal shaped protein (often referred to as PrP $^{res}$ or PrP $^{Sc}$ ) that accumulates in the brains of subjects affected by a TSE disease. Some scientists believe that TSE diseases are caused solely by the abnormal protein, and they refer to these diseases as "prion" diseases. Other scientists believe that an infectious agent, such as a virus, causes the conversion of normal PrP to abnormal PrP.

    c.  Scrapie Associated Fibrils (SAF): term used to describe aggregated PrP $^{res}$ or PrP $^{Sc}$.

    d.  Chronic Wasting Disease (CWD).

The balance of section "F.  INSURED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS" and subsection "2. *SUB-LIMITED CAUSES OF BUSINESS INCOME OR EXTRA EXPENSE LOSS – CONSEQUENTIAL LOSS OR DAMAGE*" remains unchanged.

# LIVESTOCK PRODUCTS LIABILITY ENDORSEMENT

## THIS SPECIAL ENDORSEMENT CHANGES YOUR RISKMANAGER™ POLICY.
## PLEASE READ IT CAREFULLY.

## LEGAL LIABILITY AND DEFENSE SECTION

I.   SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS – CONSEQUENTIAL LOSS OR DAMAGE is amended by the addition of a new subsection "f. *LIVESTOCK PRODUCTS LIABILITY*" within subsection "28. *PRODUCT LIABILITY – SPECIFIED CAUSES OF LOSS*" as follows:

   28.   *PRODUCT LIABILITY – SPECIFIED CAUSES OF LOSS* (other than *custom farming broad form property damage*):

      f.   *LIVESTOCK PRODUCTS LIABILITY* means all loss or damage that first occurs during the policy period, arises from *your livestock product or your livestock work* and is caused directly or indirectly from:

         1.   Bovine Spongiform Encephalopathy (BSE): a degenerative disease affecting the central nervous system.

         2.   Creutzfeldt - Jakob disease (CJD): a rare neurological disease that usually afflicts persons over 55 years of age and or new variant CJD (nvCJD) or variant CJD (vCJD): name given to a newly identified human TSE which is significantly different from other forms of CJD.

         3.   Transmissible Spongiform Encephalopathy (TSE): name for a group of brain diseases that causes sponge-like abnormalities in brain cells including, but not limited to:

            a.   Astrocytosis: an increase in the number, and often in the size, of astrocytes (one of the large neuroglia cells of nervous tissue) frequently observed in an irregular, poorly or moderately well-defined zone adjacent to degenerative lesions, focal inflammations or neoplasms in the brain.

            b.   Prion: A prion is a novel infectious particle that differs from bacteria, viruses, fungi, viroids and plasmids. It consists of one protein, is resistant to inactivation by most procedures that destroy biological agents such as heat, and shows heterogeneity with respect to size. Also referred to as protease resistant protein (PrP $^{res}$) or PrP Scrapie (PrP $^{Sc}$).PrP$^C$ (prion protein cellular): a naturally occurring protein found in cells of central nervous system and other tissues. Changes in the structure of the protein result in an abnormal shaped protein (often referred to as PrP $^{res}$ or PrP $^{Sc}$ ) that accumulates in the brains of subjects affected by a TSE disease. Some scientists believe that TSE diseases are caused solely by the abnormal protein, and they refer to these diseases as "prion" diseases. Other scientists believe that an infectious agent, such as a virus, causes the conversion of normal PrP to abnormal PrP.

            c.   Scrapie Associated Fibrils (SAF): term used to describe aggregated PrP $^{res}$ or PrP $^{Sc}$.

            d.   Chronic Wasting Disease (CWD).

         *Your livestock product* means any animal derived products grown, confined, sold, handled, distributed, manufactured, rendered or disposed of by you, and those instructions, warranties and representations you make relating to those animals.

         *Your livestock work* means any care, custody or control services performed by you on animals grown, confined, sold, handled, distributed, rendered or disposed of by you, and those instructions, warranties and representations you make relating to those animals.

   The balance of section "I.  SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS" and subsection "28. *PRODUCT LIABILITY – SPECIFIED CAUSES OF LOSS*" remains unchanged.

---



# Vehicle Accident Report

**To:**   General Fire & Casualty Company

**Fax:**   (208) 345-2871 or Phone (208) 345-6658

**From:**

**Phone:**

### Details of Accident

Date

Place _____ Time

Weather & Road Conditions

### Number of Vehicles

☐ Single Vehicle Accident

☐ Two Vehicle Accident

☐ Multi-Vehicle Accident – No. of Vehicles ( )

### Information on Your Vehicle

Driver

Vehicle

Passenger(s)

Injuries

### Reporting (Check all that apply)

☐ Police Notified

☐ Police Present   Who Received Ticket (if any)

☐ Ticket Given   _____

Who was Hospitalized (if anyone)

☐ Ambulance Called   _____

Where is Your Vehicle?

☐ Vehicle Towed   _____

### Other Vehicle (1)

Driver

Address

City & State

Phone

Drivers License #

Vehicle

Vehicle License #

Owner of Vehicle

Insurance Company

Agent Phone #

Policy #

### Other Vehicle (2)

Driver

Address

City & State

Phone

Drivers License #

Vehicle

Vehicle License #

Owner of Vehicle

Insurance Company

Agent Phone #

Policy #

### Witnesses

Name

Phone

Name

Phone

Please put description of event, diagram, and any other important details on reverse side.

# FOR YOUR INFORMATION AND PROTECTION

**Privacy:** Many states have passed legislation aimed at safeguarding their citizens' privacy. These laws require all insurance companies to let you know what information concerning you has been collected and is being kept on file. Since our policyholders' interests have always been our first concern, we at General Fire & Casualty Company are happy to comply with these consumer-protection statues.

In order to properly underwrite and administer insurance coverage, all insurance companies collect a certain amount of necessary and helpful information. For example, with automobile insurance, we often will obtain a record of accident, violations, and convictions from your State Motor Vehicle Department.

Likewise, on insurance for business operations, dwelling, and equipment, we will often have a loss control specialist verify or augment the information given on an application. This loss control report would contain information on the value and condition of your property, on how you conduct your operations, and usually will contain photographs of it. This information we receive about you will be kept and treated in the same confidential way in which we treat the information you give us on your application.

We keep information about you in our records, and we will not disclose it without your prior authorization except to:

- Adjusters, appraisers, investigators, and attorneys when a claim has been filed
- Organizations which try to detect and prevent dishonest claims or other insurance fraud
- A court or government agency when subpoenaed

You have the right to see everything about you in our files that is "personal information" under the law. You have a further right to request that we correct, amend, or delete any of this information. We will either make the corrections you request or write you with our reasons why not. If you still disagree, you may send us a statement, which we will keep in our files – so anyone who reviews the information will be aware of your objections.

At your request, we will provide you with a description of the procedures, which allow you to review and request correction of the personal information about you in our files.

**Travel in Mexico:** Coverage provided by this policy for your insured loss that occurs within the country of Mexico will be paid for in the United States.

HOWEVER, WE ARE NOT A LICENSED INSURER IN MEXICO.

Mexican law requires you to buy liability insurance from an insurance company that is licensed by the Mexico government.

Failure to comply with Mexican law may result in penalties, confiscation of your property and or imprisonment.



Aurora Dairy Corporation

1401 Walnut Street, Suite 500

Boulder, CO 80302