# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:08-cv- 01236-EWN-BNB

---

ACE AMERICAN INSURANCE CORPORATION, a Pennsylvania corporation,
INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation,
NATIONAL SURETY CORPORATION, an Illinois corporation, and
THE AMERICAN INSURANCE COMPANY, an Ohio corporation,

Plaintiffs,

v.

AURORA DAIRY CORPORATION d/b/a AURORA ORGANIC DAIRY, a Delaware corporation,

Defendant.

---

AURORA DAIRY CORPORATION d/b/a AURORA ORGANIC DAIRY, a Delaware corporation,

Counterplaintiff,

v.

ACE AMERICAN INSURANCE CORPORATION, a Pennsylvania corporation,
INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation,
NATIONAL SURETY CORPORATION, an Illinois corporation,
THE AMERICAN INSURANCE COMPANY, an Ohio corporation,
GENERAL FIRE & CASUALTY COMPANY, an Idaho corporation, and
AMERICAN FARMERS & RANCHERS MUTUAL INSURANCE COMPANY, an Oklahoma corporation,

Counterdefendants.

---

## PLAINTIFFS NATIONAL SURETY CORPORATION'S AND THE AMERICAN INSURANCE COMPANY'S JOINT ANSWER TO AURORA DAIRY CORPORATION'S FIRST AMENDED COUNTERCLAIM

---

Plaintiffs, National Surety Corporation ("NSC") and The American Insurance Company ("AIC"), for their Answers to Defendant Aurora Dairy Corporation's ("Aurora") First Amended Counterclaim deny each and every allegation in the First Amended Counterclaim except as expressly admitted.  NSC and AIC further state as follows:

## THE PARTIES

1.      Aurora is a Delaware corporation with its principal place of business in Colorado.

**ANSWER:    Admit on information and belief the allegations contained in paragraph 1 of the First Amended Counterclaim.**

2.      Upon information and belief, ACE is a Pennsylvania corporation with its principal place of business in Pennsylvania.

**ANSWER:    Admit on information and belief the allegations contained in paragraph 2 of the First Amended Counterclaim.**

3.      Upon information and belief, IICNA is a Pennsylvania corporation with its principal place of business in Pennsylvania.

**ANSWER:    Admit on information and belief the allegations contained in paragraph 3 of the First Amended Counterclaim.**

4.      Upon information and belief, NSC is an Illinois corporation with its principal place of business in Illinois.

**ANSWER:    Admit the allegations contained in paragraph 4 of the First Amended Counterclaim.**

5.      Upon information and belief, AIC is an Ohio corporation with its principal place of business in Ohio.

**ANSWER:    Admit the allegations contained in paragraph 5 of the First Amended Counterclaim.**

6.      Upon information and belief, General Fire & Casualty Company was an Idaho corporation with its principal place of business in Idaho.  Also upon information and belief, American Farmers & Ranchers Mutual Insurance Co. acquired and became a successor in interest to General Fire & Casualty Company in approximately 2008, and American Farmers & Ranchers Mutual Insurance Co. is an Oklahoma corporation with its principal place of business in Oklahoma.

**ANSWER:    NSC and AIC do not have information sufficient to admit or deny the allegations of paragraph 6.  To the extent a further response is required, NSC and AIC deny the same.**

2

## JURISDICTION AND VENUE

7.      This Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332 and Fed. R. Civ. P. 13, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**ANSWER:   Admit the allegations contained in paragraph 7 of the First Amended Counterclaim.**

8.      By filing a declaratory action against Aurora in this Court, ACE, IICNA, AIC and NSC have consented to personal jurisdiction before this Court.

**ANSWER:   Admit the allegations contained in paragraph 8 of the First Amended Counterclaim.**

9.      Personal jurisdiction before this Court is appropriate with regard to GFC pursuant to, inter alia, C.R.S. § 13-1-124(d) because GFC contracted to insure a "person, property or risk" residing or located within this state at the time of contracting.

**ANSWER:   NSC and AIC do not have information sufficient to admit or deny the allegations of paragraph 9.**

10.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to this First Amended Counterclaim occurred in this District.

**ANSWER:   Admit the allegations contained in paragraph 10 of the First Amended Counterclaim.**

## THE INSURANCE POLICIES

11.     ACE, IICNA and NSC provided general commercial liability insurance to Aurora pursuant to the insurance policies identified in Paragraphs 14-16 of the Complaint, partial or full copies of which appear to be attached to the Complaint as Exhibits B-G.  AIC provided general commercial liability coverage to Aurora pursuant to insurance policies identified in Paragraph 35 of Aurora's Answer.

**ANSWER:   Admit the allegations contained in the first sentence of paragraph 11 of the First Amended Counterclaim.  Deny that AIC provided general commercial liability coverage to Aurora.**

12.     GFC provided liability insurance to Aurora as described in Paragraph 45 of this First Amended Counterclaim.

**ANSWER:   Admit on information and belief the allegations contained in paragraph 12 of the First Amended Counterclaim.**

3

## THE ACE POLICY

13.     ACE issued to Aurora general liability coverage Policy No. FO-139293 covering the period from August 1, 2002 through August 1, 2003, which policy was renewed for the policy period August 1, 2003 through August 1, 2004.

**ANSWER:   Admit the allegations contained in paragraph 13 of the First Amended Counterclaim.**

14.     The ACE policy requires, among other things, that ACE defend Aurora against any suits seeking damage for "bodily injury" or "property damage," caused by an "occurrence" within the "coverage territory" during the policy period and/or any suits seeking damages out of a "personal and advertising injury" within the "coverage territory."

**ANSWER:   Deny that paragraph 14 of the First Amended Counterclaim accurately describes the scope of the defense obligation under the referenced insurance contract.**

15.     The ACE policy defines "bodily injury" as, inter alia, "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

**ANSWER:   Admit on information and belief the allegations contained in paragraph 15 of the First Amended Counterclaim.**

16.     The term "property damage" is defined in the ACE policy as "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

**ANSWER:   Admit on information and belief the allegations contained in paragraph 16 of the First Amended Counterclaim.**

17.     The ACE policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

**ANSWER:   Admit on information and belief the allegations contained in paragraph 17 of the First Amended Counterclaim.**

18.     The ACE policy defines the "coverage territory" as, among other areas, "the United States of America."

**ANSWER:   Deny that paragraph 18 of the First Amended Counterclaim accurately describes the scope of the "coverage territory" under the referenced insurance contract.**

19.     The term "personal and advertising injury" is defined in the ACE policy as "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses: ...[o]ral or written publication, in any manner, of material that slanders or libels a

4

person or organization or disparages a person's or organization's goods, products or services; ... [t]he use of another's advertising idea in your advertisement;' <u>or</u> ...[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" (emphasis supplied).

**<u>ANSWER</u>:   Deny that paragraph 19 of the First Amended Counterclaim accurately describes the definition of "personal and advertising injury" under the referenced insurance contract.**

20.     Aurora has complied with all applicable conditions of the ACE policy, including having paid all premiums due in connection with the ACE policy, as well as providing proper notice to ACE.

**<u>ANSWER</u>:   Deny the allegations of paragraph 20 of the First Amended Counterclaim.**

### <u>THE IICNA POLICIES</u>

21.     IICNA issued to Aurora the general liability coverage Policy Nos. FO-139292, FO-146246 and FO-146297 covering the period from August 1, 2002 through August 1, 2004.

**<u>ANSWER</u>:   Admit the allegations contained in paragraph 21 of the First Amended Counterclaim.**

22.     The IICNA policies require, among other things, that IICNA defend Aurora against any suits seeking damage for "bodily injury" or "property damage," caused by an "occurrence" within the "coverage territory" during the policy period and/or any suits seeking damages out of a "personal and advertising injury" within the "coverage territory."

**<u>ANSWER</u>:   Deny that paragraph 22 of the First Amended Counterclaim accurately describes the scope of the defense obligation under the referenced insurance contract.**

23.     The IICNA policies define "bodily injury" as, <u>inter alia,</u> "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

**<u>ANSWER</u>:   Admit on information and belief the allegations contained in paragraph 23 of the First Amended Counterclaim.**

24.     The term "property damage" is defined in the IICNA policies as "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

**<u>ANSWER</u>:   Admit on information and belief the allegations contained in paragraph 24 of the First Amended Counterclaim.**

25.     The IICNA policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

**ANSWER:    Admit on information and belief the allegations contained in paragraph 25 of the First Amended Counterclaim.**

26.    The IICNA policies define the "coverage territory" as, among other areas, "the United States of America."

**ANSWER:    Deny that paragraph 26 of the First Amended Counterclaim accurately describes the scope of the coverage territory under the referenced insurance contract.**

27.    The term "personal and advertising injury" is defined in the IICNA policies as "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses ...[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; ...[t]he use of another's advertising idea in your 'advertisement;' <u>or</u> ...[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" (emphasis supplied).

**ANSWER:    Deny that paragraph 27 of the First Amended Counterclaim accurately describes the definition of "personal and advertising injury" under the referenced insurance contract.**

28.    Aurora has complied with all applicable conditions of the IICNA policies, including having paid all premiums due in connection with the IICNA policies, as well as providing proper notice to IICNA.

**ANSWER:    Deny the allegations of paragraph 28 of the First Amended Counterclaim.**

## THE NSC POLICIES

29.    NSC issued to Aurora the general liability coverage Policy Nos. S86 MXX 80843533 and S86 MXX 80859105 covering the period from May 1, 2005 through May 1, 2007.

**ANSWER:    Admit the allegations contained in paragraph 29 of the First Amended Counterclaim.**

30.    The NSC policies require, among other things, that NSC defend Aurora against any suits seeking damage for "bodily injury" or "property damage," caused by an "occurrence" within the "coverage territory" during the policy period and/or any suits seeking damages out of a "personal and advertising injury" within the "coverage territory."

**ANSWER:    Deny that paragraph 30 of the First Amended Counterclaim accurately describes the scope of the defense obligation under the referenced insurance contract.**

31.    The NSC policies define "bodily injury" as, <u>inter alia,</u> "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

**ANSWER:    Admit the allegations contained in paragraph 31 of the First Amended Counterclaim.**

32.    The term "property damage" is defined in the NSC policies as "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

**ANSWER:    Admit the allegations contained in paragraph 32 of the First Amended Counterclaim.**

33.    The NSC policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

**ANSWER:    Admit the allegations contained in paragraph 33 of the First Amended Counterclaim.**

34.    The NSC policies define the "coverage territory" as, among other areas, "the United States of America."

**ANSWER:    Deny that paragraph 34 of the First Amended Counterclaim accurately describes the scope of the defense obligation under the referenced insurance contract.**

35.    The term "personal and advertising injury" is defined in the NSC policies as "injury, including consequential bodily injury, arising out of one or more of the following offenses: ...[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; ...[t]he use of another's advertising idea in your advertisement; or ...[i]nfringing upon another's copyright, trade dress or slogan in your advertisement." (emphasis supplied; additional emphasis omitted).

**ANSWER:    Deny that paragraph 35 of the First Amended Counterclaim accurately describes the definition of "personal and advertising injury" under the referenced insurance contract.**

36.    Aurora has complied with all applicable conditions of the NSC policies, including having paid all premiums due in connection with the NSC policies, as well as providing proper notice to NSC.

**ANSWER:    Deny the allegations of paragraph 36 of the First Amended Counterclaim. Affirmatively allege that Aurora has breached Conditions of the relevant insurance contracts by failing to respond to repeated requests for information; failed to communicate with assigned defense counsel; and incurred expenses without prior written consent.**

121232267v1  57

## THE AIC POLICIES

37.     AIC issued to Aurora and some of its related entities the general liability coverage Policy Nos. 6 43 FRM80250251, 6 43 FRM06646251 and 6 43 FRM80255328 covering the period from June 1, 2005 through June 1, 2007.

**ANSWER:   Deny the allegations contained in paragraph 37 of the First Amended Counterclaim.  Affirmatively allege that for the policy period June 1, 2005 – June 1, 2006 AIC provided Farm Liability coverage to Aurora Dairy Corp. through policy number 643 FRM 80250251.  Affirmatively allege that for the policy period June 1, 2006 – June 1, 2007 AIC provided Farm Liability coverage to Aurora Dairy Corp., Aurora Organic Dairy Texas, Inc., and TEX AGR Real Estate Holdings, LLC through policy number 643 FRM 805255328.**

38.     The AIC policies require, among other things, that AIC defend Aurora against any suits seeking damage for "bodily injury" or "property damage" caused by an "occurrence" during the policy period and/or any suits seeking damages out of a "personal injury" during the policy period or "advertising injury" in the coverage territory during the policy period.

**ANSWER:   Deny that paragraph 38 of the First Amended Counterclaim accurately describes the scope of the defense obligation under the referenced insurance contract.**

39.     The AIC policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

**ANSWER:   Deny the allegation contained in paragraph 39 of the First Amended Counterclaim.**

40.     The term "property damage" is defined in the AIC policies as "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it." (emphasis omitted).

**ANSWER:   Admit the allegations contained in paragraph 40 of the First Amended Counterclaim.**

41.     The AIC policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

**ANSWER:   Admit the allegations contained in paragraph 41 of the First Amended Counterclaim.**

42.     The term "personal injury" is defined in the AIC policies as "injury, other than bodily injury, arising out of one or more of the following offenses: ...[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or

organization's goods, products or services; <u>or</u> ...[o]ral or written publication of material that violates a person's right of privacy." (emphasis supplied; additional emphasis omitted).

**ANSWER:    Deny that paragraph 42 of the First Amended Counterclaim accurately describes the definition of "personal injury" under the referenced insurance contracts.**

43.    The term "advertising injury" is defined in the AIC policies as "an injury arising out of one or more of the following offenses: a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; b. Oral or written publication of material that violates a person's right of privacy; c. Misappropriation of advertising ideas or style of doing business; or d. Infringement of copyright, title or slogan."

**ANSWER:    Deny that paragraph 43 of the First Amended Counterclaim accurately describes the definition of "advertising injury" under the referenced insurance contracts.**

44.    Aurora has complied with all applicable conditions of the AIC policies, including having paid all premiums due in connection with the AIC policies, as well as providing proper notice to AIC.

**ANSWER:    Deny the allegations of paragraph 44 of the First Amended Counterclaim. Affirmatively allege that Aurora has breached Conditions of the relevant insurance contracts by failing to respond to repeated requests for information; failed to communicate with assigned defense counsel; and incurred expenses without obtaining prior written consent.**

## THE GFC POLICY

45.    GFC issued to Aurora legal liability and defense coverage through RiskManager Policy No. RM00734-00, a copy of which is attached as Exhibit 1 hereto, covering the period from July 1, 2004 to July 1, 2005.

**ANSWER:    Admit on information and belief the allegations contained in paragraph 45 of the First Amended Counterclaim.**

46.    The GFC Policy requires, among other things, that GFC defend Aurora for any "covered legal liability and defense causes of loss" (emphasis omitted).

**ANSWER:    Deny that paragraph 46 of the First Amended Counterclaim accurately describes the obligations under the referenced insurance contract.**

47.    The GFC Policy defines "covered legal liability and defense causes of loss" as including, <u>inter</u> <u>alia</u>, "advertising and publication liability," "bodily injury," "product liability" and "property damage."

**ANSWER:    Admit on information and belief the allegations contained in paragraph 47 of the First Amended Counterclaim.**

48. The term "advertising and publication liability" is defined in the GFC policy as "loss or damage" that arises from "oral or written publication of material that slanders or libels a person or organization; disparages a person's or organization's goods, products or services; violates a person's right of privacy; or misappropriates other's advertising ideas or style of doing business."

**ANSWER: Deny that paragraph 48 of the First Amended Counterclaim accurately describes the definition of "advertising and publication liability" under the referenced insurance contract.**

49. The term "bodily injury" is defined in the GFC policy as "all liability and defense claims that first occur during the policy period and arise from human physical damage, sickness or disease…and the resulting emotional or mental distress or death from any of these conditions."

**ANSWER: Deny that paragraph 49 of the First Amended Counterclaim accurately describes the definition of "bodily injury" under the referenced insurance contract.**

50. The term "product liability" is defined in the GFC policy as "bodily injury or property damages…caused by…any goods or products…grown, manufactured, sold, handled, distributed or disposed of by [Aurora], and those instructions, warranties and representations" Aurora made "relating to those goods or products."

**ANSWER: Deny that paragraph 50 of the First Amended Counterclaim accurately describes the definition of "product liability" under the referenced insurance contract.**

51. The term "property damage" is defined in the GFC policy as "loss or damage…aris[ing] from physical injury to or destruction of tangible property including all resulting loss of use to that property."

**ANSWER: Deny that paragraph 51 of the First Amended Counterclaim accurately describes the definition of "property damage" under the referenced insurance contract.**

52. Aurora has complied with all applicable conditions of the GFC policy, including having paid all premiums due in connection with the GFC policy, as well as providing proper notice to GFC.

**ANSWER: NSC and AIC are without sufficient information to determine the truth or falsity of the allegations contained in paragraph 52 of the First Amended Counterclaim and, therefore, deny the same.**

## THE UNDERLYING ACTIONS

53. Aurora produces organic milk that is sold by various private label customers as well as through its own label, "High Meadow." Aurora's organic milk is sold by retail grocery stores throughout the country. Aurora markets and sells its milk with the "USDA Organic" seal in accordance with the organic certifications issued to Aurora by two certifying agents -- the Colorado Department of Agriculture ("CDA") and Quality Assurance International ("QAI") --

acting pursuant to the authority vested in them by the United States Department of Agriculture ("USDA") under the Organic Food Production Act of 1990 ("OFPA") (7 U.S.C. §§ 6501 et seq.) and the National Organic Program ("NOP") regulations (7 C.F.R. Part 205). These certifications are and at all times have been valid and have never been suspended or revoked.

**ANSWER:   NSC and AIC are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 53 of the First Amended Counterclaim.**

54.     Aurora has been named in thirteen consumer class actions filed in the courts of six different states. In addition, consumers have also filed six class actions against some of Aurora's retailer customers, basing their complaints against the retailers on Aurora's alleged wrongdoing. These nineteen class actions were consolidated before the United States District Court for the Eastern District of Missouri by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407 in the action In re Aurora Dairy Corp., Case No. 4:08-md-01907-ERW.

**ANSWER:   Admit on information and belief the allegations contained in paragraph 54 of the First Amended Counterclaim.**

55.     The claimants in the underlying actions have alleged that Aurora sold milk labeled "organic" that contained contaminants and other non-organic compounds and that was not in fact produced in accordance with federal organic standards as detailed in OFPA and the NOP. See, e.g., Compl. ¶¶ 8, 16-18, Freyre v. Aurora Dairy Corp., Case No. 07-cv-02183 (D. Colo., filed Oct. 17, 2007); Compl. ¶¶ 40, 53-54, Still v. Aurora Dairy Corp., d/b/a Aurora Organic Dairy, 07-cv-02188 (D. Colo., filed Oct. 17, 2007).   Based on these allegations, the claimants in the underlying actions have asserted a variety of causes of action, including causes of action for negligence and negligence per se. See, e.g., Compl. ¶¶ 102-118, Mothershead v. Aurora Dairy Corporation d/b/a Aurora Organic Dairy, Case No. 4:07-cv-01701 (E.D. Mo., filed Oct. 7, 2007) ("Mothershead"); Compl. ¶¶ 97-104, Still v. Aurora Dairy Corp., d/b/a Aurora Organic Dairy, 07-cv-02188 (D. Colo., filed Oct. 17, 2007).

**ANSWER:   Admit that the claimants in the underlying actions allege that Aurora sold milk that was labeled organic that was not in fact produced in accordance with federal organic standards.  Deny the remaining allegations in Paragraph 55 of the First Amended Counterclaim.**

56.     The claimants in the underlying actions allege that they purchased organic milk because it is healthier and free of bovine growth hormone, antibiotics and pesticides. See, e.g., Compl. ¶ 10, White v. Aurora Dairy Corp., d/b/a Aurora Organic Dairy, 07-cv-9418 (S.D.N.Y., filed Oct. 19, 2007); Compl. ¶ 9, Kaye v. Aurora Dairy Corp., d/b/a Aurora Organic Dairy, cv-07-4425 (E.D.N.Y., filed Oct. 23, 2007) at ¶ 9. The claimants in the underlying actions further allege that the milk provided by Aurora that they purchased allegedly exposed them, their families and their friends to pesticides, hormones, antibodies and other chemicals and/or has generally caused them injury or damage. See, e.g., Mothershead, Compl. at ¶ 107.

**ANSWER:   Deny that the allegations contained in the first sentence of paragraph 56 of the First Amended Counterclaim accurately describe the allegations that have been made**

in the referenced litigation.  **Admit that paragraph 107(c) of the original Complaint in the** <u>**Mothershead**</u> **action alleged that Plaintiffs and Class suffered harm in that they:  exposed themselves, their family and friends to pesticides, hormones, antibiotics and other chemicals which were prohibited under organic standards.  Deny that the Plaintiffs in the** <u>**Mothershead**</u> **action are seeking to recover damages for "bodily injury" resulting from an "occurrence" as required by the  referenced insurance contracts.**

57.     The pleadings in the underlying actions do not implicate, on their faces, any policy exclusions for "bodily injury."  <u>See</u>, <u>e.g.</u>, <u>Mothershead</u>.

**ANSWER:   Deny the allegations contained in paragraph 57 of the First Amended Counterclaim.**

58.     Pursuant to the terms of the policies and as provided by law, Counterdefendants are obligated to assume the defense of Aurora in full and/or pay all defense-related costs, including attorneys' fees and supplemental expenses, with respect to the <u>Mothershead</u> action because allegations exist in the <u>Mothershead</u> action that state one or more claims falling within or potentially within the policy coverage.  This duty to defend further applies even if the allegations in the <u>Mothershead</u> action are groundless, false or fraudulent.

**ANSWER:   Deny the allegations contained in paragraph 58 of the First Amended Counterclaim.  Affirmatively allege that NSC has advised Aurora that it retained the law firm of Boggs, Avellino, Lach & Boggs, LLC to represent it in the** <u>**Mothershead**</u> **action while the company seeks a declaratory judgment regarding its obligation, if any, to provide a defense. Aurora has failed and refused to even acknowledge NSC's retention of the Boggs firm.**

59.     Aurora provided Counterdefendants with timely notice of each of the underlying actions, along with copies of the complaints, and requested that Counterdefendants defend and indemnify Aurora.

**ANSWER:   Deny the allegations contained in paragraph 59 of the First Amended Counterclaim.**

60.     On or about November 20, 2007, GFC informed Aurora that the allegations in the <u>Mothershead</u> complaint purportedly "do not implicate the 'Covered Legal Liability and Defense Causes of Loss'" and refused to pay Aurora's defense costs in that action.  GFC did conclude, however, that the allegations in the various complaints against Aurora triggered the "'Sub-Limited Legal Liability and Defense Cause…of Loss' for 'Internet Activity Liability.'" and paid Aurora the sum of $1,000.

**ANSWER:   NSC and AIC are without sufficient information to determine the truth or falsity of the allegations contained in paragraph 60 of the First Amended Counterclaim and, therefore, deny the same.**

61.     On or about January 14, 2008, NSC and AIC agreed to defend Aurora in the <u>Mothershead</u> action, but subsequently denied coverage for all other underlying actions that

comprise In re Aurora Dairy Corp. NSC and AIC's letter, however, was sent to the wrong address by NSC and AIC and was not actually received by Aurora until April, 2008.

**ANSWER:   Admit that on or about January 14, 2008 NSC agreed to defend Aurora in the Mothershead action under a reservation of rights.   Admit that NSC and AIC subsequently disclaimed any obligation to defend Aurora in any other proceeding consolidated as the action described as: In re Aurora Dairy Corp.  Deny the remaining allegations contained in paragraph 61 of the First Amended Counterclaim.**

62.     On or about January 28, 2008, IICNA and ACE similarly agreed to defend Aurora in the Mothershead action, but subsequently denied coverage for all other underlying actions that comprise In re Aurora Dairy Corp.

**ANSWER:   Admit on information and belief the allegations contained in Paragraph 62 of the First Amended Counterclaim.**

63.     On or about April 15, 2008, NSC and AIC learned that they had sent their prior correspondence to the wrong address and re-sent their January correspondence to Aurora via e-mail, affirming that they would defend Aurora in the Mothershead action.

**ANSWER:   Admit that based on representations made by the insured's representatives, NSC re-sent its January correspondence to representatives of Aurora on or about April 15, 2008 based on representations made by Aurora's representatives that the correspondence had not been received.  Deny the remaining allegations contained in paragraph 63 of the First Amended Counterclaim.**

64.     NSC, AIC, IICNA and ACE, however, have not paid the full cost of defense of the Mothershead action, in direct violation of both the terms of the relevant policies and of Counterdefendants' representations to Aurora.

**ANSWER:   Deny the allegations contained in paragraph 64 of the First Amended Counterclaim.  Affirmatively allege that Donna Getman, the authorized representative of Aurora, has been expressly advised that Vincent Velker of the firm Boggs, Avellino, Lach & Boggs, LLC had been retained to represent Aurora in the Mothershead action.  Aurora has refused to even acknowledge the defense that was offered and without seeking or obtaining the written consent of its insurers has continued to incur legal expense through counsel that were not retained by the insurers or retained with the insurers' written consent.**

## COUNT 1 – DECLARATORY JUDGMENT

65.     Aurora realleges and incorporates herein by reference the foregoing Paragraphs 1 through 64 of its Counterclaim as if set forth fully herein.

**ANSWER:   NSC and AIC reallege and incorporate by reference their responses to Paragraphs 1 – 64 of the First Amended Counterclaim.**

13

66.     An actual controversy has arisen and now exists between Aurora and Counterdefendants concerning their respective rights, obligations and other interests under the policies. Counterdefendants have at all relevant times been obligated under the policies to provide a complete and full defense to Aurora in the <u>Mothershead</u> action, which they have failed to do to date.

**ANSWER:   Admit only that an actual controversy has arisen between Aurora and the Counterdefendants.  NSC and AIC deny the remaining allegations contained in paragraph 66 of the First Amended Counterclaim.**

67.     Aurora seeks a judicial determination of the obligations of Counterdefendants to reimburse Aurora's costs of defense to date and to pay such further defined costs as Aurora may hereafter incur in connection with the <u>Mothershead</u> action.

**ANSWER:   Admit the allegations contained in paragraph 67 of the Counterclaim.  NSC and AIC deny that Aurora is entitled to the determination it seeks.**

68.     A prompt judicial determination is necessary and appropriate at this time in order that Aurora may ascertain its rights to a full and complete defense in the <u>Mothershead</u> action and its right to reimbursement for defense costs already incurred under the policies.

**ANSWER:   Admit the allegations contained in paragraph 68 of the Counterclaim.  Deny that Aurora is entitled to the relief sought in its prayer for relief for Count I.**

## COUNT II – CLAIM FOR BREACH OF CONTRACT

69.     Aurora realleges and incorporates herein by reference the foregoing Paragraphs 1 through 68 of its Counterclaim as if set forth fully herein.

**ANSWER:   NSC and AIC reallege and incorporate by reference their responses to Paragraphs 1 – 68 of the First Amended Counterclaim.**

70.     The policies require Counterdefendants to defend Aurora against claims for liability potentially covered by those policies, including, <u>inter alia,</u> claims for damages because of "bodily injury," "property damage," "personal injury" and/or "advertising injury."

**ANSWER:   Deny that paragraph 70 of the First Amended Counterclaim accurately describes the scope of the defense obligation under the referenced insurance contracts.**

71.     The claimants in the <u>Mothershead</u> action are seeking damages against Aurora for claims which are, at an absolute minimum, potentially or possibly within the coverage afforded by the policies issued by Counterdefendants.

**ANSWER:   Deny the allegations contained in paragraph 71 of the First Amended Counterclaim.**

72.     On the face of the complaint in the <u>Mothershead</u> action, none of the exclusions contained in the policies bars potential coverage for the claims made against Aurora in that lawsuit.

**<u>ANSWER</u>:   Deny the allegations contained in paragraph 72 of the First Amended Counterclaim.**

73.     By failing to defend Aurora in the <u>Mothershead</u> action, Counterdefendants have breached their duties under the policies.

**<u>ANSWER</u>:   Deny the allegations contained in paragraph 73 of the First Amended Counterclaim.**

74.     As a direct and proximate result of each such breach of the policies, Aurora has incurred and continues to incur substantial costs, including but not limited to attorneys' fees, expenses and costs in connection with the <u>Mothershead</u> action, as will be proven at or before the trial of this matter.

**<u>ANSWER</u>:   Deny the allegations contained in paragraph 74 of the First Amended Counterclaim.**

75.     Aurora has performed all conditions required of it under the policies issued to it by Counterdefendants.

**<u>ANSWER</u>:   Deny the allegations contained in paragraph 75 of the First Amended Counterclaim.  Deny that Aurora is entitled to the relief sought in its prayer for relief for Count II.**

**<u>COUNT III – AGAINST ALL COUNTERDEFENDANTS</u>**
**<u>BAD FAITH BREACH OF AN INSURANCE CONTRACT</u>**

76.     Aurora realleges and incorporates herein by reference the foregoing Paragraphs 1 through 75 of its Counterclaim as if set forth fully herein.

**<u>ANSWER</u>:   NSC and AIC reallege and incorporate by reference their responses to Paragraphs 1 – 75 of the First Amended Counterclaim.**

77.     By unreasonably failing to defend Aurora in the <u>Mothershead</u> action, Counterdefendants have (1) breached their contractual obligations to Aurora; (2) breached the implied duty of good faith and fair dealing; and (3) acted in bad faith.

**<u>ANSWER</u>:   Deny the allegations contained in paragraph 77 of the First Amended Counterclaim.**

78.     Counterdefendants' breach of their contractual obligations was in bad faith because, <u>inter alia,</u> Counterdefendants knew or should have known that there was no reasonable

15

basis for Counterdefendants to fail to fulfill their duty to defend Aurora in the <u>Mothershead</u> action.

**ANSWER:   Deny the allegations contained in paragraph 78 of the First Amended Counterclaim.**

79.   By way of example, ACE, IICNA, NSC and AIC conceded they had a duty to defend Aurora in the <u>Mothershead</u> action on or about January 14, 2008 and reaffirmed that duty on or about March 6, 2008 and on or about April 15, 2008. On or about June 11, 2008, however, ACE, IICNA, NSC and AIC withdrew their commitment to defend Aurora, despite the fact that there had been no material changes to, developments in or new information regarding the <u>Mothershead</u> action since their prior correspondence with and commitment to Aurora.

**ANSWER:   Deny the allegations contained in paragraph 79 of the First Amended Counterclaim.**

80.   Moreover, Counterdefendants have failed and continue to fail to reimburse Aurora for all costs incurred by Aurora in the <u>Mothershead</u> action.

**ANSWER:   Admit that NSC and AIC have not reimbursed Aurora for all costs incurred in the <u>Mothershead</u> action.   Affirmatively allege that under the relevant insurance contracts NSC and AIC have no duty to reimburse Aurora for any costs or fees incurred without their express, written consent or which are incurred in the defense of actions which do not seek to recover damages covered by the insurance contract.   Affirmatively allege that Aurora has never sought or obtained NSC or AIC's consent to incur costs in defending the <u>Mothershead</u> action.   Affirmatively allege that NSC, IICNA and ACE have entered into a interim funding agreement with Aurora to cover certain costs incurred in the <u>Mothershead</u> action.**

81.   As a direct and proximate result of Counterdefendants' bad faith, Aurora has been damaged and has incurred and continues to incur substantial costs, including, but not limited to, attorneys' fees, expenses and costs in connection with the <u>Mothershead</u> action.

**ANSWER:   Deny the allegations contained in paragraph 81 of the First Amended Counterclaim.**

82.   As a further result of Counterdefendants' bad faith refusal to satisfy their coverage obligation, Aurora was forced to file this Counterclaim and thereby incurred unnecessary legal fees and costs in order to obtain the coverage due to it under the policies issued by Counterdefendants.

**ANSWER:   Deny the allegations contained in paragraph 82 of the First Amended Counterclaim.   Deny that Aurora is entitled to the relief sought in its prayer for relief for Count III.**

16

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1.    The Counterclaims fail to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

2.    Aurora's claims are barred, in whole or in part, by the doctrines of waiver, estoppel and/or laches.

### THIRD AFFIRMATIVE DEFENSE

3.    Aurora's claims are barred, in whole or in part, to the extent that it engaged in unlawful, inequitable or improper conduct.

### FOURTH AFFIRMATIVE DEFENSE

4.    Aurora's claims are barred, in whole or in part, because Defendant has breached its duties to NSC and AIC and its contractual obligations under the insurance contracts.

### FIFTH AFFIRMATIVE DEFENSE

5.    NSC and AIC have insufficient knowledge or information upon which to form a belief as to whether they may have additional affirmative defenses that govern the claims asserted by Defendant.   NSC and AIC, therefore, reserve the right to raise additional defenses as appropriate in the future.

WHEREFORE, Plaintiffs NSC and AIC pray for judgment as follows:

1.    That the First Amended Counterclaim be dismissed with prejudice; and

2.    For such other and further legal, equitable or other relief as this Court deems just and proper.

121232267v1 57

Dated:  April 3, 2009

s/Jacob S. Woodard_____
Bethany K. Culp
Jacob S. Woodard
**Attorneys for Plaintiffs National Surety
Corp. and The American Insurance
Company**
Hinshaw & Culbertson LLP
333 South Seventh Street, Suite 2000
Minneapolis, Minnesota  55402
Telephone:  612.333.3434
Fax:  612.334.8888
bculp@hinshawlaw.com
jwoodard@hinshawlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of April, 2009, I electronically filed the foregoing Plaintiffs National Surety Corporation's and The American Insurance Company's Joint Answer to Aurora' Dairy Corporation's First Amended Counterclaim with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

| Mark S. Mester | mark.mester@lw.com |
|---|---|
| Livia M. Kiser | livia.kiser@lw.com |
| Daniel F. Wake | dwake@siplaw.com |
| Garrick Lloyd Gallagher | Garrick.Gallagher@SandersParks.com; Peggy.Bailey@SandersParks.com |

s/Jacob S. Woodard_____
Bethany K. Culp
Jacob S. Woodard
**Attorney for Plaintiffs National Surety
Corp. and The American Insurance
Company**
Hinshaw & Culbertson LLP
333 South Seventh Street, Suite 2000
Minneapolis, Minnesota  55402
Telephone:  612.333.3434
Fax:  612.334.8888
bculp@hinshawlaw.com
jwoodard@hinshawlaw.com

121232267v1  57