# EXHIBIT C

**Rain and Hail L.L.C.**

**Agribusiness Division**
9200 Northpark Drive, Suite 250
Johnston, IA 50131
Tel: (515) 559-1200
    (800) 585-9624
Fax: (515) 559-1201
Website: www.RainHail.com



**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

January 28, 2008

Ms. Donna Getman
Director of HR & Corporate Services
Aurora Organic Dairy
1401 Walnut Street, Suite 500
Boulder, CO 80302

| | | |
|---|---|---|
| Re: | | Class-Action Lawsuits Against Aurora Dairy |
| | Insured: | Aurora Dairy |
| | Insurance Companies: | Indemnity Insurance Company of North America ("IICNA") |
| | | ACE American Insurance Company ("ACE") |
| | Claimant(s) | Various Named Plaintiffs and Potential Class Plaintiffs |
| | Claim No. | 03-003114L |

Dear Ms. Getman:

We have carefully reviewed the lawsuits provided to us filed against Aurora Dairy Corporation ("Aurora"), as listed in the attached Exhibit A ("Aurora Suits"). If there are other suits not included in Exhibit A that you believe have been or should have been tendered to the insurance carriers, please advise us. To our knowledge, Aurora has only tendered the Aurora Suits under the 2003-2004 policy period. However, because our analysis is the same whether the 2002-2003 policies or the 2003-2004 policies are considered, we have addressed both years of coverage in as much as some of the allegations in the Aurora Suits include allegations as early as January 2003.

We are also aware of the additional related lawsuits listed in the attached Exhibit B ("Retailer Only Suits"), which have been filed against various retailers, but in which Aurora is not named as a defendant. We have not received any information confirming that the Retailer Only Suits have been tendered to Aurora. Thus, this letter addresses only Aurora's tender of the Aurora Suits, listed in Exhibit A.

Based on the allegations in the Aurora Suits, we have treated the information provided as notice under the following Primary Commercial General Liability Policies issued by Indemnity Insurance Company

of North America ("IICNA") and ACE American Insurance Company ("ACE") (collectively, "the Carriers") to Aurora Dairy Corporation ("Aurora"):

(1) Policy No. FO-139292, issued by IICNA, having a policy period from 8/1/02 to 8/1/03;

(2) Policy No. FO-139293, issued by ACE American, having a policy period from 8/1/02 to 8/1/03;

(3) Policy No. FO-139293, issued by ACE American, having a policy period from 8/1/03 to 8/1/04;

(4) Policy No. FO-146246, issued by IICNA, having a policy period from 8/1/03 to 8/1/04;

(5) Policy No. FO-146297, issued by IICNA, having a policy period from 8/1/03 to 8/1/04;

(Referred to herein as "the Policies".)

Each of the Policies provides CGL Coverage with the following limits:

- General Aggregate Limit (other than Products/Completed Operations) of $2 million,
- Products/Completed Operations Aggregate Limit of $2 million,
- Personal & Advertising Injury Limit of $1 million,
- Each Occurrence Limit of $1 million.

We have analyzed the coverages available under the Policies expressly identified above for the claims in the Aurora Suits and, as more fully outlined below, we have concluded that there is no coverage available for those claims. Among other reasons, there is no coverage because:

- The allegations in the Aurora Suits do not involve "bodily injury" or "property damage" caused by an "occurrence" as those terms are defined in the Policies.

- The allegations do not allege an "offense" of "personal injury" or "advertising injury" as those terms are defined in the Policies.

- The Aurora Suits seek equitable relief, injunctive relief, and punitive damages, none of which constitute covered "damages" under the Policies.

- The Policies specifically exclude coverage for "bodily injury" or "property damage" expected or intended from the standpoint of the insured.

- The Policies specifically exclude coverage for "property damage" to "your product" arising out of it or any part of it.

- The Policies specifically exclude coverage for "personal and advertising injury" "arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your 'advertisement.'"

- The Policies specifically exclude coverage for injuries "arising out of the wrong description of the price of goods, products or services stated in your 'advertisement.'"

2

Therefore, we are denying coverage for all the Aurora Suits, except Mothershead/Lloyd v. Aurora Dairy Corp., Case No. 4:07-CV-01701, pending in the United States District Court for the Eastern District of Missouri ("Mothershead Matter"). Based on the information provided to date, and subject to the reservation of rights outlined herein, the Carriers will provide Aurora with a defense in the Mothershead Matter. The Carriers will reimburse Aurora for its reasonable and necessary defense costs incurred in responding to the complaint in the Mothershead Matter, subject to the reservation of the Carriers' right to approve the defense counsel and determine acceptable rates to be charged. Nothing contained in this letter should be deemed a waiver of the terms or conditions of the Policies. The Carriers expressly reserve the right to rely upon any term or condition of the contract or any other ground which may be found to limit or preclude coverage, including those outlined herein. The Carriers further reserve the right to deny coverage, withdraw from the defense of Aurora in the Mothershead Matter, and/or to recover from Aurora defense costs in the event it is determined there is no coverage. This determination is based on the analysis below.

We remind you that, under the Policies, you have a duty to cooperate with the Carriers, which requires you to provide us with any information that you may receive in the future. Therefore, on behalf of the Carriers, we ask that you advise us of any information you may possess that you believe may affect the determination concerning the coverage available under the Policies, including whether you are aware of any other insurance policies which you believe may apply to the claim. None of the actions taken by the Carriers in connection with this claim shall constitute an admission of liability or an admission of coverage under the Policies and should not be deemed a waiver of any right to disclaim liability or coverage under the policies. The Carriers reserve the right to modify or amend their coverage position and to assert defenses based upon any of the policy provisions whether or not specifically mentioned in this letter.

## BACKGROUND

### I. Parties and Policies

The Aurora Suits allege that Aurora Dairy Corporation d/b/a Aurora Organic Dairy is the country's leading producer of organic milk and milk products for use in private label and store brand products and that it sells the organic milk it processes to retailers who, in turn, sell the milk as their own brand. The organization's headquarters are in Boulder, Colorado. It is the Carriers' understanding that Aurora processes the organic milk at its processing plant near Platteville, Colorado.

Aurora purchased various Commercial General Liability ("CGL") policies from the Carriers covering two policy periods: August 1, 2002-August 1, 2003 and August, 1, 2003-August 1, 2004 ("relevant policy periods"). Each of the Policies was issued to Aurora at its headquarters in Boulder, Colorado. Safeway, which is a co-defendant of Aurora's in one suit and named independently as a defendant in another, is named as an additional insured in Policy No. FO-146297 FPC-CO03 (coverage period Aug. 1, 2003 to Aug. 1, 2004). None of the other defendants or co-defendants are expressly named as additional insureds under the Policies.

### II. Underlying Litigation

To date, there have been twelve (12) lawsuits filed against Aurora in six (6) different jurisdictions, including Missouri (1), Colorado (5), Florida (1), California (2), New York (2), and Indiana (1). All but one of the lawsuits was filed in federal district court. The suit filed in Indiana was dismissed, but re-filed in Minnesota, naming Target only, leaving only eleven (11) active suits pending against Aurora in five (5) different jurisdictions.

3

The Aurora Suits are brought on behalf of consumers (versus competitors) and arise out of a complaint that was filed with the USDA. The USDA investigation has been pending since 2005 and concluded in early 2007. In April 2007, the USDA issued findings and conclusions in which they found that, from 2003 through 2006, Aurora failed to comply with the USDA standards for production of organic milk, thereby willfully violating the Organic Foods Production Act. On August 29, 2007, Aurora entered into a consent agreement with the USDA, which preserved its organic certification subject to its compliance with certain restrictions.

While Aurora is a named defendant in each of the eleven active lawsuits, two of the pending actions also have named co-defendants. For example, the Snell Matter (pending in Colorado) also includes Wild Oats, Costco, and Safeway as co-defendants. The Snell Matter was recently amended to add Wal-Mart as a defendant. Each of the co-defendants in the Snell Matter is a retailer who sells milk produced by Aurora under a variety of brands. Further, the DiSimone Matter (pending in California State Court) also includes Case Vander Eyk, Jr., Case Vander Eyk, Jr., Dairy, and Quality Assurance International, Inc. ("QAI") as co-defendants. Like Aurora, Vander Eyk produces and sells milk to retailers under their label. QAI is the "predominant certifier of organic dairies in the United States, including dairies owned and/or operated by Defendants, Aurora and Vander Eyk." (DiSimone Complaint, ¶ 23.) Of these co-defendants, only one (Safeway) is a named "Additional Insured" under one of the Primary Policies (Policy No. FO-146297 FPC-CO03).[1]

The Aurora Suits vary slightly, but all were brought by consumers. Despite the different forums in which the lawsuits were instituted and variations in phraseology of their allegations, they are all based upon a common conceptual framework, and share many allegations that are virtually identical.

In each of the Aurora Suits, the plaintiffs allege that by selling non-organic milk improperly labeled as organic milk, Aurora sold milk that was cheaper to produce than organic milk at the premium price for organic milk. Therefore, they allege, Aurora's non-organic processing caused the plaintiffs to pay excessive amounts for the milk and Aurora should not be permitted to keep those profits. At the heart of each claim is the alleged fact that Aurora sold milk at a premium price because it was sold as "organic" when it allegedly did not meet the standards for organic milk. The consumer plaintiffs assert that they were "tricked" into buying milk that was non-organic and, thus, they were forced into paying a higher price for the milk than they should have had to pay.

Specifically, the claims include: unjust enrichment, breach of express and implied warranties, violation of various states' deceptive trade practices acts (including false advertising), violation of various consumer protection statutes, breach of contract, false representation, and unfair competition. The Mothershead Matter also alleges a claim of negligence, stating that Aurora had a duty to describe its milk products accurately and that it breached its duty by saying the milk was organic when it knew or should have known that it was not. Thus, while framed in terms of negligence, the conduct is the same, i.e., Aurora sold non-organic milk at organic milk prices.

Further, despite the different forums and the slight variations in phraseology, the plaintiffs in the Aurora Suits seek damages, including statutory damages, disgorgement of profits, restitution, and attorneys' fees. Eight of the Aurora Suits also seek injunctive relief. Five of the Aurora Suits also seek punitive damages. In each of the Aurora Suits, to be a class member, one must have purchased milk that was produced by Aurora and which was labeled as "organic."

---

[1] We are not aware of any information that Safeway has tendered the defense of this matter to Aurora or to the Primary Carriers. However, should they do so, our conclusions with respect to the coverage analysis would be the same as for Aurora.

4

None of the complaints involve allegations relating to bodily harm caused by exposure to the non-organic milk. None of the relief requested involves damages for bodily injury or medical monitoring. Indeed, with the exception of the <u>Mothershead</u> Matter, none of the Aurora Suits allege the plaintiffs ever consumed, ingested, or were exposed to the milk. Further, none of the Aurora Suits (including the <u>Mothershead</u> Matter) require such exposure, consumption or ingestion to be a member of the class. Similarly, none of the complaints involve allegations relating to property damage.

## ANALYSIS OF THE POTENTIAL COVERAGE UNDER THE PRIMARY POLICIES

### I.   Coverages Provided Under the Primary Policies

#### A.   Coverage Forms

Each of the Policies contains the following two coverage forms which define the extent of insurance coverage afforded: (1) the 2001 Insurance Services Office, Inc. ("ISO") CGL Coverage Form CG 00 01 10 01; and (2) the ISO Farm Property Coverage Form FP 00 10 06 90.

The CGL Coverage Form provides the following three coverages: (1) Coverage A – "bodily injury" and "property damage"; (2) Coverage B – "personal and advertising injury"; and (3) Coverage C – "medical payments" arising out of accidents in which third parties suffer bodily injury. The ISO Basic Farm Premises Liability Endorsement, FL 04 11 06 90, modifies the CGL Coverage Form to include liability arising out of the ownership, use or maintenance of "farm premises," and also adds a fourth type of coverage: (4) Coverage M –chemical drift liability. Only Coverages A and B are material to our analysis as the other coverages are not implicated by the allegations in the Aurora Suits.

The Farm Property Coverage Form covers commercial farm property owned by the insured, including: (1) Coverage A – dwellings; (2) Coverage B – other private structures appurtenant to dwelling; (3) Coverage C – household personal property; (4) Coverage D – loss of use; (5) Coverage E – scheduled farm property; and (6) Coverage G – other farm structures.

Although some of the forms and endorsements differ among the Policies, we are aware of no facts suggesting that these differences would affect the coverages afforded under any of the Policies with respect to the Aurora Suits. For purposes of this analysis, the applicable policy provisions in the Policies are essentially the same. We have therefore applied the same analytical framework to all the Policies, unless otherwise noted.

#### B.   CGL Coverage Analysis

In general, CGL Coverage provides an insured both defense and indemnity against damage claims brought by third-party claimants. <u>Gap, Inc. v. Fireman's Fund Ins. Co.</u>, 11 A.D.3d 108, 782 N.Y.S.2d 242 (2004) (CGL policy covers the insured's damage liability to others). In contrast, Farm Property Coverage indemnifies the insured only for damage to the insured's own property. <u>Id.</u> Thus, because the Aurora Suits do not involve Aurora seeking to recover for damage to commercial farm property owned by Aurora, but rather damage claims against Aurora brought by third-party claimants, that coverage is not triggered.

The CGL Policies contain coverage for Bodily Injury and Property Damage Liability (Coverage A) and Personal and Advertising Injury (Coverage B). As outlined below, the Aurora Suits do not trigger coverage under either Coverage A or Coverage B.

5

### C.   Coverage A – Bodily Injury and Property Damage

#### 1.   Insuring Agreement

The Coverage A Insuring Agreement provides the following coverage:

**SECTION I -- COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
**1. Insuring Agreement**

> **a.** We will pay those sums that the *insured* becomes legally obligated to pay as *damages* because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
> \* \* \*
>
> **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B . . . .
>
> \* \* \*
>
> **b.** This insurance applies to "bodily injury" and "property damage" only if:
>
> **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>
> **(2)** The "bodily injury" or "property damage" occurs during the *policy period*;
>
> \* \* \*

(CGL Coverage Form, Coverage A, ¶ 1, at 1 (emphasis added).) The Carriers' duty to indemnify is therefore invoked only when an insured is liable for damages because of covered "bodily injury" or "property damage." The Carriers are only obligated to defend an insured against a claim or "suit" seeking those damages.

To obtain coverage, Aurora must establish the Aurora Suits alleged facts against "an insured" or "additional insured" for "bodily injury" or "property damage" resulting from an "occurrence" "during the policy period."

#### a.   ***Insured***

##### (1)   *Who Is An Insured*

The Coverage A Insuring Agreement provides that the Carriers could have defense and indemnity obligations only to "insureds." The Policies define the term insured, in relevant part, as follows:

6

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

    a. An individual, you are an insured; and, if they are members of your household, your spouse, and your and your spouse's relatives who are under the age of 21 are also insureds.

    b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your "farming" operations.

    c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

* * *

(CGL Coverage Form, Section II – Who Is An Insured, at 9-10.)

In the Policies, Nos. FO-139292 (8/1/02-8/1/03), FO-139293 (8/1/02-8/1/03), FO-139293 (8/1/03-8/1/04), FO-146246 (8/1/03-8/1/04), and FO-146247 (8/1/03-8/1/04), the only individual or legal entity listed in the Declarations is Aurora Dairy Corporation. See Hall v. Auto-Owners Ins. Co., 265 Neb. 716, 720, 658 N.W.2d 711, 716 (2003) (holding that listing a DBA in the declarations does not create a separate legal entity covered by the policy). Aurora Dairy Corporation is therefore an *insured* under the Policies.

   b.   **_Damages_**

According to the Insuring Agreement, coverage is afforded only for *damages* because of "bodily injury" or "property damages" for which the insured becomes liable:

**SECTION I -- COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as *damages* because of "bodily injury" or "property damage" to which this insurance applies. . . .

(CGL Coverage Form, Section I Coverages, Coverage A, Insuring Agreement, ¶ a, at 1 (emphasis added).)

The plaintiffs in the Aurora Suits seek damages, including disgorgement of profits and restitution. The term "damages" as used in insurance policies does not include situations in which the defendant is required to restore property or money to the plaintiff which was wrongfully acquired. Ellett Bros., Inc. v. United States Fid. & Guar. Co., 275 F.3d 384, 387-88 (4th Cir. 2001) (holding claims seeking "restitution, disgorgement, civil penalties, . . . contribution to a fund to monitor gun dealers" do not seek "damages" insurable under a comprehensive liability insurance policy); Level 3 Communications, Inc. v. Fed. Ins. Co., 272 F.3d 908, 910 (7th Cir. 2001) (stating that insurance policies do not cover "restoration of an ill-gotten gain"); Haines v. St. Paul Fire & Marine Ins. Co., 428 F. Supp. 435, 438-41 (D. Md. 1977) (holding "damages" did not encompass injunctive relief sought and available ancillary relief of restitution and disgorgement); O'Neill Investigations, Inc. v. Illinois Employers Ins., 636 P.2d 1170, 1172, 1176 (Alaska

7

1981) (holding insurance "damages" did not encompass remedies awarded in suit brought by state against debt collection agency based on violations of the Consumer Protection Act and seeking injunctive relief and restoration of monies or property wrongfully acquired); Bank of the West v. Super. Ct., 10 Cal. Rptr. 2d 538, 547, 833 P.2d 545, 554 (1992); Reliance Group Holdings, Inc. v. Nat'l Union Fire Ins. Co., 594 N.Y.S.2d 20, 24, 188 A.D.2d 47, 55 (App. Div. 1993); Vigilant Ins. Co. v. Credit Suisse First Boston Corp., 782 N.Y.S.2d 19, 20, 10 A.D.3d 528, 528 (App. Sep. 16, 2004); Cent. Dauphin Sch. Dist. v. Am. Cas. Co., 493 Pa. 254, 260, 426 A.2d 94, 97 (1981) (holding defendant political subdivision's return of tax monies unlawfully collected was uninsurable). As a result, the risk of being ordered to return property or money wrongfully obtained is generally not insurable. Vigilant Ins. Co., 782 N.Y.S.2d at 20, 10 A.D.3d at 528.

The California Supreme Court explained that the term "'damages' as used in an insurance policy describes a payment made to compensate a party for injuries suffered" as a result of the wrongful conduct. Bank of the West, 10 Cal. Rptr.2d at 547, 833 P.2d at 554. In contrast, the term "damages" does not include the defendant's return of property that was wrongfully obtained:

> It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award "damages" as that term is used in insurance policies.

Id. at 546, 833 P.2d at 553; Reliance Group Holdings, 594 N.Y.S.2d at 24, 188 A.D.2d at 55. In other words, "[r]estitution and disgorgement require payment of the defendant's ill-gotten gain, not compensation of the plaintiff's loss." Ellett Bros., 275 F.3d at 388; see also Level 3 Communications, 272 F.3d at 910 (stating that insurance policies do not cover "restoration of an ill-gotten gain").

The purpose of a restitutionary remedy is to prevent unjust enrichment by requiring the defendant to return the wrongfully obtained property, or the value of the property, to the rightful owner. Level 3 Communications, 272 F.3d at 910-11 (restitution "seeks to deprive the defendant of the net benefit of the unlawful act"). The wrongful conduct by which the defendant acquired the property may involve "fraud, duress, undue influence or mistake, breach of fiduciary duty, or wrongful disposition of another's property." Reliance Group Holdings, 594 N.Y.S.2d at 25, 188 A.D.2d at 55. Courts frequently implement a restitutionary remedy by temporarily imposing a constructive trust on the property, thereby preventing the defendant from realizing a profit from his wrongful conduct. Id. at 22, 188 A.D.2d at 51.

Eight of the Aurora Suits also seek injunctive relief. As indicated above, claims for injunctive relief do not constitute "damages" under the policies. See, e.g., Haines v. St. Paul Fire & Marine Ins. Co., 428 F. Supp. 435, 438-41 (D. Md. 1977) (holding "damages" did not encompass injunctive relief sought); O'Neill Investigations, Inc. v. Illinois Employers Ins., 636 P.2d 1170, 1172, 1176 (Alaska 1981) (holding insurance "damages" did not encompass requests for injunctive relief).

Five of the pending suits against Aurora seek punitive damages. Public policy excludes insurability of punitive damages in any of the jurisdictions in which lawsuits are pending against Aurora. Thus, none of the claims which seek equitable relief or punitive damages would constitute "damages" under the Policies.

### c. *Bodily Injury*

The Policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (CG 00 01 10 01, p. 13.) The majority of courts hold that "bodily injury" does not include claims for purely nonphysical or emotional harm. See, e.g., National Casualty Co. v. Great Southwest Fire Ins. Co., 833 P.2d 741, 746 (Colo. 1992).

8

None of the Aurora Suits allege facts or theories of recovery that could trigger coverage under this definition of "bodily injury." Further, none of the complaints require exposure or consumption to the non-organic milk as a requirement to be a member of the class. Specifically, each requires the class member have <u>purchased</u> non-organic milk. The claims are purely economic and, thus, do not fall under the scope of the "bodily injury" coverage in the Policies.

d. **_Property Damage_**

The Policies define "property damage" as follows:

> 17. "Property damage" means:
> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(CG 00 01 10 01, p. 15.) Thus, under the Policies, property damage is limited to either physical or non-physical injury to "tangible property."

The plaintiffs in the Aurora Suits primarily allege that they were "tricked" or "forced" into paying more for the milk than they should have had to pay given its alleged non-organic status. There are no allegations of damage to tangible property. Further, the definition of "tangible property" in an insurance policy does not include purely economic losses because "tangible property" is that which is capable of being handled, touched, or physically possessed. Lamar Truck Plaza, Inc. v. Sentry Ins., 757 P.2d 1143, 1144 (Colo. App. 1988). None of the Aurora Suits contain allegations of property damage of the type that might trigger a duty to defend.

e. **_Occurrence_**

While we do not believe the claims trigger coverage because there are no allegations of "bodily injury" or "property damage," even if there were such claims, the Policies only cover them if they were caused by an "occurrence." Specifically, the Policies only apply to "bodily injury" or "property damage" that is caused by an "occurrence" that takes place in the coverage territory. (CG 00 01 10 01, p. 1.) The Policies define "occurrence" as "an <u>accident</u>, including continuous or repeated exposure to substantially the same general harmful conditions." (CG 00 01 10 01, p. 14 (emphasis added).) Whether something is an "accident" will depend on whether it was "unexpected or unintended." See, Hoang v. Monterra Homes (Powderhorn) LLC, 129 P.3d 1028, 1034 (Colo. Ct. App. 2005), as modified on denial of reh'g (May 12, 2005); see also Union Ins. Co. v. Hottenstein, 83 P.3d 1196, 1201 (Colo. App. 2003) ("An 'accident' is an unanticipated or unusual <u>result</u> flowing from a commonplace cause." (Emphasis added.)).

The claims alleged against Aurora do not fall within the definition of "occurrence" under the Policies, including those that involve allegations of intentional conduct. Damage arising from expected or intentional conduct (e.g., deceptive trade practices) typically would not be considered an "occurrence" triggering coverage under Coverage A because the result of such conduct would be reasonably anticipated.

Further, the mere presence of a "negligence" claim (e.g., in the <u>Mothershead</u> Matter) is insufficient to trigger a duty to defend due to an "occurrence," absent alleged <u>facts</u> to support that claim. Colorado

9

Farm Bureau Mut. Ins. Co. v. Snowbarger, 934 P.2d 909, 912 (Colo. App. 1997) (duty to defend negligence claim was not triggered because the only facts recited in the complaint concerned repeated intentional acts and there were no facts in the complaint to substantiate a negligence theory).

Finally, at least one of the Aurora Suits contains a claim for breach of contract. The claims for breach of contract are not deemed an "occurrence" under the Policies. See, e.g., Adair Group, Inc. v. St. Paul Fire and Marine Ins. Co., 477 F.3d 1186, 1188 (10th Cir. 2007); see also Union Ins., 83 P.3d at 1201 ("A breach of contract is not generally an accident that constitutes a covered occurrence.").

### f. *During the Policy Period*

The Policies only apply if the "bodily injury" or "property damage" "occur during the policy period." (CG 00 01 10 01, p. 1.) The Policies cover from August 1, 2002 through August 1, 2004, two for 2002-2003 ("first policy period") and three are for 2003-2004 ("second policy period"). The Aurora Suits allege conduct covering a variety of timeframes. With respect to any claims that allege conduct outside these two policy periods, coverage would not be afforded.

The plaintiffs have not plead claims that trigger coverage under Coverage A because they allege no claims for "bodily injury," or "property damage"; that constitute an "occurrence" "during the policy period."

## 2. Exclusions

Although Aurora cannot establish coverage under Coverage A of the Insuring Agreement, we discuss the Coverage A exclusions below as they would also preclude coverage. The Policies expressly exclude the following from coverage under Coverage A, each of which is defined in the Policies:   a. Expected Or Intended Injury and k. Damage to your Product. (CG 00 01 10 01, p. 2-5.)

### a. *Expected or Intended Injury*

Courts generally recognize a public policy against insuring intentional or willful wrongful acts. Bohrer v. Church Mut. Ins. Co., 965 P.2d 1258, 1262 (Colo. 1998). This exclusion is intended to address that public policy. It is defined in the Policies as follows:

**SECTION I -- COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
**2. Exclusions**

This insurance does not apply to:

**a. Expected or Intended Injury**
"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Thus, the Policies exclude bodily injury or property damage if it is expected or intended from the standpoint of the insured.

10

> b. *Damage To Your Product*

While the Aurora Suits do not assert claims for property damage, even if the allegations were some how read to characterize the class plaintiffs' claims as "property damage," i.e., the milk they bought was "damaged" because it was not "organic" as promised, the Policies would exclude such coverage under the "Damage to Your Product" exclusion, which states:

> **SECTION I -- COVERAGES**
> **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
> **2. Exclusions**
>
> This insurance does not apply to:
>
> **k. Damage To Your Product**
> "Property Damage" to "Your Product" arising out of it or any part of it.

Thus, to the extent the allegations in the Aurora Suits involve "Property Damage," this provision also excludes coverage.

## D.   Coverage B – Personal and Advertising Injury Liability

### 1.   Insuring Agreement

The Aurora Suits also do not trigger coverage under Coverage B of the Policies. Specifically, Coverage B of the CGL Policies provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or 'suit' that may result.

(CG 00 01 10 01, p. 5.)

> a. *Insured*

The analysis of who is the insured under the Policies is the same for Coverage B as it was for Coverage A, as discussed more fully above in Section C(1)(a), i.e., that Aurora Dairy Corporation is an *insured* under each of the Policies.

> b. *Damages*

The analysis of whether there are covered damages claimed under the Policies is the same for Coverage B as it was for Coverage A, as discussed more fully above in Section C(1)(b), i.e., that none of the claims, including those which seek equitable relief or punitive damages, would constitute "damages" under the Policies.

11

c. *Personal and Advertising Injury Offenses*

The Policies narrowly define "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of one or more of the following **offenses**:"

(a) False arrest, detention or imprisonment;

(b) Malicious prosecution;

(c) The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;

(d) Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

(e) Oral or written publication, in any manner, of material that violates a person's right of privacy;

(f) The use of another's advertising idea in your "advertisement"; or

(g) Infringing upon another's copyright, trade dress or slogan in your "advertisement".

(CG 00 01 10 01, p. 14 (emphasis added).)

The Aurora Suits generally allege violations of state statutes for deceptive trade practices, breach of express and implied warranties, unjust enrichment, violation of consumer protection statutes, breach of contract, false representation and unfair competition. There are no claims involving (a) false arrest, (b) malicious prosecution, or (c) wrongful eviction. Because the claims involve Aurora's "advertising" with respect to its own products and there are no allegations that Aurora mentioned another's goods, products, or services, (d) does not apply. Further, none of the complaints contain factual allegations to support that Aurora published material that violates any person's privacy (e). The class plaintiffs do not allege that Aurora used another's advertising "idea" (f). Rather, they allege that Aurora mislabeled non-organic milk as organic. Finally, none of the class plaintiffs allege that Aurora's use of "organic milk" in its advertising infringed another's copyright, trade dress or slogan (g). None of the specifically enumerated offenses required under Coverage B are implicated by the allegations in any of the Aurora Suits.

The coverage cases that have addressed claims for "false advertisement" or mislabeling products (regardless of how those claims are framed) have usually addressed language similar to that which is addressed in subpart ((f) – use of another's advertising idea). Those cases generally find no coverage for these types of claims. For example, in one case, a competitor hard candy company brought a claim against the insured, a competing company, for improperly using the terms "low calorie," "sugar free," "fat free," and "cholesterol free" in its candy package labeling. Sorbee Int'l, Ltd. v. Chubb Custom Ins. Co., 735 A.2d 712, 713 (Pa. 1999). The competing candy company sued Sorbee alleging that: (a) Sorbee failed to follow FDA policies and regulations, (b) its packaging contained "false and misleading factual misrepresentations of the nature, characteristic and qualities of its product" and (c) Sorbee intentionally made its low calorie claim and other labeling violations to obtain an unfair competitive advantage over its competitors. Id.

The Court found that the claims were not covered by the advertising injury language in the CGL policy because the claims did not fall under the coverage for "misappropriation of advertising ideas." Id.

12

The court found the term to unambiguously mean the taking of another's ideas for use in the company's advertising. Id. at 714. The court stated: "More to the point, nothing in the Simply Lite counterclaim suggests that Simply Lite is accusing Sorbee of stealing an original, novel advertising idea. Simply Lite is instead claiming that Sorbee has not met the requirements for using these terms to describe its product." Id. at 715. In our cases, the plaintiffs are similarly alleging Aurora has not met the requirements for labeling its product "organic." Other similar cases have followed this same reasoning. See, e.g., American Simmental Association v. Coregis Ins. Co., 75 F. Supp. 2d 1023 (Neb. 1999) (claims for false advertisement relating to whether cattle were truly "full blood Simmentals" did not constitute an "unauthorized taking of advertising ideas or style of doing business").

Labeling its milk as "organic" is not taking another's "advertising idea." Thousands of products are labeled as "organic" and there is an entire government-regulated system for qualifying to do so. Thus, like in Sorbee, the plaintiffs claims do not trigger coverage under the offense listed in (f), use of another's advertising idea.

### 2. Exclusions

Although Aurora cannot establish coverage under Coverage B of the Insuring Agreement, we discuss the Coverage B exclusions below as they would also preclude coverage.

#### a. *Quality Or Performance Of Goods – Failure to Conform to Statements*

In our case, the Policies specifically exclude coverage for personal and advertising injury "arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your 'advertisement'." (CG 00 01 10 01, p. 6.) At the very heart of the class plaintiffs claims are that Aurora's milk failed to conform with the statement that it is "organic." This exclusion applies precisely to these types of claims.

#### b. *Wrong Description of Prices*

The Policies specifically exclude injuries "arising out of the wrong description of the price of goods, products or services stated in your 'advertisement'." (Id.) Among the class plaintiffs' claims are that Aurora charged a higher (premium) price for its milk because of its "organic" status. Essentially, the plaintiffs allege that Aurora's description of the milk was wrong because the milk was not actually organic. Thus, the exclusion also takes such claims out of coverage.

Thus, even where there is advertising injury coverage, the Policies will exclude injury arising from the incorrect description of the merchandise or a mistake in the advertised price. See e.g., New Hampshire Ins. Co. v. Power-O-Peat, Inc., 907 F.2d 58 (8th Cir. 1990).

### CONCLUSION

Based on the foregoing, the Carriers will defend Aurora in the Mothershead Matter, subject to the reservation of rights and conditions set forth herein, and deny a defense of Aurora in the remaining Aurora Suits. The Carriers reserve the right to file a declaratory judgment action seeking a declaration that they have no duty to defend Aurora in any of the Aurora Suits. We reiterate our request that you provide us with any information you have that you believe may affect the determination concerning the coverage available under the Policies. Nothing contained in this letter should be deemed a waiver of the terms or conditions of

13

the Policies and the Carriers reserve the right to rely upon such terms and conditions or any other basis which may be found to limit or preclude coverage.

Sincerely,

*[signature]*

Randy Henry,
Rain and Hail L.L.C
Claims Manager
PH:   (515) 559-1406
FAX:  (800) 334-4009
randy.henry@rainhail.com

14